**MAPLEWOOD PARTNERS, L.P., Maplewood Management, L.P., and Maplewood Holdings, LLC, Plaintiffs,**

v.

**INDIAN HARBOR INSURANCE COMPANY, Defendant.**

No. 08–23343–CIV.

United States District Court, S.D. Florida.

July 16, 2013.

Maria Regina Caldera, Richard Hugh Lumpkin, Ver Ploeg & Lumpkin, Miami, FL, Jeffrey L. Schulman, John W. Schryber, Dickstein Shapiro, LLP, Washington, DC, for Plaintiffs.

Cathy A. Simon, Elizabeth Sarah Gere, Prashant K. Khetan, Steven W. McNutt, Troutman Sanders LLP, David M. Gische, Ross Dixon & Bell, Washington, DC, Christopher J. Maranges, Michael Jerome Higer, Higer Lichter & Givner LLP, Aventura, FL, for Defendant.

*ORDER DENYING PLAINTIFFS' MO-TION FOR RECONSIDERATION AND/OR CLARIFICATION AND RULING ON OTHER DISCOVERY DISPUTES RELATING TO CLAIMS OF ATTORNEY–CLIENT PRIVILEGE OR WORK–PRODUCT PROTECTION* [1]

WILLIAM M. HOEVELER, Senior District Judge.

THIS CAUSE comes before the Court on Plaintiffs' Motion for Reconsideration or, in

---

[1] A prior version of this Order was issued under seal on June 27, 2013, at ECF No. 293. The Court placed that Order under seal for a temporary period to permit the parties to comment on the inclusion of certain facts in that Order (facts which the parties had at times designated as "confidential" and at other times publicly dis-closed) prior to release of the Order for publication. After reviewing the parties' response to the Court's directive that the parties carefully review all of the items which they had filed under seal, the Court has unsealed the majority of documents which the parties previously had deemed

the Alternative, for Clarification of Order Overruling Plaintiffs' Objections to Order Granting Motion to Compel; Plaintiffs' Motion to Compel Production and Proper Responses to Requests for Admission; and Defendant's Motion to Compel Additional Testimony. The Court has engaged in a lengthy and comprehensive review of the parties' submissions, and pertinent portions of the record. Based on that review, the Court has determined that the Motion for Reconsideration and/or Clarification shall be DENIED, and the parties' motions to compel each shall be granted, in part, for the reasons stated below.

## I. INTRODUCTION

Plaintiffs Maple Wood Partners, L.P., Maple Wood Management, L.P., and Maple Wood Holdings, LLC, filed this action in December 2008 alleging breach of contract by Defendant Indian Harbor Insurance Company as to a financial and professional services indemnity policy. Plaintiffs were sued in three matters (the "Underlying Matters")[2] and timely sought coverage pursuant to the subject insurance policy which provided coverage for the costs of defense fees and judgment or settlement amounts incurred by an insured. Briefly stated, Plaintiffs' action before this Court alleges that Defendant failed to pay Plaintiffs' claims in full as to the Underlying Matters; specifically, Plaintiffs challenge Defendant's decision as to who was insured and what claims were covered, and the Defendant's method of applying the policy's retention amount to the covered claims.

Defendant argues that it has complied with the terms of the parties' insurance contract, and describes the parties' dispute as resulting from the Plaintiffs' unwillingness to provide sufficient information regarding an appropriate allocation of loss between what is covered under the policy (i.e., insured claims brought against an insured) and what is not covered (i.e., claims brought against an uninsured, or those claims brought against its insureds but which are not covered claims under the policy). Defendant also argues that Plaintiffs have not had to pay any of the amounts for which they seek reimbursement, as other entities or insurers already have made the payments. While Plaintiffs do not dispute that others have made the payments, Plaintiffs assert that they are obligated to repay any amounts already paid by others.[3] Plaintiffs also argue that they have cooperated adequately with the insurer, pursuant to the terms of the policy, such that there is no basis for a denial of coverage.

The parties' discovery disputes addressed in this Order each involve challenged claims of attorney-client privilege and work-product protections. Defendant has requested documents and communications between Plaintiffs and their agents or attorneys pertaining to the Underlying Matters, including assessments of potential liability and estimates of settlement values. Plaintiffs have objected to the production of more than 700 documents (including correspondence by letter or electronic-mail ("e-mail")) on the basis of attorney-client privilege or work-product immunity. Defendant responds that the materials must be provided, as the parties effectively were joint clients of the insured's attorney or at least had a common legal interest at the time such materials were made and, also, that the Plaintiffs' specific allegations of breach of the policy have waived any potential claims of privilege or immunity as to certain subject matters. Defendant

"confidential." The Court's Order issued today is a revised version of the Court's prior Order, and includes amendments necessitated by the parties' correction of the record as to those few facts which correctly are deemed to be confidential; the Order also includes a few minor modifications which were necessary in order to finalize this Order for publication none of which materially alter the Court's conclusions announced previously. Thus, the Court hereby VACATES its prior Order, entered June 27, 2013 (ECF No. 293, which remains under seal) and replaces it with this Order.

**2.** As discussed in further detail, below, two of the matters had been resolved before this suit was

filed, and the third matter was settled in September 2010.

**3.** As support for this assertion, Plaintiffs claim that any payments which they have received from Indian Harbor already have been tendered to others, and that they "are obligated on receipt of money from the Insurer, to reimburse Julio & Sons for all Defense Expenses and other Loss that Julio & Sons advances to or on behalf of the Policyholders in connection with the underlying claims and lawsuits that are at issue in this action." ECF No. 100, ¶ 24.

also requests permission to have Plaintiffs' counsel in the Underlying Matters sit for deposition again, in order to obtain answers to questions he previously refused to answer on the grounds of privilege. Finally, Plaintiffs seek Defendant's allegedly privileged or protected materials in its file created during the processing of Plaintiffs' claim.

While this case presents a relatively straightforward claim for breach of contract, the Court—in light of these discovery disputes involving important and heavily fact-dependent issues of attorney-client privilege and work-product protections—has provided an extensive summary of the relevant factual allegations.[4] The summary includes the insurance policy's provisions, the entities and individuals described in the complaint, the legal actions which resulted in the claims for coverage under the policy, and the communications between the parties prior to the filing of this lawsuit. This statement of the relevant background provides context for the Court's decision entered September 6, 2011 (overruling Plaintiffs' objections to the Magistrate Judge's Order overruling Plaintiffs' objections to Defendant's discovery requests), and for the Court's decision today, which, hopefully, will bring clarity to this long-pending matter.

## II. BACKGROUND

### A. The insurance policy

In November 2006, Indian Harbor sold a "Financial Services Liability Policy" to Maple Wood Partners, L.P., as the "Named Insured." ECF No. 1 ("Policy"), at 33.[5] The Policy includes sections providing coverage for Investment Advisers Management Liability, id., at 57–60 ("IAML"), Investment Advisers Professional Liability, id., at 61–65 ("IAPL"), and Investment Fund Management and Professional Liability, id., at 66–72 ("IFMPL"), and each coverage type has a separate maximum of $5,000,000 liability and a $250,000 "Retention," id., at 33–34. The period of coverage was from November 4, 2006, through November 4, 2008.[6]

The Policy is described as a "claims made policy." Policy, General Terms and Conditions ("GTC"). The terms of the Policy require the insured to provide notice of any claim as soon as practicable after it is first made, id., GTC, General Conditions, (C),[7] and requires the insured to "provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request," id., (I).

According to the Policy, the insurer was obligated to pay for "Defense Expenses" incurred in the defense of any "Claim" (as defined in the Policy to include civil proceedings in courts of law, or an arbitration)[8] brought against an "Insured." GTC, General Definitions, (B) and (C). The Policy qualifies the definition of "Defense Expenses" as "reasonable legal fees and expenses incurred in the defense of any Claim." Further, the Policy defines "Loss" as "damages, judg-

---

4. The operative pleading is Plaintiffs' second amended complaint, titled a "Supplemental Amended Complaint," filed on May 5, 2011, which includes 168 paragraphs of factual allegations. While the parties do not agree as to all of the relevant facts, as evidenced in their disagreements in their extensive statements of facts which accompany their competing motions for judgment (addressed in a separate order), there is no genuine dispute as to the material facts summarized herein to provide context for the Court's decision as to these discovery disputes.

5. The Policy also is attached to the current version of the complaint, at ECF No. 100, and to several other documents in the record. As a general rule, when multiple copies of a document appear in the record, the Court has cited to only one entry consistently (the most complete version of the document), regardless of whether that item is a sealed item. The Court has not published the content of any sealed items and

any citation thereto is simply to direct the parties to the most complete view of the particular document.

6. ECF No. 100, ¶¶ 54–55; ECF No. 153, ¶ 15 (Defendant's Statement of [undisputed] Material Facts in Support of its Motion for Summary Judgment).

7. Executive Liability Underwriters ("ELU") served as the Underwriting Manager for Indian Harbor Insurance Company as to this Policy (see Policy, General Terms and Conditions ("GTC")), and notices required under the Policy were to be provided to ELU (see GTC, General Conditions, (C)(3), and Policy, Declarations).

8. It is undisputed that the Underlying Matters, to the extent that they were claims filed by individuals or entities not insured by Indian Harbor, meet the definition, generally, of a "Claim."

ments, settlements or other amounts ... in excess of the Retention that the Insured is obligated to pay, and Defense Expenses, whether incurred by the Insurer or the Insured, in excess of the Retention." GTC, General Definitions, (G).[9] Thus, the Policy envisions that covered losses will be in one of two categories: 1) an insured's defense expenses and 2) the amount an insured is responsible to pay as a result of a judgment or settlement; both categories of loss are defined in the Policy to be only those amounts "in excess of" the Retention. *See also*, GTC, General Conditions, (A)(4).[10] The Policy expressly states that it is in excess of coverage under any other insurance. "All Loss payable under this Policy will be specifically excess of, and will not contribute with, any other Insurance.... This Policy will not be subject to the terms of any other insurance policy." *Id.*, (E).

The Policy provides that the insureds may not incur Defense Expenses "or admit any liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent...." GTC, General Conditions, (B)(2). Indian Harbor retains "the right to make investigations and conduct negotiations and, with the consent of the Insured, enter into such settlement of any Claim as the Insurer deems appropriate." *Id.*[11] Moreover, in a section titled "Assistance, Cooperation and Subrogation," the Policy provides that:

> The Insured agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in

any way prejudices the Insurer's potential or actual rights of recovery.

*Id.*, (I)(1). The insured also is required to "do everything necessary to secure [subrogation rights of the insurer], and will provide all other assistance and cooperation which the Insurer may reasonably require." *Id.*, (I)(2).[12]

In the event that an insured incurs a loss that is not within the definition of "Loss" in the Policy, e.g., a claim is made against the insured as to a matter not covered by the Policy or a claim is made against the insured along with allegations against others not insured by the Policy, the insurer is entitled to "allocate" the loss and pay only the portion considered to be a covered "Loss," pursuant to the terms of the Policy.

> If both Loss covered by this Policy and loss not covered by this Policy are incurred ... the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of Loss, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim by, the Insured and others.

GTC, General Conditions, (B)(4). When the insured and the insurer are unable to reach agreement as to how to allocate loss, the Policy provides that "the Insurer shall advance that portion of Loss which the Insured

---

9. Excluded from the definition of "Loss" are, *inter alia*, those matters which are "uninsurable under the law."

10. "With respect to a Claim under any Coverage Part ..., the Insurer shall only pay Loss which is in excess of the ... Retention applicable to each Claim under the applicable Coverage Part. If different Retentions are applicable to different parts of any Loss under this Policy, the applicable Retention will be applied separately to each part of such Loss, and the sum of such Retentions will not exceed the largest applicable Retention set forth in Item 4 of the Declarations." GTC, General Conditions (A)(4).

11. This provision does not apply if the insured is facing a relatively small amount of loss, i.e., 50% or less of the amount of the applicable retention, but even in such circumstance, the insured "must promptly advise the Insurer of any such settlement and provide any information in connection therewith that the Insurer may request." *Id.*, (B)(3).

12. As evidenced by the cooperation clause, cited above, Plaintiffs have a relationship with their chosen insurer, as memorialized in their voluntarily-entered-into insurance contract, which required them to cooperate with their insurer in the investigation and resolution of any claims under the Policy.

and the Insurer agree is not in dispute until a final amount is agreed upon or determined." *Id.*, (B)(5). The "allocation clause," GTC, General Conditions, (B)(4), is at the heart of the parties' coverage dispute, and is key to their dispute as to whether allegedly privileged or protected communications and materials can be discovered.

Plaintiffs describe themselves as "Policyholders" in the complaint, but the parties are not in agreement as to the identity of the insureds, i.e., there is a dispute as to which entities or individuals are entitled to coverage under the Policy. In order to evaluate the Plaintiffs' claims of privilege as to the withheld documents and evidence of communications, it is necessary to understand the identities of the alleged "insureds" and the scope of coverage provided in the Policy.

*B. The entities and individuals in this action, and their relevant relationships*

The complaint describes the following entities as Plaintiffs:

—Maple Wood Partners (a limited partnership providing financial advisory services to companies including Julio & Sons, Maple Wood Equity Partners, L.P. and Maplewood Equity Partners (Offshore) Ltd.), ECF No. 100, ¶ 5.

—Maple Wood Management (a limited partnership serving as the funds manager for Maple Wood Equity Partners, L.P., and Maple Wood Equity Partners (Offshore) Ltd.; a limited partner of Maple Wood Equity Partners, L.P.; a shareholder of Maple Wood Equity Partners (Offshore) Ltd.; and the managing member of Julio Investors, LLC), ECF No. 100, ¶ 6.

—Maple Wood Holdings (a limited liability company serving as the general partner in both MapleWood Partners and MapleWood Management; members of MapleWood Holdings during the relevant period of this case are Robert V. Glaser, Robert J. Rea-

le, Joseph DaGrosa, and Glen Dell—and each of these persons also is a limited partner of both MapleWood Partners and MapleWood Management), ECF No. 100, ¶¶ 7–10.

The complaint also lists the following as Relevant Nonparties:

—Maple Wood Equity Partners, L.P. (an equity investment fund, with MapleWood Management as its general partner)

—MapleWood Equity Partners (Offshore), Ltd. (an equity investment fund, with MapleWood Management as its shareholder and manager) [13]

—Julio & Sons Company (formerly known as Lucky Boy Corp.; sole shareholder of subsidiaries that operate the Uncle Julio's chain of Mexican restaurants) [14]

—Julio Investors, LLC (the majority owner of Julio & Sons; Julio Investors is owned by MapleWood Equity Partners and MapleWood Equity Partners (Offshore))

—Robert V. Glaser (managing member of MapleWood Holdings, limited partner of MapleWood Management and MapleWood Partners, and employee of MapleWood Partners at all relevant times; Director of Julio & Sons and Uncle Julio's since 2007; Chair of Executive Committee and Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings,[15] and Director of MapleWood Equity Partners (Offshore) at all relevant times)

—Robert J. Reale (member of MapleWood Holdings, limited partner of MapleWood Management and MapleWood Partners, and employee of MapleWood Partners at all relevant times; Director of Julio & Sons and Uncle Julio's from 2001 to 2005; served on Executive Committee and Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings at all relevant times)

---

**13.** Both of these MapleWood Equity Partners entities are identified in Endorsement No. 4 of the Policy as Investment Funds. ECF No. 1, at 48.

**14.** Plaintiffs allege that Julio & Sons Company is a "Portfolio Entity" pursuant to the Policy, ECF No. 100, ¶ 22, and that Uncle Julio's is a "Portfolio Company" (or "Outside Entity") pursuant to the Policy, ECF No. 100, ¶¶ 94, 101.

**15.** Plaintiffs' counsel in this case has described the Executive and Investment Committees as operating "for" MapleWood Holdings, MapleWood Management, and MapleWood Partners, and that the Committees "were to operate a concept, the MapleWood Group, which is not a legal entity." ECF No. 39–7 (June 24, 2010, letter Lumpkin to McNutt).

—Joseph DaGrosa (member of Maple-Wood Holdings, limited partner of Maple-Wood Management and MapleWood Partners at all relevant times; employee of MapleWood Partners, and served on Executive Committee and Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings at least some part of the time relevant to this action)

—Glen Dell (member of MapleWood Holdings, limited partner of MapleWood Management and MapleWood Partners at all times relevant to this lawsuit; served on the Executive Committee and Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings through 2001)

—Lt. Gen. Burton C. Glosson (Director of Julio & Sons and Uncle Julio's since 2004, and "indirect limited partner" in MapleWood Equity Partners at all relevant times)

—Rick Levitt (Director of Julio & Sons and Uncle Julio's since 2001, employee of MapleWood Partners from 2002–2007)

—Bill Tillett (Director of Julio & Sons and Uncle Julio's since 2001, employee of MapleWood Partners until 2002, member of MapleWood Holdings and limited partner of MapleWood Management and MapleWood Partners through 2001; and served on Executive Committee and Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings through 2001)

—Greg Morris (chief financial officer of Julio & Sons, 2003–2006; served on Investment Committee of MapleWood Partners, MapleWood Management, and MapleWood Holdings through 2003, former employee of MapleWood Partners)

—Abdo Shashy (President of Julio & Sons, 1997–2006, Director of Uncle Julio's)

—Gerald Green (Vice President of Julio & Sons, 1997–2006)

ECF No. 100, ¶¶ 13–51.

### 1. The individuals behind the MapleWood entities

The evidence before the Court reveals that MapleWood Partners had a small number of employees who carried out the firm's function of providing financial services, while MapleWood Management (a manager of funds), and MapleWood Holdings (general partner of the other two MapleWood entities appearing here as Plaintiffs) never had employees. ECF Nos. 168–2, 168–3, Transcript of Deposition Testimony of Robert V. Glaser, May 17, 2011 ("Glaser Dep. Maple Wood"), at 17.[16] Since 2003 or 2004, the entities had been represented by attorney Brian Miller, of the Miami office of the Akerman Senterfitt, LLP, law firm.[17] It is clear from the record that the three Plaintiff entities had one individual in common as their primary contact for purposes of communication with counsel: Glaser, who served as Chair of the Plaintiffs' Executive and Investment Committees, and also was an employee of MapleWood Partners.[18]

---

**16.** The Court's description of the MapleWood corporate relationships is derived from relevant deposition testimony, the Plaintiffs' pleading, and the "MapleWood Corporate Structure Diagram," (ECF No. 153–1). (The Diagram may reveal an inconsistency: according to the Supplemental Amended Complaint, filed in May 2011, Dell was "at all times relevant to this lawsuit, a member of Holdings and a limited partner of Management and Partners," ECF No. 100, ¶ 37; the Diagram, however, dated September 2009, describes Dell as a *former* member of MapleWood Holdings (and a former employee of MapleWood Partners).)

**17.** ECF Nos. 221–1, 221–2, Transcript of Deposition Testimony of Brian Miller, June 23, 2011 ("Miller Dep."), at 13. The Court has referenced the version of the Miller deposition transcript which was filed on September 19, 2011, at ECF No. 221. Although the full transcript was submitted after entry of this Court's Order on Sep-

tember 6, 2011, none of the testimony is "new evidence" which might support reconsideration of this Court's Order, as the parties had deposed Miller in June 2011 and, presumably, had access to the transcript soon thereafter (and had filed excerpts of this transcript previously, *see, e.g.,* ECF Nos. 132–3, 139, 142–1, 144, 153–7, 171–12). Indeed, as a general statement, to the extent that the Court has referenced any evidence which was not before the Court at the time of the September 2011 decision, the Court is not relying on such evidence for its ruling today, nor is this statement an indication that there exists any "new evidence."

**18.** Miller described Glaser as not only the primary contact for MapleWood Partners but, also, as Glaser was the managing member of MapleWood Holdings and that entity was the general partner of MapleWood Management, Miller would speak to Glaser as the representative of

Other employees of MapleWood Partners included: Levitt (until 2007), Tillett (until March 2002), Morris, Reale, Dagrosa and Dell. ECF No. 153–1.[19] In September 2011, the MapleWood current and former employees noted above (Glaser, Levitt, Tillett, Morris, Reale, Dagrosa and Dell), along with Glosson,[20] were granted leave to intervene in this action for the limited purpose of asserting objections to this Court's Order on discovery of information as to which these Intervenors now claimed a privilege.[21] These men asserted that they each had been "representatives of Plaintiffs" and had "participated in decisions concerning Plaintiffs, litigation strategy, settlement strategies and actions taken concerning insurance coverage." ECF No. 214 (Emergency Motion for Leave to Intervene, filed by Plaintiffs' counsel on behalf of the Intervenors). Intervenors described Glaser and Reale "as the *de facto* management committee [for the MapleWood entities, i.e., Plaintiffs in this case]," and noted that Reale "has appeared at depositions as a representative of the client group as a whole." ECF No. 214. At depo-

sitions in this case, Glaser testified as the corporate representative, pursuant to Fed. R.Civ.P. 30(b)(6), for all three of the Plaintiff Maple Wood entities, Glaser Dep. MapleWood.[22]

### 2. MapleWood Partners and Julio & Sons are related entities

According to the pleadings, MapleWood Partners provides advisory services to Julio & Sons Company, pursuant to "contracts, and in exchange for a fee." ECF No. 100, ¶ 21. MapleWood entities, including Plaintiffs in this action, also were the owners and managers of Julio & Sons.[23]

A review of the record reveals that, at least at the time this action was filed, Julio & Sons Company—whose majority shareholder was Julio Investors—was the sole owner of Uncle Julio's Corporation.[24] Julio Investors had been created in December 2001[25] by MapleWood entities for the purpose of the acquisition of Uncle Julio's Corporation.[26] Julio Investors—which has no employees—acted only through MapleWood Management, the managing member of Julio Investors, and action by MapleWood Management required the signature of its general partner, MapleWood Holdings.[27] Therefore, Glaser not

MapleWood Management in order to "get authorization" on behalf of both those entities. Miller Dep., at 94–95. (Glaser held more than 50% of the ownership interest, and voting rights, in both MapleWood Holdings and MapleWood Management. Glaser Dep. MapleWood, at 17, 22.)

19. According to an attorney for Plaintiffs in the present action, "Levitt, Tillet, Morris, and Reale ... [were or are MapleWood employees and each] performed investment advisory or management positions." ECF No. 40–11 (April 11, 2008, letter Lumpkin to Simon).

20. Glosson was Chairman of Uncle Julio's Corporation, ECF No. 174–2 at 32 (Nov 1, 2006, letter Glosson to Shashy).

21. Intervenors asserted that they had been provided "legal advice and counsel on business and individual matters" for many years by Akerman Senterfitt and that the firm has represented these Intervenors "as representatives of Plaintiffs." ECF No. 214. Intervention was not sought as to Dagrosa.

22. During his testimony, Glaser referred to the MapleWood entities collectively as a "group of companies." *Id.*, at 24. "[R]ather than calling it a corporate entity, why don't we use a concept called the MapleWood group of companies." *Id.*

23. Intervenors describe Uncle Julio's (Julio & Sons Company) as an entity "indirectly owned and managed by Plaintiffs." ECF No. 214.

24. According to the MapleWood Corporate Structure Diagram and other record evidence, Julio & Sons had a majority shareholder, Julio Investors, whose Managing Member was MapleWood Management. ECF No. 153–1.

25. Uncle Julio's Corporation had been acquired in December 2001 by MapleWood entities, ECF No. 40–14 (Jan. 28, 2009, letter from Simon to Florida Department of Financial Services, describing relationships of entities; this letter was written in response to a Civil Remedy Notice of Insurer Violation filed with the State of Florida by MapleWood Partners (and other related entities and individuals) alleging that Indian Harbor had misrepresented coverage purchased and had failed to pay alleged loss under the Policy).

26. According to Glaser, "[i]n private equity transactions it is typical for private equity funds, such as MapleWood Equity Partners, LLP, and MapleWood Equity Partners Offshore limited, to create an investment holding company, the purpose of which is to own the stock of the operating entities that they are acquiring. So [t]hose two entities through their lawyers created Julio's [sic] Investors, LLC." Glaser Dep. MapleWood, at 97.

27. "Any action taken by Julio's [sic] Investors would have been [executed through a document

only was the primary contact for all three of the Plaintiffs, but also, as managing member of MapleWood Holdings, was the voice of Julio Investors.

As noted above, Glaser testified at a deposition in this case as the Plaintiffs' representative; he also testified in a separate deposition as the corporate representative for Julio & Sons Company, ECF Nos. 153–3, 210–9, 241 (Transcript of Deposition Testimony of Robert V. Glaser, June 15, 2011, excerpts only) ("Glaser Dep. Julio's").[28] Glaser was a Director of Julio & Sons as of February 2007; other Directors of Julio & Sons (and Uncle Julio's Corporation [29]) during relevant times included: Glosson,[30] Reale,[31] Morris,[32] Levitt and Tillett,[33] in addition to Todd Conger.[34] Glosson also served as a limited partner in MapleWood Equity Partners, the owner, along with MapleWood Equity Partners (Offshore), of Julio Investors, which was the majority shareholder of Julio & Sons, ECF No. 100, ¶¶ 28, 39; thus, arguably, Glosson also represented the interests of Julio Investors.

Plaintiffs' provision of advisory services to Julio & Sons included an agreement as to indemnification and, consistent with that agreement, Julio & Sons advanced all de-

fense expenses incurred by MapleWood Partners in defense of the Underlying Matters. *Id.*, ¶ 23.[35] That agreement is found in the Advisory Agreement which MapleWood Partners entered into with Uncle Julio's Corporation on December 17, 2001, ECF No. 171–2. The 2001 Agreement provides that Uncle Julio's would indemnify MapleWood Partners from any claims relating to its association with Uncle Julio's.[36] On September 23, 2008 (after all of the Underlying Matters had been filed against MapleWood), MapleWood Partners entered into a superseding Advisory Agreement with Uncle Julio's Corporation; Julio & Sons was also a party to the agreement. ECF No. 171–4. According to the 2008 Agreement, MapleWood was to be indemnified by Uncle Julio's and Julio & Sons, jointly and severally.[37] Both agreements contained an exception to the indemnity provision in the event of bad faith or gross negligence by MapleWood.

The record before the Court includes an "Assignment and Assumption Agreement" which purports to assign to Julio Investors certain amounts which MapleWood entities might receive from Indian Harbor, signed by Glaser on September 12, 2011, on behalf of

being] signed by MapleWood Management, which would have acted through MapleWood Holdings, its general partner." Glaser Dep. MapleWood at 98–99.

28. Glaser, as the managing member of MapleWood Holdings (which was the general partner of MapleWood Management, which was the Managing Member of Julio Investors), represented the majority shareholder (Julio Investors) of Julio & Sons. When he was deposed, Glaser appeared to describe Julio Investors as among the "MapleWood group of companies." Glaser Dep. MapleWood, at 121–22. He refused to answer directly whether Julio Investors or Julio & Sons was a member of the "MapleWood group of companies," but acknowledged that he "would probably consider Julio's to be an entity that companies within the MapleWood group of companies have a majority shareholder stake in." *Id.*, at 123–24.

29. Uncle Julio's Corporation, which is wholly owned by Julio & Sons, has the same Directors as Julio & Sons. ECF No. 153–1.

30. Director of Julio & Sons since April 2004. ECF No. 153–1.

31. Director from Dec. 2001 to May 2005, and again from March 31, 2009, to the present. ECF Nos. 153–1, 153–6.

32. Director and formerly CFO from Dec. 2003 to Aug. 2006. ECF No. 153–1.

33. Levitt and Tillett were Directors since Dec. 2001. ECF No. 153–1.

34. Conger is described as "presently serving" as a Director, ECF No. 153–1.

35. Although these allegations (of indemnification by, and a reimbursement obligation to, Julio & Sons) were not in the original complaint, they were added to the Amended Complaint, ECF No. 21, ¶¶ 23–24, filed in May 2009–prior to the Defendant's demand for the discovery which is the subject of the Order as to which Plaintiffs seek reconsideration.

36. The 2001 Agreement was signed by Glaser (for MapleWood) and Shashy (for Uncle Julio's). ECF No. 171–2.

37. The 2008 Agreement was signed by Glaser (for MapleWood Partners) and Glosson (for Uncle Julio's and for Julio & Sons). ECF No. 171–4.

*all* parties to the Agreement.[38] In Glaser's own words: "Well, there were times, I guess, I had multiple roles. So when I sat there listening [in meetings], I wasn't able to differentiate whether I was listening for Julio or for MapleWood at times. But if any formal decisions were taken, they were taken in a formal capacity role." Glaser Dep. Julio's, ECF No. 153–3, at 29.[39] When communicating by e-mail, which appears to be the primary method by which Glaser communicated with attorneys for the "MapleWood group of companies," Glaser only sent e-mails from MapleWood Partners. "That's my e-mail account for I am an employee." *Id.*, at 127.

The Court has determined that there is no relevant difference between the Plaintiffs and Julio Investors (or the company as to which it was majority shareholder, Julio & Sons) for the purposes of addressing the discovery disputes at issue. Plaintiffs' proffered evidence reveals that the same individuals controlled these entities, and Plaintiffs themselves have described Julio Investors and Julio & Sons as insureds under the subject Policy and—at least implicitly—seek coverage on behalf of all of these entities. Thus, the Court finds that Glaser and all of the Intervenors were representatives of the entities, and the interests of these entities were identical or aligned as to any matter relevant to this discovery dispute.

## C. The Underlying Matters

In 2007, two different lawsuits were filed against certain MapleWood entities and their officers or directors, alleging negligent misrepresentation and breach of fiduciary duties relating to the provision of financial advisory services to Julio & Sons. In 2008, another action was filed against the defendants, alleging damages related to the expiration of stock options as to Julio & Sons.

The MapleWood entities and individuals were represented in these matters [40] by Miller, serving as the lead attorney,[41] and other members of his firm,[42] and by Gary Kessler and Brad D'Amico of the law firm Kessler Collins (the firm is in Dallas, Texas).[43] Julio & Sons was included in certain of these actions, and was represented by Michael Adams (and other attorneys at the firm Parker Poe Adams & Bernstein firm),[44] and

---

**38.** *See* ECF No. 268–1 (redacted copy of Assignment and Assumption Agreement). In other words, Glaser signed for each party to the Agreement: MapleWood Partners (as the "Managing Member" of MapleWood Holdings), MapleWood Management (as the "Managing Member" of MapleWood Holdings), MapleWood Holdings (as its "Managing Member"), and Julio Investors (as "Managing Member" of MapleWood Holdings, the general partner of Julio Investors, and also as "MapleWood Management" as the "managing member" of Julio Investors).

**39.** According to Glaser:
> Well, to the outside world if the outside world wanted to speak with somebody they couldn't place a phone call to MapleWood Holdings or MapleWood Management or MapleWood Partners. They couldn't place a phone call [to] MapleWood Equity Partners, LP. They couldn't place a phone call to MapleWood Equity Partners Offshore Limited. They couldn't place a phone call to Julio's [sic] Investors. They couldn't place a phone call to Julio's [sic] & Sons, and they couldn't place a phone call to Uncle Julio's Corporation. They could place a phone call to an individual who somehow is connected with that term I used before, 'the Maple Wood Group.'

Glaser Dep. MapleWood, at 104. Although the Court has a sufficient understanding of the Plaintiffs' roles and the role of any other relevant entities or individuals in order to enter today's ruling, the Court remarks that the MapleWood corporate relationships may be somewhat confusing to a casual observer. Such potential for confusion, however, does not relieve an insurer from responsibility for the insurance contract into which it entered, particularly when "comprehensive information detailing the Policyholders' ownership and structure" was submitted to the Defendant before the Policy was issued. ECF No. 100, ¶ 53.

**40.** The Court includes the information as to the identity of counsel as it is relevant to the Court's determination as to the Plaintiffs' claims of privilege and immunity as to the withheld documents at issue in the discovery dispute.

**41.** Miller Dep., at p. 18.

**42.** Miller and his firm also had "extensive experience representing these individuals and Mr. Glaser in other litigation .... [and] represented MapleWood entities in the investments into Julio and Sons [sic] and Tia's Restaurant and other related issues that underpin the [RRGC action]." ECF No. 40–10.

**43.** ECF No. 151–1, at 16–37 (Answer and Counterclaim in RRGC Action).

**44.** Miller Dep., at 88, 291; Glaser Dep. MapleWood, at 205–06.

Joseph Cox (of the firm Hughes & Luce LLP and then at Patton Boggs).[45] Miller described that these entities and attorneys coordinated a joint defense, and were members of a "joint defense" group, i.e., the group included the MapleWood entities, the Julio entities, the Intervenors, and all of the counsel noted above. Miller Dep., at 92, 169, 291, 309, 327. Miller testified that he "determined that [his law firm] could represent [all of the defendants, including officers and directors of Julio & Sons, as to certain of the Underlying Matters] on a joint basis without having a conflict of interest," but that his law firm was not asked to represent Julio & Sons. *Id.*, at 30–32, 36.[46] Miller testified that there was no written joint defense agreement, but "[w]e did what we could to try to keep costs down and assigned projects to different people to be responsible for certain areas rather than duplicate effort." *Id.*, at 290–91.[47]

### 1. The RRGC action

Retail and Restaurant Growth Capital, L.P. ("RRGC"),[48] filed a lawsuit in state court in Texas in February 2007, against MapleWood Partners, MapleWood Management, MapleWood Holdings, Julio & Sons, and Glaser (the "RRGC Action"). Briefly, RRGC, a small business investment company, had invested in Julio & Sons (sole shareholder of subsidiaries operating the Uncle Julio's chain of Mexican restaurants) through a note purchase agreement and warrant agreement, giving RRGC the right to purchase shares in Julio & Sons. RRGC alleged that the defendants, who invested in Uncle Julio's at the same time as RRGC and began operating the company, gave bad advice to Uncle Julio's thereby causing $10 million in economic damages and $20.75 million in punitive damages.[49] A Second Amended Petition was filed in March 2008. According to the Second Amended Petition, Glaser "through a web of entities, controls Uncle Julio's," and he "was the master-mind of a scheme and artifice that was designed to hide the movement of funds without RRGC's knowledge." ECF No. 151–1, at 4, 7.[50] Glaser ultimately was dismissed from the RRGC Action on

45. Miller Dep., at 103, 210; Glaser Dep. Maple-Wood, at 206.

46. A client can waive a conflict of interest upon informed consent, *see, e.g., Gen. Cigar Holdings v. Altadis*, 144 F.Supp.2d 1334, 1338–39 (S.D.Fla. 2001), but there is no evidence of any such waiver, nor any need for such waiver, in this record. The privilege log provided by Plaintiffs indicates that a letter was sent from Miller in late September 2007 to Glaser, Glosson, Reale, Levitt, MapleWood Partners and Julio Investors regarding "joint representation." ECF No. 39–11, Bates 16839–41.

47. Miller's testimony as to the attempt to "keep costs down" was directed specifically to the first of the Underlying Matters, discussed *infra*, but the joint defense arrangement appeared to apply to all three of the Underlying Matters.

48. Retail and Restaurant Growth Capital ("RRGC") was represented by attorneys Lawrence J. Friedman, Michael L. Gaubert, Ernest Leonard and R. Brian Shields (and other attorneys from the law firm of Friedman & Feiger, LLP, in Dallas, Texas), ECF No. 151–1, at 2–15 (Second Amended Petition, RRGC action). Miller testified at deposition that Leonard and Friedman represented RRGC during settlement discussions, and that Cox represented Julio & Sons. Miller Dep., at 209–10.

49. The allegations of bad advice related to defendants' (the MapleWood entities and Julio & Sons (doing business as Uncle Julio's)) decision to have Uncle Julio's guarantee leases as part of the Julio Investors' acquisition of Tia's, a Mexican restaurant, in 2003; the allegations are that funds then were taken (improperly) from Uncle Julio's to provide support to Tia's. ECF No. 100, ¶¶ 116–127. In the RRGC action, the plaintiffs alleged that the defendants "structured extravagant corporate partnerships" in order to conceal information from RRGC relating to the Tia's transaction. ECF No. 151–1, at 2–3. According to the allegations, defendants "funneled nearly $10 million"—without the approval of RRGC, a warrant holder—to the failing Tia's chain of restaurants which ultimately went bankrupt. By diverting these funds and guaranteeing these leases as to the doomed restaurants (the leases had to be satisfied by Uncle Julio's), RRGC alleged that defendants had hindered the ability of Uncle Julio's to expand its operations and, consequently, caused economic damages to RRGC, an investor.

50. "RRGC asserted that "[t]his lawsuit is about a transaction where business partners—cloaked as friends and fiduciaries—misled and deceived [RRGC] to its detriment." ECF No. 151–1, at 2. According to the defendants in the RRGC action, RRGC had "approached the MapleWood entities to recommend the acquisition of Julio & Son's" and "eagerly offered to provide financing" for the acquisition. ECF No. 151–1 at 24.

August 25, 2008, for jurisdictional reasons. ECF No. 100, ¶ 128.

The defendants (acting as a joint defense group, as noted above) responded to the complaint, asserting, *inter alia,* that the claims were barred by waiver and a release executed by RRGC, that no fiduciary duty was owed to RRGC,[51] and that RRGC had breached a covenant not to sue. ECF No. 151–1, at 17–19, 27. They also filed a counterclaim alleging that RRGC breached a contract between RRGC and Julio & Sons (as to which defendants were intended third-party beneficiaries), that RRGC's partners (Mark L. Masinter and Joseph L. Harberg) and others breached their fiduciary duty to defendants by encouraging defendants to acquire Tia's restaurants, and that RRGC had conspired in an attempt to convince defendants to Purchase the Tia's restaurants for more than they were worth. ECF No. 151–1, at 20, 25–27, 32, 35–36.

During the pendency of the RRGC litigation, Miller communicated regularly with Indian Harbor, through the insurer's counsel.[52] Miller provided assessments of liability, litigation updates, and settlement estimates—all pursuant to and consistent with the Policy's cooperation clause. Miller also prepared a litigation budget[53] and a "Pre-trial Report" for Defendant, who paid for the preparation of the Report, which included an assessment of the financial and legal risks of the litigation. *See* ECF No. 40, at 17 (Plaintiffs' Opposition to Defendant's Motion to Compel).[54]

Miller testified that he expressed to Indian Harbor that "if liability was found, that it was joint and several liability and that the MapleWood parties were much more likely to be … liable for the amount because of the facts that I already explained." Miller Dep., at 194, 199–200.[55] According to Defendant's employee responsible for making the determination as to coverage of Plaintiffs' claim:[56]

> in speaking with defense counsel prior to the settlement, he separated the warrant repurchase and damages separately. The warrant repurchase is a noncovered claim. He valued the amount of potential damages against MapleWood and Julios at a million dollars.

ECF No. 89–4, Transcript of Deposition of Rebecca Pidlak, April 14, 2011 (Pidlak Dep.) at 145.[57] Pidlak also recalled that "Miller indicated that the most he could recommend that we settle the damages component [as compared to the warrant buyback] of the RRGC matter was with $1 million." Pidlak Dep., at 290.

As the trial date approached in the RRGC action, settlement discussions advanced. The defendants addressed settlement as a unified group, and there is no evidence in the record

---

**51.** Defendants asserted that the purchase of Tia's restaurants was made by Julio Investors, and not by Julio & Sons Company and, therefore, no consent of RRGC allegedly was required.

**52.** Indian Harbor retained "coverage" or "monitoring" counsel shortly after the RRGC lawsuit was filed against the MapleWood entities, Pidlak Dep., at 43, and almost all of the relevant communications from Indian Harbor were made through its counsel, Cathy A. Simon, Pamela L. Wahl and Steven McNutt (and other attorneys with the Troutman Sanders firm and formerly with the Ross, Dixon & Bell firm).

**53.** Miller provided Defendant with a detailed trial budget for the RRGC litigation. ECF No. 39–2 (Sept. 11, 2009, letter Miller to McNutt—filed under seal).

**54.** The Pre-trial Report (ECF No. 39–1, filed under seal) was sent to Defendant's counsel in this coverage case on February 9, 2010, i.e., while the parties were actively litigating the question of coverage. At approximately the same time he was preparing that Report, Miller wrote that he was "always happy to speak with [insurer's counsel] to answer any questions you may have [regarding potential liability and damages/value of the RRGC action]." ECF No. 40–15 (Jan. 17, 2010, e-mail from Miller to McNutt).

**55.** Miller apparently was referencing his testimony, *see* Miller Dep., at 195, 198, that there was an e-mail sent from Glaser in October 2003 to other individuals at MapleWood Partners and at Julio & Sons, and that e-mail was the principal document relied on by RRGC to support its fraud claims.

**56.** Rebecca Pidlak was deposed as Defendant's Fed.R.Civ.P. 30(b)(6) witness and claims handler for the MapleWood claims. ECF No. 89–4 (Pidlak Dep.). She testified that she was the "decision-maker" at Indian Harbor who decided what was owed under the Policy, after consulting with counsel. *Id.,* at 37. Another copy of the deposition, with different pagination, was filed at ECF Nos. 83, 84.

**57.** The Court denies Plaintiffs' counsel's request to strike, as nonresponsive, this statement.

before the Court that the defendants discussed an allocation of responsibility among themselves for any payments which might be made to RRGC. Miller testified that he never discussed with anyone the settlement value of the claims asserted against the Maple-Wood entities separate from the claims against Julio & Sons, as RRGC had alleged joint and several liability against the defendants. Miller Dep., at 189.[58]

Miller sent a draft settlement agreement to Glaser and Reale, as representatives of MapleWood Partners, MapleWood Management, and MapleWood Holdings. Miller Dep., at 282. Intervenors Glosson, Levitt and Tillett also reported that they "participated in phone conferences and meetings discussing defense and joint defense issues in relation to RRGC [in which they were not named individually as parties], and were consulted from time to time, especially on matters of settlement" by Glaser and Reale "who acted as the *de facto* management committee [for the MapleWood entities]." ECF No. 214. According to Miller, the board of directors of Julio & Sons "was involved" but did not participate in the discussions with RRGC. Miller Dep., at 206–207. (Miller testified that he participated in telephone calls with the board of Julio & Sons, upon the request of either Glaser or Glosson. *Id.*)[59] Glaser has testified that there were no discussions between representatives of Julio & Sons and representatives of any of the MapleWood entities about allocation of liability between them for any settlement of the RRGC action. Glaser Dep. Julio's, ECF No. 153–3, at 29–30.[60]

An attorney for RRGC has testified that RRGC did not negotiate separately with Julio & Sons as compared to the MapleWood entities. "Cox was the point man pretty much for the entire group. And he was the lawyer just for Uncle Julio's. But it was always a global settlement for all defendants .... [and all claims were settled]." ECF No. 153–7, Transcript of Deposition Testimony of Ernest Leonard, May 31, 2011 ("Leonard Dep.")—excerpts only, at 31. After being shown a copy of an e-mail dated August 18, 2010, which purportedly [61] says "Brian, to follow up on our conversation," Leonard admitted that he also may have had a conversation with Miller at the time of the settlement discussions. Leonard Dep., at 32–33.

Defendant was included in the RRGC settlement discussions. Michael Huber (of the law firm Ver Ploeg & Lumpkin, which represents Plaintiffs before this Court) [62] provided

---

**58.** As further support for the interpretation that the interests of the Plaintiffs (the three Maple-Wood entities) and Julio & Sons are aligned for the purposes of the Court's decision today, the Court notes that a proposed findings of fact and conclusions of law was submitted jointly by the defendants in the RRGC action, with no division of interest among the defendant MapleWood entities and Julio & Sons and Glaser, Miller Dep., at 288–92, i.e., these parties appeared to have no conflict as to their interests as to any of the issues in that litigation. Thus, although Miller may have expressed that the MapleWood parties were "much more likely" to be liable for the amount of any award, even if entered jointly and severally against the defendants, there was no conflict identified among these entities.

**59.** Miller also testified that he was told by someone at MapleWood Partners to send his invoices for attorneys' fees and defense expenses not only to MapleWood Partners and its insurer, Indian Harbor, but also to Julio & Sons. Miller Dep., at 18–20.

**60.** Glaser testified that "[t]he settlement of the RRGC action imposed joint and several obligations on the Julio's entities and the Maple-Wood entities, and I don't believe that there was any discussion of any allocation." Glaser Dep.

Julio's, at 30. Glaser testified that he "probably would have been involved [if there had been conversations between Julio & Sons and the MapleWood entities].... " *Id.*, at 96–97. The Court observes that this reported lack of discussion suggests either a cavalier approach as to who would provide the funds for a potentially multi-million dollar liability among these entities, or— more probably—that the entities were representing essentially the same financial interests (perhaps all controlled by Glaser) so there was no need to apportion responsibility among themselves. The latter view provides further support for the Court's determination, for the purposes of its ruling today, that there is no material difference between the Plaintiffs and Julio & Sons.

**61.** The Court did not locate this document in the record before the Court, but did find another e-mail, dated August 24, 2010, from Leonard to Cox (with a copy to Miller), transmitting RRGC's settlement offer. ECF No. 144–2.

**62.** Richard Hugh Lumpkin and Maria Regina Caldera (and other attorneys of the Ver Ploeg & Lumpkin firm) also represent Plaintiffs in this case, along with lawyers from the firm of Dickstein Shapiro (John W. Schryber and Jeffrey L. Schulman).

Indian Harbor with the RRGC settlement proposal (which had been received by Miller and then provided to Huber). ECF No. 144–2 (Aug. 24, 2010, e-mail Huber to McNutt). Counsel for Indian Harbor responded that "last week we had a call with Brian Miller. Hugh Lumpkin [of Ver Ploeg & Lumpkin] participated in the call. Brian told us that after the MapleWood Entities received an updated demand they would have a meeting to decide how they wanted to respond to the offer." ECF No. 144–2.[63] Several days later, counsel for Indian Harbor wrote to Huber and Lumpkin:

> to confirm our discussions concerning RRGC's settlement offer.... As we discussed, Indian Harbor previously agreed to contribute $125,000 toward a settlement up to [$1 million] for the potential liability damages .... premised on MapleWood's defense counsel's [Miller's] assessment of a reasonable settlement value of [$1 million] for potential liability.... As we confirmed to you earlier, subject to the terms of this agreement [which was to be without prejudice to any positions previously taken],

Indian Harbor agrees to contribute $250,000 toward the settlement.

ECF No. 204–3 (Aug. 27, 2010, e-mail Gere to Huber).[64]

The RRGC action finally settled on September 3, 2010, for $2,750,000. Of the total settlement amount, Julio & Sons paid $1,750,000, and Indian Harbor paid $250,000.[65] Another insurer (Travelers Casualty and Surety Company of America ("Travelers")) paid the balance of $750,000 toward the settlement; Travelers made that payment on behalf of its insured, Julio & Sons, and also on behalf of Glaser. ECF No. 156–1 (Oct. 11, 2010, letter Gere to Cox). Julio & Sons and Travelers also made all of the payments for defense expenses. Glaser described that all of the defense fees billed by Akerman Senterfitt or Kessler Collins prior to the date Glaser was dismissed from the RRGC action (August 25, 2008) were assumed to relate to Glaser, and Julio & Sons had demanded coverage from Travelers for those invoices (and subsequently settled its claim with Travelers). Glaser Dep. MapleWood, at 233.[66] Glaser has testified that

63. Huber wrote to counsel for Defendant: "Based on your correspondence and our telephone conferences, MapleWood understands that Indian Harbor consents to this settlement." ECF No. 174–18, Aug. 31–Sept. 3, 2010, e-mail communications Huber to McNutt (including proposed settlement agreement in RRGC matter, RRGC's proposed revisions thereto, and the final version of the agreement). At the time that the RRGC case was settling, the parties already were adversaries before this Court. Despite their status as adversaries before this Court, it appears that there was some effort by some attorneys on each side to comply with the terms of the Policy, including its cooperation clause, as to the RRGC settlement.

64. Defendant's e-mail was sent the day after receipt of a letter from Lumpkin demanding "What more can MapleWood do to instill a sense of urgency in Indian Harbor? With settlement of the RRGC claim at stake less than a week before trial this is not the time for continued posturing and foot-dragging by the insurance company." ECF No. 218–1 (Aug. 26, 2010, letter Lumpkin to McNutt).

65. Pidlak has testified that:
> We were only asked to pay $250,000, which is exactly what we did.... So taking into consideration a 25 percent allocation [of the damages estimated by Miller to be $1 million], it makes sense that it was requested of Indian Harbor, and we did, in fact, pay what you asked us to.

Pidlak Dep. at 145. The Court denies Plaintiffs' counsel's request to strike this statement.

66. According to Plaintiffs' counsel, as of August 12, 2010, a total of $1,915,526.95, had been paid by Travelers to Julio & Sons for its litigation expenses in the RRGC action, at least part of which represented expenses incurred by Julio & Sons in defending Glaser, personally, as a director of Julio & Sons. ECF No. 39–10 (Aug. 12, 2010, letter Huber to McNutt). Defendant has provided evidence from Travelers indicating that its insured, Julio Investors (and its "subsidiary" Julio & Sons), submitted defense invoices from Akerman Senterfitt and Kessler Collins totaling "in excess of $1.1 million but then withdrew its demand for payment of invoices for time after Robert Glaser was dismissed from the RRGC Action," and only pursued reimbursement for $850,000 for those invoices—which amount was paid by Travelers. ECF No. 204–12 (Sept. 8, 2011, Declaration of Kelly Kihlmire–Caudill). Defense counsel has provided a declaration that those same defense invoices (from Akerman Senterfitt and Kessler Collins) submitted to Travelers also were submitted to Indian Harbor. ECF No. 204–13 (Sept. 8, 2011, Declaration of Steven W. McNutt). Travelers also was asked to, and did, pay additional defense expenses as to Parker Poe Adams & Bernstein and Patton Boggs, the two firms which represented Julio & Sons. ECF No. 204–12.

he believed that the insurance policy issued to Julio & Sons by Travelers covered him as to the RRGC action, Glaser Dep. Maple-Wood, at 131, and he admitted that he knew that Travelers was obligated, by a court order, to pay Glaser's defense costs in that action, id., at 228–30.[67]

The MapleWood entities (and Glaser) paid nothing as to either defense expenses or the settlement of the RRGC action, pursuant to those parties' indemnification agreement.[68] Although they did not make any payments for defense expenses directly, Plaintiffs claim that they incurred a total of $1,710,000 in defense fees for the RRGC action. Glaser Dep. MapleWood, at 58.

### 2. The Shashy matter

In June 2007, Shashy and Green, on behalf of themselves and Julio & Sons, filed a lawsuit in state court in Texas against Maple-Wood Partners, Maplewood Management, Maplewood Holdings, Julio Investors, Uncle Julio's, Glaser, Glosson, Levitt, Morris, Reale, and Tillett.[69] The lawsuit claimed that these defendants breached a stockholder's agreement by failing to re-elect Shashy to the Board of Julio & Sons (in February 2007), and breached Shashy's employment agreement by failing to renew his employment (in December 2006).[70] The suit also claimed that the MapleWood defendants wasted corporate assets and engaged in conversion or statutory theft by making unsound investments in Tia's restaurant in 2003 and diverting resources from Uncle Julio's to keep Tia's afloat. Shashy and Green also alleged conspiracy and other claims, and sought a total of $26 million in economic damages. ECF No. 100, ¶¶ 134–143.

The Shashy lawsuit was stayed and referred to arbitration in November 2007, ECF No. 152–1, at 30, after certain defendants sought arbitration pursuant to the stockholder's agreement and the employment agreement. The defendants in the Shashy lawsuit (MapleWood Partners, MapleWood Management, MapleWood Holdings, Julio & Sons, Julio Investors, Glaser, Glosson, Levitt, Morris, Reale, and Tillett-all represented by Miller and his firm, ECF No. 214) initiated the Arbitration by filing a claim against Shashy and Green[71] (i.e., the substance of the claimants' allegations would have been their counterclaim in the state court lawsuit), alleging misconduct by Shashy and Green, including breach of contract, fraud, violation of a non-compete covenant, mismanagement, misappropriation of company funds, providing company information to third parties, and other claims. ECF No. 100, ¶ 147. Shashy and Green then filed a counterclaim in the Arbitration which restated the claims made in their original suit in state court.

The Shashy claims and the MapleWood counterclaims (collectively, the "Shashy matter") all were resolved as a result of a mediation conducted in early April 2008, at which Indian Harbor and its counsel were present. ECF No. 40–11 (April 11, 2008, letter Lumpkin to Simon).[72] The settlement required

67. In a decision entered December 17, 2008, a federal court in New York determined that the allegations in the RRGC action triggered the right of Julio & Sons to advancement of defense costs on behalf of Julio & Sons and its "director and majority shareholder Robert V. Glaser." Julio & Sons Co. v. Travelers Cas. and Sur. Co. of Am., 591 F.Supp.2d 651 (S.D.N.Y.2008).

68. Plaintiffs' complaint indicates that Julio & Sons Company "advanced all Defense Expenses . . . that the Policyholders incurred in the underlying claims," and that the Policyholders are obligated to reimburse Julio & Sons Company. ECF No. 100, ¶¶ 23–24.

69. It appears from the record that Shashy and Green were represented by John Crouch, Theodore C. Anderson, and W.D. Masterson (of the Kilgore & Kilgore, PLLC law firm in Dallas, Texas). ECF No. 152–1, at 2–29 (Respondents'

defense and counterclaim in the Shashy matter). Bruce Hallet and Edward Perrin apparently also represented Shashy and Green.

70. According to Plaintiffs' counsel, "MapleWood Partners was a central defendant, and, along with Mr. Glaser, the fulcrum of any alleged liability in the Shashy action." ECF No. 40–11 (April 11, 2008, letter Lumpkin to Simon).

71. Although Shashy and Green filed the lawsuit in Texas purportedly on behalf of Julio & Sons (as they owned a small amount of interest in the company even after they were no longer officers), Julio & Sons then—along with the Maple Wood entities and individuals—proceeded against Shashy and Green in the arbitration. ECF No. 152–1.

72. Glaser, Glosson, Tillett and Reale also attended the Shashy mediation. ECF No. 214.

Julio & Sons to pay $3,288,520. MapleWood paid no portion of the settlement (nor are they seeking coverage for the settlement[73]), but Plaintiffs claim to have incurred a total of $385,000 in defense expenses, Glaser Dep. MapleWood, at 58, 173 (all of which was paid by Julio & Sons, ECF Nos. 153 at ¶ 38; 192 at ¶ 38)—for which they seek payment by Defendant.

### 3. The Green claim

In May 2008 a supplemental counterclaim was filed by Gerald Green in the then recently-settled Arbitration. The counterclaim was filed against the same entities and individuals whom Green had sued in the Shashy lawsuit, above (i.e., the claimants in the Arbitration—which includes the three MapleWood entities appearing as Plaintiffs before the Court today). Green alleged that he had options to buy Julio & Sons' stock and had suffered economic damages of $665,400, but the respondents to his counterclaim argued that Green had let the options expire. The claim was arbitrated and denied, on October 22, 2008, ECF No. 100 at ¶ 164, and the parties were ordered jointly to pay the arbitration fees and expenses. The arbitration claimants/Shashy lawsuit defendants also were responsible for their own attorneys' fees, which they claim were $68,000. Glaser Dep. MapleWood, at 58, 173. Although all of the defense expenses were paid by Julio & Sons, Plaintiffs seek payment from Defendant for this amount. (ECF Nos. 153, ¶ 41; 192, at ¶ 41).

### D. Who is insured, and as to what types of claims in the Underlying Matters?

Plaintiffs acknowledge that MapleWood Partners is the only Named Insured, ECF No. 100, ¶ 5, but allege that they, and the related entities and individuals identified in the complaint, are "Advisers" or "Insured Persons" as defined in the Policy's various coverage parts (e.g., IAML, IAPL, or IFMPL), ECF No. 100, ¶¶ 77, 78, 87, 88, 99, 101, or are "Investment Funds" or a "Portfolio Company." ECF No. 100, ¶¶ 93, 94, 100.[74] Plaintiffs also assert that they are obligated to indemnify their "past, present and future directors, officers, partners, principals, members, trustees, and employees"—as well as Julio & Sons Company—for Loss resulting from Claims as defined in the Policy. ECF No. 100, ¶¶ 10–11.[75] In other words, Plaintiffs assert that they are seeking funds which will be provided to, or will benefit: Julio & Sons, DaGrosa, Dell, Levitt, Tillett, Morris, Glaser and Reale.

Defendant views the following as potentially insured, according to each type of coverage in the Policy, and each of the Underlying Matters:

### 1. IAML coverage

Coverage pursuant to the IAML provisions is available for loss suffered by an "Insured Person" or an "Adviser" as a result of Claims brought during the Policy period for "Wrongful Acts."[76] IAML, I(A), (B). An "Adviser" is defined, in pertinent part, as the Named Insured, i.e., MapleWood Partners, and any "Subsidiary,"[77] and "Insured Person" is defined, in pertinent part, as a director, officer or member of the Board of Managers of the Adviser, or those serving in a functionally equivalent role for the Named Insured. The Policy states that "Insured" means the "Insured Persons and the Adviser." IAML, II(C). Thus, the Insured, under this coverage, is MapleWood Partners and its "past,

---

**73.** ECF Nos. 153 at ¶ 39, 192 at ¶ 39 (Plaintiffs' Response to Defendant's Statement of Facts); ECF No. 40–14, at 16.

**74.** The Policy envisions coverage for other than just the "Named Insured"—for example, the Policy provides that the Named Insured will act on behalf of the "Insureds" with respect to giving and receiving notices to/from the Insurer. GTC, General Conditions, (M).

**75.** In essence, as Plaintiffs have alleged that they are obligated "on receipt of money from the Insurer, to reimburse Julio & Sons," ECF No. 100, ¶ 24, Plaintiffs are pursuing the claims in this coverage action on behalf of Julio & Sons.

**76.** The Policy also covers loss which an Adviser is required to pay as indemnification to an Insured Person. Policy, IAML, I(B).

**77.** "Subsidiary" is defined as "any entity during any time in which the Named Insured [i.e., MapleWood Partners] owns, directly or through one or more Subsidiar(ies), more than fifty percent (50%) of the oustanding securities representing the present right to vote for the election of such entity's directors." GTC, General Definitions, (J).

present or future" directors, officers or persons serving in a functionally equivalent role. IAML, II(D).

A "Wrongful Act" is defined as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty [by an Insured Person] but *solely by reason of his or her status* as such" or "any actual or alleged act, error or omission, misstatement, misleading statement or breach of duty by the Adviser [MapleWood Partners]." IAML, II(F) (emphasis added). It is undisputed that the Named Insured, i.e., the Adviser, MapleWood Partners, was sued in the RRGC and Shashy lawsuits, and the Green claim, and that the actions complained of in those three matters [78] involved alleged acts and breaches of duty by MapleWood Partners, i.e., "Wrongful Acts" pursuant to the IAML provisions.

Indian Harbor communicated its interim decision regarding coverage for MapleWood Partners as to the RRGC and Shashy lawsuits in letters directed to Glaser, dated June 20, 2007, ECF No. 40–5 (re: RRGC action), and July 9, 2007, ECF No. 40–7 (re: Shashy action), and as to the Green Claim in a letter directed to Miller, dated June 13, 2008, ECF No. 40–9.[79] The letters are described as the insurer's "preliminary assessment of coverage" and specifically note that "further investigation and developments in the [RRGC and Shashy actions] may affect" the coverage analysis.[80] Glaser and Miller were invited "to provide [the insurer] with any additional information that would confirm or clarify the preliminary conclusions" that Indian Harbor had reached, and were informed that "there are a number of open questions regarding the availability of coverage under the Policy [for the RRGC and Shashy actions and the Green Claim]." *Id.*

That same correspondence, mentioned above, advised Glaser that he was "likely . . . an Insured Person" as defined in the IAML provisions, because he served as Managing Partner of MapleWood Partners, as to both the RRGC and the Shashy actions.[81] However, Indian Harbor stated that the claims in the RRGC and Shashy actions did not appear to meet the definition of "Wrongful Act" as to an "Insured Person." Specifically, in the RRGC action, the insurer said that Glaser apparently was being sued in his capacity as majority shareholder of Uncle Julio's and not " 'solely' by reason of [his] status as an Insured Person." ECF No. 40–5.[82] Miller, on behalf of Glaser and the MapleWood entities, responded that coverage should be provided to Glaser as he had been sued solely in his capacity representing the "Adviser," Maple-Wood Partners. ECF No. 40–10 (Oct. 12, 2007, letter Miller to Simon).

In the Shashy action, Indian Harbor took the position that Glaser was being sued as a director of Uncle Julio's, along with Reale— also determined to possibly be an "Insured Person" under the IAML coverage—and since it was not clear that they were being sued "solely" by reason of their status as an Insured Person, coverage was denied under IAML. ECF No. 40–7.[83]

---

**78.** In its initial response to the demand for coverage as to the Green claim, Indian Harbor simply adopted its coverage assessments as to the Shashy action as to the claims against Maple-Wood Partners, noting that the claims were legally and factually distinct but that the coverage issues "largely parallel" the issues raised in the Shashy Arbitration. ECF No. 40–9.

**79.** "We direct this letter to you on behalf of all Insureds under the Policy." ECF Nos. 40–5, 40–7, 40–9.

**80.** The insurer's response to the Florida Department of Financial Services is consistent with the preliminary coverage assessments contained in these letters. ECF No. 40–14. Pidlak testified that the allocation decision was "based on the totality of information" that had been received by the insurer as of the time of each coverage letter and included consideration of the relative expo-

sure of MapleWood to an adverse judgment. *Pidlak Dep.*, at 175–176.

**81.** Indian Harbor later questioned whether this was a correct understanding, noting that Maple-Wood Partners did not have a Board of Managers, and requested further information from Miller regarding the management structure of MapleWood Partners, ECF No. 40–6.

**82.** Miller objected to this statement, noting that "the majority shareholder of Julio and Sons actually is Julio Investors. . . ." ECF No. 40–10. Indian Harbor responded that it continued to reserve its rights regarding coverage, based on RRGC's allegations.

**83.** Defendant has indicated that it "does not appear" that the following qualify as Insureds under the IAML coverage as to the RRGC action: *MapleWood Management, MapleWood Holdings,*

In summary, the insurer preliminarily determined that coverage was available under IAML as to MapleWood Partners (as to all three of the Underlying Matters); the insurer identified Glaser and Reale as possibly insured under IAML, but not as to the complaints brought in the Underlying Matters.

### 2. IAPL coverage

Pursuant to the IAPL provisions of the Policy, coverage is available for loss suffered by an "Insured" as a result of Claims brought during the Policy period for "Wrongful Acts." IAPL, I. An "Adviser" is defined, in pertinent part, as the Named Insured, i.e., MapleWood Partners, and any Subsidiary, and "Insured Person" is defined, in pertinent part, as a director, officer, partner, principal, member, trustee or employee of the Adviser. IAPL, II(A), (C). The Policy states that "Insured" means the "Insured Persons and the Adviser." IAPL, II(B). Thus, the Insured, under this coverage, is MapleWood Partners and its "past, present or future" directors, officers, partners, principals, members, trustees or employees.

A "Wrongful Act" is defined, in pertinent part, as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty [by an Insured] *in the performance of, or failure to perform, Professional Services.*" IAPL, II(E).[84] It is undisputed that Maple-Wood Partners, the "Adviser," and Glaser, an "Insured Person," were sued in the RRGC and Shashy lawsuits, and Reale—whom also may have qualified as an "Insured Person" under IAPL (as an employee of

MapleWood Partners)—was sued in the Shashy lawsuit. The insurer's preliminary assessment of coverage did not conclude that the actions complained of in the RRGC and Shashy lawsuits involved alleged acts or breaches of duty related to the provision of Professional Services, i.e., "Wrongful Acts" pursuant to the IAPL provisions.[85] Similarly, as to the Shashy lawsuit, the insurer stated that:

> [t]he questions here are whether you [Glaser], Mr. Reale and/or MapleWood were performing the identified services and, if so, whether those services were provided for a fee or commission. Even if these questions were answered in the affirmative, it is not entirely clear that the [Shashy lawsuit] would constitute a Claim against MapleWood [Partners], you and Mr. Reale "for" such Wrongful Acts.

ECF No. 40–7.

Indian Harbor reserved its rights with regard to those questions, and invited Glaser to provide information to "clarify the situation." [86] Miller responded to this position by noting that MapleWood Partners earned a fee for the provision of "Professional Services" to Julio & Sons and the two Maple-Wood Equity funds, ECF No. 40–10, and that the RRGC complaint alleged that Glaser and MapleWood Partners engaged in fraud as to a lease guaranty by Julio & Sons and the two MapleWood Equity funds, such that coverage under the IAPL part of the Policy should apply. ECF No. 40–10. A subsequent communication by the insurer indicated that the claims as to Glaser in the RRGC action may be subject to an exclusion in the

---

and Uncle Julio's; and as to the Shashy action none of the following qualify under IAML as "Insureds": MapleWood Management, Maple-Wood Holdings, Uncle Julio's, and Julio Investors. ECF Nos. 40–5, 40–7. In addition, as to the Shashy action, none of the following qualify as "Insured Persons": Glosson, Levitt, Tillet, and Morris. ECF No. 40–7.

84. "Professional Services" are defined as "financial, economic or investment advice given or investment management services performed for others for a fee or commission by the Adviser or on behalf of the Adviser by any person or entity; ... [or] the selection, oversight and direction by any Insured of any person or entity performing Professional Services on behalf of the Adviser." IAPL, II(D).

85. The correspondence, mentioned above, advised Glaser that he was an Insured Person as defined in the IAPL provisions, but noted that the insurer was unable to conclude whether the claims in the RRGC action met the definition of "Wrongful Act" as it was not clear whether they were related to the performance of "Professional Services." ECF No. 40–5.

86. Indian Harbor stated that it "does not appear" that the following qualify as Insureds under the IAPL coverage as to the RRGC action: MapleWood Management, MapleWood Holdings, and Uncle Julio's; nor do they qualify as Insureds as to the Shashy action (nor does Julio Investors qualify). The insurer also stated that Glosson, Levitt, Tillet, and Morris, are not "Insured Persons" under IAPL as to the Shashy action. ECF Nos. 40–5, 40–7.

Policy's IAML and IAPL coverage sections which denies coverage as to claims brought against an Insured Person "acting in his or her capacity as a ... partner ... or employee of any entity other than an [Adviser,] Insured or Outside Entity." ECF NO. 40–14 (referring to IAML, Exclusions, (H); IAPL, Exclusions, (H); and IFMPL, Exclusions, (H)).

In summary, the insurer preliminarily determined that coverage was available under IAPL only as to MapleWood Partners, Glaser, and Reale, at most, but not necessarily as to the complaints in the Underlying Matters.

### 3. IFMPL coverage

Coverage pursuant to the IFMPL provisions is available for loss suffered by an "Insured" as a result of Claims brought during the Policy period for "Wrongful Acts." IFMPL, I. "Insured" is defined to include the Named Insured, i.e., MapleWood Partners, as well as "Insured Persons," and "Investment Funds" [87] and their general partner or managing general partner (if organized as a limited partnership) or managing member (if organized as a limited liability company), and specifically does not include an "Outside Entity" (which includes a "Portfolio Company" [88]) as an "Insured." IFMPL, II(A), (G). The Policy lists MapleWood Equity Partners, LP, and MapleWood Equity Partners (Offshore), Ltd., as Investment Funds. Policy, Schedule of Investment Funds.

"Insured Persons" under this coverage part is defined to include a director, officer, partner, principal, member, trustee or employee of an "Investment Fund" or their general partner or managing general partner (if organized as a limited partnership) or managing member (if organized as a limited liability company). IFMPL, II(C). A "Wrongful Act" is defined as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by an *Insured* in the performance of, or failure to perform *Professional Services* " [89] or "by an *Insured Person* in his or her capacity as a director. *officer, member of the Board of Managers, general partner, or managing general partner of an Investment Fund* " or "any matter asserted against an Insured Person *solely by reason of his or her status* as a director, officer, member of the Board of Managers, general partner, or managing general partner of an Investment Fund," or acts by an "Insured person in his or her Outside Capacity." [90] IFMPL, II(J) (emphasis added).

It is undisputed that the Named Insured, i.e., MapleWood Partners, was an Insured under the IFMPL as to both the RRGC and Shashy actions. Indian Harbor also concluded that MapleWood Management was an Insured (as General Partner of MapleWood Equity Partners, and as Manager of MapleWood Equity Partners (Offshore)), and that Glaser was an Insured Person (as Director of MapleWood Equity Partners (Offshore)). ECF No. 40–5. The insurer did not find, however, that the allegations in the RRGC action met the definition of "Wrongful Acts" pursuant to the IFMPL provisions.

Indian Harbor's "preliminary assessment of coverage" indicated that it did not appear from the allegations in the RRGC action, nor the Shashy matter, that MapleWood Partners, MapleWood Management, and Glaser were being sued for acts or omissions relating to services by or on behalf of an Investment Fund,[91] nor that Glaser had been sued

---

87. "Investment Fund" includes only those funds listed in the Policy and "any pooled investment vehicle formed by the Named Insured during the Policy Period." IFMPL, II(D).

88. Portfolio Company is defined as "any entity ... in which an Insured, through an Investment Fund, owns or controls outstanding securities representing the right to vote for the election of such entity's directors or members of the Board of Managers." IFMPL, II(H).

89. Professional Services are defined as "advisory or other services performed by [or on behalf of] an Investment Fund ... provided such services are performed in connection with the manage-

ment or operation of such Investment Fund, ... [or] the selection, oversight and direction by any Insured of any person or entity performing Professional Services on behalf of an Investment Fund." IFMPL, II(I).

90. "Outside Capacity" is defined as "service by an Insured Person as a director, officer, trustee, regent, governor or member of the Board of Managers of an Outside Entity, but only during the time that such service is at the specific request of an Insured Entity." IFMPL, II(F).

91. "Indeed, there are no allegations whatsoever regarding either of the Investment Funds identified [in the Policy]." ECF No. 40–5.

in his capacity or by reason of his status as the Director of MapleWood Equity Partners (Offshore). ECF No. 40–5.[92] Miller, on behalf of Glaser and the MapleWood entities, disputed the insurer's assessment and argued that the allegations in the RRGC action did meet the definition of "Wrongful Act" because, *inter alia*, they involved claims against Glaser personally, due to his role as a director of one of the Investment Funds, and also included claims that Glaser, MapleWood Management and MapleWood Holdings had engaged in fraud and breach of fiduciary duty in connection to the investment in the Tia's restaurants by the Investment Funds. ECF No. 40–10. The insurer responded that the RRGC allegations did not appear to relate to Glaser's acts or omissions in his capacity as director of the Investment Fund. ECF No. 40–6 (Nov. 13, 2007, letter from Simon to Miller).[93]

Finally, as to the Green claim, Indian Harbor noted that Glaser also may be considered as an Insured under the IFMPL coverage, because he served as a director of an Outside Entity (Julio & Sons) during the period of the alleged conduct and, as such, the Green claim may be a Claim against Glaser for a Wrongful Act in his Outside Capacity. ECF No. 40–9.[94]

In summary, the insurer preliminarily determined that coverage was available under the IFMPL provisions in the Policy, but only as to MapleWood Partners, MapleWood Management, Glaser, and Glosson; however, as to these entities and individuals, the only claims which might be covered were those brought against Glaser and Glosson in the Shashy action and the Green claim. In addition to the issues noted above, the insurer's coverage letters also identified nine other coverage issues, including the allocation clause and breach of the parties' agreement.

### E. The claims

Defendant has not yet issued a final decision as to coverage. The Court has summarized the parties' positions, below, as to the individuals or entities which are insured, and the claims which are covered.

#### 1. The claims originally presented to Indian Harbor, and Indian Harbor's responses

As noted above, Plaintiffs sought coverage pursuant to the terms of the insurance Policy in February 2007, as to the RRGC Action, in June 2007, for the Shashy lawsuit,[95] and in May 2008, for the Green Claim.[96] Defendant

92. The insurer noted that Uncle Julio's may be a "Portfolio Company" and, therefore, an "Outside Entity," but coverage was not available for Glaser as a shareholder of an Outside Entity. ECF No. 40–5.

93. As to the Shashy action, the insurer noted that Glaser was being sued in his status as a director of Uncle Julio's "which, in fact, may be a 'Portfolio Company' and, therefore, an 'Outside Entity,' as those terms are defined in the IFMPL Coverage Part." ECF No. 40–7. Indian Harbor concluded that the Shashy action "may assert a Claim against you for a Wrongful Act under the IFMPL Coverage Part." *Id.* The insurer later indicated that Glaser "apparently did not serve in such a capacity during the period in which the allegedly wrongful conduct occurred." ECF No. 40–14. Indian Harbor also found that, as to the Shashy action, neither Glosson, Levitt, Tillett, Morris, or Reale appear to qualify as an "Insured Person" under IFMPL, ECF Nos. 40–5, 40–7, but the insurer later indicated that Glosson's status as a limited partner in MapleWood Equity Partners might give rise to coverage as to IFMPL if he was serving as a director of Julio & Sons at the specific request of either MapleWood Partners or MapleWood Management. ECF No. 40–14.

94. The insurer has indicated that it "does not appear" that the following qualify as Insureds under the IFMPL coverage as to the RRGC action: MapleWood Holdings, and Uncle Julio's; nor do they (or Julio Investors) qualify as Insureds as to the Shashy action. ECF No. 40–5. Miller disputed the determination as to MapleWood Holdings, noting that it is the general partner of MapleWood Management and, because MapleWood Management is the general manager of one of the Investment Funds, then MapleWood Holdings should be considered as an Insured Person and an Insured. ECF No. 40–10. Indian Harbor responded that "Insured Persons" must be "natural human beings," as the Policy includes several references to an "Insured Person" in "his or her" capacity. ECF No. 40–6.

95. The Shashy lawsuit is subsequently described as the Shashy matter, as it was arbitrated along with claims filed by MapleWood entities and individuals.

96. ECF No. 40–2 (February 19, 2007, letter from Brian Miller to Executive Liability Underwriters ("ELU")), ECF No. 40–3 (June 21, 2007, letter Miller to ELU), and ECF No. 40–4 (May 16, 2008, letter Miller to ELU).

responded to each of the letters demanding coverage, and explained the bases for its "preliminary assessment of coverage" as to each matter, as described above.[97] The insurer objected to the claim for reimbursement of expenses incurred in prosecuting affirmative claims/counterclaims and, at least as early as November 13, 2007, requested that Miller, as counsel for MapleWood Partners and Glaser, contact the insurer, through counsel, "to discuss an appropriate allocation in light of the claims asserted against [MapleWood Holdings] (which is not an Insured under the Policy) and the counterclaim asserted by certain defendants (for which there is no coverage)." ECF No. 40-6.[98] The insurer's letters responding to the demands for coverage also invited the insured to provide additional information as to the outstanding issues.[99]

In October[100] and November 2007[101], Miller responded to the insurer's preliminary coverage letters as to the RRGC action and the Shashy matter. Miller noted that a settlement demand had been made in the Shashy matter, but that his clients had not yet responded to the demand. At some time in late November 2007, Miller also participated in a call with the insurer's attorneys. ECF No. 107-4 (Nov. 30, 2007, e-mail to Indian Harbor from its outside counsel which references the call; the contents of this document are under seal).

Approximately three months after Miller received the insurer's November 13, 2007 correspondence, which had invited Miller to

discuss an appropriate allocation, the insurer notified Miller that Indian Harbor had consented to the retention of the Akerman Senterfitt and Kessler Collins law firms as defense counsel for the "Insureds" (described as MapleWood Partners, MapleWood Management, Glaser and Reale), and to the incurrence of Defense Expenses on their behalf, in the RRGC action and Shashy matter. ECF No. 89-3 (Feb. 4, 2008, letter from Simon to Miller). Indian Harbor advised Miller that it had no obligation to pay Defense Expenses under the Policy until the Retention had been satisfied, and that it would not pay expenses as to the pursuit of affirmative claims. ECF No. 89-3. In addition, the insurer noted that while Miller's firm and the Kessler Collins firm also represented MapleWood Holdings, Julio Investors, Levitt, Glosson, Tillett, and Morris, the insurer did not consider those entities and individuals to be insured under the Policy, and an allocation would be required. Indian Harbor proposed a 50% allocation, i.e., it proposed to allocate 50% of the legal fees and expenses incurred by the law firms to the defense of the insureds, and the remainder to the defense of uninsured parties or the prosecution of affirmative claims. ECF No. 89-3.[102] According to Plaintiffs' Supplemental Amended Complaint, Plaintiffs submitted a letter to the insurer on March 20, 2008, proposing a 70% allocation, instead of 50%, as to the interim funding agreement. ECF No. 100, ¶ 181.[103]

Three weeks later, on April 11, 2008, the MapleWood entities, through Lumpkin, ad-

---

97. ECF Nos. 40-5 (June 20, 2007, letter Simon to Glaser), 40-7 (July 9, 2007, letter Simon to Glaser), and 40-9 (June 13, 2008, letter Simon to Miller).

98. Defendant specifically has denied that MapleWood Holdings was entitled to coverage. Defendant's Answer (which included 45 Affirmative Defenses), ECF No. 109.

99. At the deposition of Defendant's corporate representative, Plaintiffs' counsel, Schryber, asked for an explanation of how the insurer arrived at a 25% allocation decision. Schryber relied on the initial coverage response, i.e., the letter dated June 20, 2007, and argued that several of the bases stated therein as "other coverage issues" were inapplicable and therefore Defendant should have increased its 25% allocation. Pidlak Dep., at 182–202. This approach failed, however, to recognize that the 25% determina-

tion was made much later, and after this federal lawsuit was filed. *Id.*, at 202.

100. ECF No. 40-10 (October 12, 2007, letter regarding RRGC action).

101. *See,* Case No. 11–mc–22477–WMH, ECF No. 13–6 (November 5, 2007, letter from Miller to Simon, regarding Shashy matter)—a miscellaneous case, now closed, which had been opened in another district and subsequently transferred to this Court; the case involved a discovery dispute between the parties to this action.

102. Indian Harbor also provided a draft "Interim Funding Agreement" to facilitate the advancement of Defense Expenses. ECF No. 89-3.

103. The Court has not located this letter in the Court's file.

vised Indian Harbor that the Shashy matter had settled. ECF No. 40–11.[104] (Indian Harbor and its counsel had attended the Shashy mediation, but had not been provided with a copy of the Insureds' mediation statement, despite having requested the information. ECF No. 221–4.)[105] Lumpkin advised Indian Harbor that a total of $828,000 in attorneys' fees had been incurred as of February 2008 (i.e., in the first eight months of litigation of the Shashy matter), by four law firms: Akerman Senterfitt, Kessler Collins, Parker Poe, and "Judge Cox's firm" (Hughes & Luce). *Id.*

On April 18, 2008, Indian Harbor responded that it had only consented to the retention of two law firms as to the Insureds, and had not consented to the retention of the other two firms which were representing "Julio & Sons, which is not an Insured under the Policy." ECF No. 221–4 (April 18, 2008, letter Simon to Lumpkin). The insurer also advised Lumpkin that questions remained outstanding as to the Shashy matter (e.g., the status of Glosson and his service on the board of Julio & Sons), and that the insurer had concluded that there was no coverage under the IAPL, and only limited coverage, if any, available under the IAML (only as to Maple Wood Partners) or IFMPL (as to Maple Wood Partners and Maple Wood Management, as well as Glaser and Glosson) parts of the Policy. *Id.* Indian Harbor noted that while it had offered to pay one-half of the charges incurred by the two approved law firms representing its insureds in the Shashy matter and RRGC action (not to include prosecution of affirmative claims[106] or representation of uninsured entities or individuals), it appeared that a lesser allocation might be appropriate. *Id.*[107]

Notably, in its letter dated April 18, 2008, the insurer raised several requests for information from Lumpkin and his clients, including, *inter alia,* information regarding prior or pending litigation potentially related to the Shashy matter, and copies of correspondence or court filings in a matter brought by Julio & Sons against Travelers insurance company seeking coverage under an insurance policy as to the loss in connection with the Shashy matter. ECF No. 221–4. Indian Harbor referred Plaintiffs to the provision in the Policy stating that the Policy only covered losses in excess of what was covered by another insurance policy. GTC, General Conditions, (E).

On June 6, 2008, Indian Harbor responded to a letter written by Lumpkin on May 27, 2008 (a copy of which the Court has been unable to locate in the record), which purportedly stated that the insurer must make "'immediate reimbursement' in order 'to avoid a litigated resolution.'" ECF No. 174–11 (June 6, 2008, letter Simon to Lumpkin). The insurer's counsel wrote: "To be frank, we were somewhat surprised by these comments, given your failure to respond to our client's [Indian Harbor's] allocation proposal and to its specific questions regarding the defense arrangements for this Claim." *Id.* Referencing the Policy's allocation clause, the letter states: "In these circumstances, and in light of our client's further assessment of coverage for these matters, we [are] prepared to advance 25% of the fees and expenses incurred by approved defense counsel in the Shashy and RRGC proceedings, subject to receipt of an executed Interim Funding Agreement." ECF No. 174–11.

One week later, Indian Harbor advised Miller, on June 13, 2008, that the Green

---

**104.** Lumpkin also confirmed that Reale was an employee of MapleWood Partners. ECF No. 40–11. Indian Harbor noted, in April 2008, that "no one acting on behalf of the MapleWood parties ever confirmed Mr. Reale's status or took issue with Indian Harbor's conclusions before now." ECF No. 221–4.

**105.** Indian Harbor has noted that the settlement of the Shashy matter did not constitute an insurable Loss under the Policy, ECF No. 221–4. As Plaintiffs are not seeking indemnification as to the amount of the Shashy matter settlement, the Court need not address the issue further.

**106.** The Court need not address the question of coverage for the prosecution of these affirmative claims at this time; however, it appears that such claims were of the same subject matter as the claims being defended by Plaintiffs so any difference may be immaterial in terms of determining the amount of legal work required, i.e., the reasonableness of the attorneys' fees submitted to Indian Harbor for reimbursement.

**107.** Indian Harbor offered to maintain its prior offer, "if the Maple Wood parties withdraw their request for reimbursement of some portion of the settlement payment in the Shashy arbitration." *Id.*

action would be treated as a new Claim, "unrelated to any previously asserted Claims" in the Shashy matter, such that a separate Retention would apply, i.e., "coverage would be available, if at all, only to the extent that Loss incurred in connection with the Green Claim exceeds the $250,000 per Claim retention applicable to each of the potentially relevant Coverage Parts." ECF No. 40–9.[108] Huber objected to this characterization of the Green claim, arguing that the claim was part of the same arbitration, involved the same parties, and arose out of the same or related facts, "i.e., the fallout from Julio Investors' acquisition of Lucky Boy Corporation, now known as Julio & Sons." ECF No. 40–12 (July 1, 2008, letter Huber to Simon). The insurer has not altered its conclusion as to this issue, and Plaintiffs' claim for $68,000 in incurred defense expenses remains outstanding.

The parties' correspondence reveals that they had reached a tentative agreement as to a 30% allocation in October 2008—without limiting their rights to later seek a different allocation. "Indian Harbor believed that the parties actually had reached an agreement with regard to allocation, but Maple Wood Partners later reconsidered its position and rejected Indian Harbor's offer." ECF No. 40–14, at 9, 17. The Maple Wood entities offered to settle for $100,000 in exchange for a full release [fees and settlement amounts] as to the Shashy matter, and a 40% allocation "above the retention" toward the total defense fees as to the RRGC action and the Green claim, on the condition that the allocation would be "without prejudice to any of the parties' seeking a greater or lesser allocation by judicial intervention or otherwise."

ECF No. 189–8, Sept. 9, 2008, e-mail Huber to Simon. The following month, Indian Harbor offered to pay the $100,000 to resolve the Shashy matter, and would pay 30% of the fees as to the RRGC action, but would require that the fees as to the Green claim be subject to a separate Retention. ECF No. 89–3.[109] Counsel for the parties exchanged a summary of the pending invoices for fees, and Plaintiffs' counsel noted that "it seems we have an agreement in concept, just numbers need to be worked out—assume one deductible for Shashy/RRGC and one for Green," ECF No. 189–9 (Oct. 23, 2008, e-mail Lumpkin to Wahl), but within a few hours the parties' communication had deteriorated.

The Maple Wood entities demanded that the 30% allocation be applied after deducting the retention, ECF No. 189–6 (Oct. 23, 2008, e-mail from Huber to Simon), and Indian Harbor maintained that the 30% must be applied before applying the retention, ECF No. 189–10 (Oct. 23, 2008, e-mail Wahl to Huber). Counsel for the insurer wrote: "When [Huber and Lumpkin] called me this morning to indicate Maple Wood's agreement to our counterproposal, I assumed that you actually had read the counterproposal, which could not have been more clear. . . . Indeed, we even illustrated the proposal with reference to the precise figure Indian Harbor would be obligated to pay." *Id.* In response, Huber wrote: "MapleWood is disappointed with Indian Harbor's response. . . . MapleWood, which has spent more than a million dollars so far on defense, does not believe your current offer—which amounts to about 3 percent of that amount—is even in the ballpark." ECF No. 189–11 (Oct. 24, 2008, e-mail from Huber to Wahl).[110] A week later,

**108.** Indian Harbor determined that the Green claim was based on a factual and legal predicate that differed from the basis for the Shashy claim and, therefore, should be treated as a separate claim, with the requirement that the Retention be met before any coverage would be extended. ECF No. 40–14, at 22.

**109.** The Court observes that the net result of this agreement would have provided $263,000 (i.e., 30% of the fees ultimately billed in the RRGC action ($1,710,000), and then reducing that amount by the Retention), plus $100,000 toward the total fees of $385,000 in the Shashy matter (recall that the MapleWood entities were not seeking contribution toward the settlement of that action), for a total payment of $363,000 by

Indian Harbor for defense fees. This agreement did not preclude the parties from seeking a different allocation through litigation.

**110.** At the time this action was filed before this Court, MapleWood reportedly had submitted invoices for a total of approximately $1.3 million in defense expenses (attorneys' fees). According to a letter from the insurer, dated Jan. 27, 2009, which accompanied its first payment made to MapleWood Partners under the Policy, defense invoices for the RRGC matter totaled $994,732.21, and invoices for the Shashy Defense (which included both the lawsuit filed in Texas and the arbitration) totaled $308,948.56. ECF No. 40–13.

Huber's colleague added that "MapleWood views your client as in breach of its obligations under the policy." ECF No. 218–1 (Nov. 3, 2008, e-mail Lumpkin to Wahl, excerpts only).[111] In response, Indian Harbor asked for clarification as to the alleged breach, and copied Glaser; Lumpkin replied: "please do not communicate directly with the insured." *Id.*

Ultimately, the insurer made an interim decision to provide funds and—approximately one month after the filing of this lawsuit challenging the (interim) coverage decision [112] —Indian Harbor produced a chart detailing its calculations as to "Undisputed Amounts." ECF No. 40–14, at 26–31. Defendant advised Plaintiffs that, in light of the parties' dispute as to what amounts of the total $1.3 million in reported defense costs constituted a covered Loss, Indian Harbor was obligated to pay only those Defense Expenses not in dispute, which it determined to be 25% of the claimed expenses, until such time as the parties could agree on an appropriate allocation of loss.

During a deposition of Defendant's corporate representative, Plaintiffs' counsel asked for an explanation of the decision to allocate exactly 25% of the claimed expense. Pidlak testified that "there is no specific mathematical formula contained in the policy with regard to the allocation provision" and instead

the Policy "uses the best efforts language of the insured/insurer ... to determine a fair and reasonable allocation." Pidlak Dep., at 66, 185–86, 212, 289.[113] "I considered whether certain individuals and entities were insureds under the policy and whether they were sued in their capacity under various coverage parts. I also considered the types of claims that were being alleged against those entities or individuals to determine what an appropriate allocation under the policy would be." *Id.*, at 151.[114]

In January 2009, Defendant tendered a check to counsel for Plaintiffs in the amount of $75,920.19, representing 25% of the total claimed defense costs,[115] after deducting the $250,000 retention amount pursuant to the Policy. ECF No. 40–13 (Jan. 27, 2009, letter from Cathy A. Simon to Michael F. Huber).[116] Additional payments were made on May 5 ($19,808.23), September 25, 2009 ($19,130.23), January 8 ($25,732.23), June 11 ($13,223.49), December 21, 2010 ($27,291.55), and June 6, 2011 ($66,362.32). ECF No. 174–17 (correspondence from insurer's counsel, with checks and description of any deductions as to ineligible amounts for, e.g., "overhead" or unspecified "other travel expenses"). In summary, Defendant provided a total of $247,468.24 toward Defense Expenses as of June 2011.[117]

---

111. Although the record does not reveal that Indian Harbor ever made a "final" decision as to coverage, it is clear that at least as of this date (November 3, 2008) the parties reasonably anticipated that litigation was forthcoming.

112. The parties have described the insurer's decision as an "interim allocation" Plaintiffs, ECF No. 217, at 12; ECF No. 40–14, at 15.

113. As to defense invoices already reviewed by Defendant, the witness testified that additional payments might be made as to those invoices "[i]f additional information is learned that would allow Indian Harbor to increase its 25 percent allocation determination." Pidlak Dep., at 36.

114. "There are probably hundreds of pieces of information that we evaluated to come to a determination that a 25 percent allocation was reasonable." *Id.*, at 214. "There are numerous pieces of information that we use to come to a determination of what is a reasonable and fair allocation under the policy. I consult with counsel [and have conversations with defense coun-

sel], I look at all the documents [including underlying pleadings, coverage analysis, discovery responses], and on the basis of those things, I come to a fair and reasonable allocation." *Id.*, at 287–88.

115. Twenty-five percent of the total claimed defense costs equals $325,920.19.

116. It appears that the payment was made as a result of Defendant's determination that MapleWood Partners was the insured, and entitled to coverage under the IAML part of the Policy. ECF No. 40–14, at 11, 17.

117. Of the total $2,163,000 in defense expenses claimed by Plaintiffs (all of which was paid by others) as to the Underlying Matters, Defendant tendered $247,468.24 in response to the demand for coverage. (If the parties had adopted the 30% allocation, with $100,000 toward the expenses of the Shashy matter—as discussed in October 2008, Defendant would have paid a total of $363,000 in defense expenses.)

### 2. A summary of Plaintiffs' claims, as currently stated, and Defendant's interim decision on coverage

To summarize the Plaintiffs' view (according to the complaint before this Court) of who was covered and as to what claims:

—MapleWood Partners and Glaser were covered as to all three types of coverage, and as to all three of the Underlying Matters;

—Tillett, Levitt, and Reale also were covered as to IAML and IAPL as to the Shashy matter, and Tillett and Levitt were covered as to the Green claim; and

—MapleWood Holdings and MapleWood Management were covered as to IAPL and IFMPL as to all three of the Underlying Matters.

ECF No. 100, ¶¶ 77–82 (IAML coverage), ¶¶ 87–90 (IAPL coverage), ¶¶ 99–103 (IFMPL coverage); see also, ¶ 129 (RRGC action), ¶ 151 (Shashy matter), ¶ 166 (Green claim).

While Plaintiffs do not specifically include Glosson and Morris in the listing of who is insured under the Policy, the complaint does reference these two men as having "incurred covered Loss and Defense Expenses, as those terms are defined by the Policy and applicable law," as to the Shashy matter. ¶ 151.[118] And, although the complaint fails to identify an applicable coverage part of the Policy which specifically insured Julio Investors or Julio & Sons, Plaintiffs allege that the Julio entities and Glosson incurred covered losses as to the Underlying Matters.[119] Thus, the Court adds the following to the list of those described by Plaintiffs as covered under the Policy:

—Glosson, Julio Investors, and Julio & Sons (or Uncle Julio's),[120] as to all three of the Underlying Matters; and

—Morris, as to the Shashy matter.[121]

As to the three Underlying Matters, Plaintiffs claim defense expenses totaling $2,163,000—all of which was paid by Julio & Sons (or its insurer, Travelers[122]), and seek an additional $2,500,000 for the amount of the RRGC settlement (including those amounts paid by Julio & Sons and its insurer) after deducting the $250,000 already paid by Defendant. The total amount of Plaintiffs' demanded coverage, before applying the Retention or any allocation, is $4,663,000. In addition, Glaser testified that Plaintiffs had incurred $1,062,000 in "coverage action attorney's fees" as of March 18, 2011. Glaser Dep. MapleWood, at 58, 173.

To summarize the Defendant's view of who was insured and as to what claims:

—MapleWood Partners as to IAML as to all three Underlying Matters, but not as to IFPL and IFMPL unless the RRGC and Shashy matter alleged "Wrongful Acts"; and

—Glaser and Glosson as to IFMPL coverage, and only as to the Shashy matter and Green claim to the extent that the com-

---

118. "The Insurer has refused to indemnify ... Glosson ... [and] Morris ..." in connection with the Shashy and Green litigation, arbitration, mediation and settlement." ¶¶ 200, 205.

119. Plaintiffs allege that "the Julio's Parties (which included various MapleWood's [sic] entities) incurred covered Loss and Defense Expenses, as those terms are defined by the Policy" as to the RRGC action, ¶ 130; that "[Julio] Investors ... [and] Uncle Julio's ... incurred covered Loss and Defense Expenses as those terms are defined by the Policy" and as to the Shashy matter, ¶ 151; and that "[Julio] Investors, ... Julio & Sons ... [and] Glosson ... incurred substantial Defense Expenses in defending the Green Option Claim. [However, Indian Harbor] refused to reimburse any of the Loss incurred." ¶ 166.

120. According to a letter sent by Miller to Indian Harbor's counsel in October 2007, "MapleWood Partners has not submitted any claim under the Policy on behalf of Julio and Sons. Moreover, this firm does not represent Julio and Sons in connection with the litigation." ECF No. 40-10. Regardless, in light of the allegations in the complaint, it appears that Plaintiffs are pursuing coverage for "the Julio's Parties" as to "covered Loss and Defense Expenses." ECF No. 100, ¶ 130, see also ¶¶ 151, 166.

121. Although several of the individuals as to whom coverage was sought have appeared as Intervenors in this action, the entities "Julio Investors" and "Julio & Sons" (or "Uncle Julio's") have not sought leave to intervene.

122. Although Akerman Senterfitt and Kessler Collins were not retained directly by Julio & Sons, it appears that their bills for representation of Glaser were submitted to Julio & Sons for payment by its insurer, Travelers.

plaints in those matters met other terms of the Policy.

On October 11, 2010, Defendant paid $250,000 to RRGC in settlement of the RRGC action. ECF No. 156–1 (Oct. 11, 2010, letter McNutt to Cox). When added to the amount paid for Defense Expenses, noted above, the full amount paid by Defendant pursuant to this Policy (and according to the record before the Court) was $497,468.24. The RRGC settlement amount remains an issue in dispute, as does the question of the defense fees for both the RRGC and Shashy actions; Plaintiffs also disagree with Defendant's decision that the demand for defense fees as to the Green claim did not exceed the Policy's Retention.

In addition, Defendant asserts that the Maple Wood entities "did not disclose to Indian Harbor the existence of the Indemnification Agreements or Julio & Sons' obligation to indemnify the MapleWood Entities for all defense expenses and settlement amounts in the underlying actions until after this coverage action was brought." ECF No. 149, at 4.[123] Not surprisingly, Indian Harbor has stated that it reserves its right to seek recovery of amounts it has already paid to Plaintiffs. ECF No. 149 at 7, n.7.

Given this extensive statement of the background facts and arguments,[124] the Court turns to the question presented in Plaintiffs' motion: was this Court's prior ruling in error or is the ruling in need of clarification? To answer this question requires a review of the basis for the Court's ruling as to the parties' discovery dispute.

**123.** Indian Harbor alleges that it learned about this information shortly before the Shashy matter mediation (in April 2008), through its own investigation, and asked the MapleWood entities to respond, ECF No. 221–4.

**124.** Preparation of the Court's fifty-plus page summary of the relevant facts required a substantial amount of time spent reviewing the parties' submissions, which tended to be dis-connected and unnecessarily voluminous, e.g., the same document would appear as an attachment to multiple filings, and other documents were not provided at all (for example, the copies of deposition transcripts submitted to the Court did not include the numerous exhibits referenced at the depositions, nor were all of those documents available elsewhere in the record). In addition, the parties treated certain facts as confidential in

## III. ANALYSIS

In September 2011, after a review of the privilege log submitted by Plaintiffs (ECF No. 39–11), the parties' briefs, the Order of Magistrate Judge Turnoff entered in March 2011,[125] and the controlling law, this Court issued an Order overruling Plaintiffs' objections to the Magistrate Judge's Order. This Court rejected Plaintiffs' claim that all of the documents on the privilege log were privileged or protected from disclosure. Plaintiffs have challenged the Court's determination, and argue that the Court misapplied the law, overlooked precedent, and relied on a "factually incorrect interpretation" of the parties' relationships and the "admitted time line of events."

■ Plaintiffs' motion for reconsideration recites the factors, set out in Rule 60(b), Fed.R.Civ.P., which provide a basis upon which a court may relieve a party from the terms of the court's order: a showing of mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or "any other reason that justifies relief." Fed. R.Civ.P. 60(b)(1), (2), and (6). Decisions as to reconsideration are, of course, left to the discretion of this Court, with the caution that reconsideration is an "extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F.Supp.2d 1366, 1370 (S.D.Fla.2002). As this Court stated, many years ago, a "motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made . . . . '[and should not] ask the Court to rethink what the Court . . .

some instances but not in others, which resulted in an unnecessarily large number of items being filed under seal which, upon reflection, need not have been filed under seal. The Court reminds the parties that the discovery process and rules governing that process, properly used, should "prevent prejudicial surprises and conserve precious judicial energies." *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 304 (5th Cir.1973).

**125.** Magistrate Judge Turnoff, after hearing argument from counsel, compelled Plaintiffs to disclose items responsive to Defendant's request for "documents and communications between [Plaintiffs] and [Plaintiffs' attorneys]" which was directed at items "pertaining to estimates, evaluations and/or assessments of your potential legal liability and/or settlement values" in the Underlying Matters. ECF No. 64.

already thought through—rightly or wrongly....'" *Z.K. Marine, Inc. v. M/V Archigetis,* 808 F.Supp. 1561, 1563 (S.D.Fla.1992) (internal citation omitted).

Plaintiffs also have requested "clarification" of this Court's Order, but their request for clarification instead seeks to avoid the Court's explicit ruling that "all other documents" other than those "select few documents which contain the work-product of attorneys at Ver Ploeg & Lumpkin" prepared after January 1, 2008, should be produced to Defendant.[126] Thus, the Court has evaluated the Plaintiffs' request for "clarification" under the principles applicable to a motion for reconsideration.

Before addressing the specific aspects of the discovery dispute, the Court restates, briefly, the issues in this litigation, as that will guide the analysis of whether the requested discovery is "relevant." Plaintiffs complain that Defendant conducted a flawed analysis as to allocation (including making erroneous decisions as to who was insured and as to what claims), and misapplied the Retention provisions of the Policy. Defendant argues that its allocation decision and coverage determinations were consistent with the terms of the Policy, and its three coverage parts, based on the information available to the insurer at the time of those determinations, that it properly applied the Retention, and that it properly denied Plaintiffs' claims seeking reimbursement for amounts already paid by another (i.e., the Travelers insurance payments to Julio & Sons for defense expenses in the RRGC action).

■ The Court also reminds the parties of the guiding principle that the "Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Farnsworth v. Procter & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir.1985). Discovery is permitted as to "any nonprivileged matter that is relevant to any party's claim or defense," even if the material sought would not be admissible at trial, as long as the discovery is "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

## A. Defendant's discovery request, Plaintiffs' response, and judicial direction

The Defendant's discovery request—served more than three years ago—sought from Plaintiffs (MapleWood Partners, MapleWood Management, and MapleWood Holdings):

3. All documents and communications between *You* and any of *Your Agents,* including but not limited to Brian Miller and/or other individuals at Akerman Senterfitt, LLP, and Michael F. Huber and Richard Hugh Lumpkin and/or other individuals at Ver Ploeg & Lumpkin, *pertaining to the Underlying Matters.*

4. All documents and communications pertaining to *estimates, evaluations and/or assessments of your potential legal liability and/or settlement values* in the *Underlying Matters* made by *You* and/or *Your Agents.*

ECF. No. 37 (Defendant's memorandum in support of its motion to compel, quoting Defendant's Second Set of Document Requests which had been served in December 2009) (emphasis added). In January 2010, Plaintiffs responded, apparently without providing any documents, *see* ECF No. 39–4, Exhibit 4 to Declaration of Steven W. McNutt. Plaintiffs stated that they would "produce any nonprivileged, nonimmune responsive documents," *id.,*[127] but asserted objections as to

---

**126.** The Court's Order stated: "Plaintiffs may submit to the Court for *in camera* review those select few documents which contain the work-product of attorneys at Ver Ploeg & Lumpkin.... Plaintiffs will produce to Defendant all other documents...." ECF No. 187, at 18. Plaintiffs claim to need "clarification" as to whether to produce all documents as to which they have claimed an attorney-client privilege or work-product protection—or just those arguably relevant to the allocation issue, or whether they must produce documents pertaining to coverage issues, and whether they may submit any of the challenged documents for *in camera* review. De-

spite these claimed areas of confusion, Plaintiffs subsequently submitted a total of 28 documents for *in camera* review, which they claimed "contain discussions as to coverage and the work-product of attorneys at Ver Ploeg & Lumpkin." ECF No. 222.

**127.** Plaintiffs, of course, produced to Indian Harbor all correspondence between Akerman Senterfitt and Indian Harbor, i.e., documents presumably already in Defendant's own correspondence file, ECF No. 39–7 (June 24, 2010, letter Caldera to McNutt).

other documents as protected by attorney-client privilege and work-product immunity.

The parties have offered a stipulation that January 1, 2008, is the first date on which the parties anticipated that litigation was forthcoming. In other words, the parties agree that documents created on or after that date "that otherwise qualify as trial preparation materials under the applicable rules" are not subject to production in this case. ECF No. 107–3 (Jan. 5, 2010, e-mail Huber to McNutt). The parties' agreement envisioned that "responsive non-privileged and nonprotected documents prepared after January 1, 2008, *such as correspondence between the Parties and materials from the underlying RRGC litigation*" would be produced. *Id.* (emphasis added).

Despite this stipulation, it appears that the production of documents by Plaintiffs, including their privilege log, was less than swift or efficient. For example, in June 2010, Plaintiffs' counsel indicated that there were *no* documents responsive to Request No. 3 that were prepared in 2007, as the firm of Ver Ploeg & Lumpkin was not retained until late February 2008, and the firm of Akerman Senterfitt already had produced the responsive documents. ECF No. 39–7 (emphasis added). However, approximately *250* documents prepared in 2007 are included in the privilege log presently before the Court. Also, Plaintiffs previously had indicated that they would be producing additional documents responsive to Request No. 4, but it is unclear whether that occurred. According to Defendant:

> Plaintiffs produced a CD containing over 12,000 pages of documents described as "MapleWood's revised document production," which purported to replace entirely MapleWood's seven earlier document productions. The only explanation Plaintiffs offered for this change was to "correct numbering errors" in previous productions. Based on a preliminary review of the revised production, however, we note that there were changes far beyond correcting simply numbering errors. Accordingly, Indian Harbor has been required to spend considerable time and expense (in excess of forty (40) hours of attorney and parale-

gal time) attempting to discern what changes Plaintiffs, in fact, made in their document productions.

> First, it appears that numerous new documents, which had not previously been produced to Indian Harbor, have been sprinkled throughout the production. See, e.g., MPW 7748, 7920, 8313, 9700. Plaintiffs provided no notice to Indian Harbor by letter or Bates number that Plaintiffs were interspersing new documents throughout their substitute production.

> Further, documents previously produced to Indian Harbor appear to have been removed from the substitute production—again with no notice or explanation to Indian Harbor. See, e.g., MAN 9622, MAN 9624. Exactly what has been removed, as opposed to what has been moved around in the revised production, is difficult to tell as some documents have been renumbered out of the order in which they originally were produced. See, e.g., MPW 2976 (previously produced as MPN2978), and MPW 7505 (previously produced as MAN 7524). Compounding the complexity of ascertaining all of Plaintiffs' changes to their various productions, scores of new documents have been added to Plaintiffs' most recent substitute privilege log. These newly added privilege log entries do not come at the end of Plaintiffs' revised log, but, rather, are mixed throughout the hundreds of log entries. Accordingly, these new entries do not appear to represent newly discovered documents, but, instead, are documents that Plaintiffs intentionally removed from their previous productions (leaving numbering gaps in their previous productions) and failed to identify on previous privilege logs. Again, Plaintiffs provided no notice or explanation for the wholesale rejiggering of their privilege log.

ECF No. 39–8 (July 28, 2010, letter Gere to Huber). As late as August 2010, Plaintiffs were still "in the process of logging all privileged communications between Akerman and MapleWood concerning the Underlying Matters in its log." ECF No. 39–10. The Court observes that this appears to be an unjustifiably delayed response to discovery requests initially served in November 2009.

In November 2010, Plaintiffs provided a final version [128] of their privilege log, totaling

---

**128.** Counsel for Indian Harbor noted that there

had been "many changes" to Plaintiffs' privilege

104 pages and listing more than 700 documents, spanning a time period of October 2003 to August 2010. ECF No. 39–11 (submitted with Declaration of Steven W. McNutt, in support of Defendant's Motion to Compel). (Local Rule 26.1(g) describes the procedure for counsel to follow when asserting privilege as a reason for not producing requested materials, and specifies that sufficient information must be provided to identify the withheld materials.[129] As a court often relies on counsel's representations made in the privilege log when reviewing the basis for the asserted privileges, the preparation of the log must be given serious attention by counsel.)

In response to Plaintiffs' objections, Defendant filed a motion to compel, specifically seeking documents reflecting Plaintiffs' "communications with defense counsel, Akerman Senterfitt, LLP, regarding three underlying legal actions brought against Plaintiffs for which they seek reimbursement of indemnity and defense expenses from Indian Harbor." ECF No. 36. Magistrate Judge Turnoff heard argument on the Defendant's motion to compel and, in March 2011, entered an order granting the motion. ECF No. 64 (Order, Hon. William C. Turnoff). Plaintiffs then filed objections to the Order, and asked this Court to find that the documents were protected by attorney-client privilege and were immune from production as opinion work-product.

This Court's Order entered in September 2011 overruled Plaintiffs' objections to Magistrate Judge Turnoff's Order, and invited Plaintiffs to submit those documents "which contain the work-product of attorneys at Ver Ploeg & Lumpkin" for *in camera* review (the Court suggested several documents identified in the privilege log which appeared to be in that category).[130] Plaintiffs also were ordered to turn over all other documents, which they have not yet done.

Plaintiffs subsequently submitted a total of 28 documents which they claimed "contain discussions as to coverage and the work-product of attorneys at Ver Ploeg & Lumpkin." ECF No. 222 (September 19, 2011, notice of submission of documents, filed under seal). None of the submitted documents are those documents specifically identified by the Court, i.e., Plaintiffs apparently do not assert that those documents previously identified by the Court, or any other documents in the privilege log other than the 28 documents submitted for review, contain the opinion work-product of attorneys at Ver Ploeg & Lumpkin.[131]

Plaintiffs have asked this Court to reconsider its decision to overrule Plaintiffs' objections to Magistrate Judge Turnoff's Order. To address Plaintiffs' request, the Court sets forth the legal standards governing whether communications and documents are protected by the attorney-client privilege or work-product immunity. The analysis, below, expands on the analysis provided in the Court's Order of September 2011, ECF No. 187, at 3–18.

## B. Attorney-client privilege

The attorney-client privilege has long been understood to protect from compelled disclosure those confidential communications between a client [132] and the client's

logs. ECF No. 39–9 (Aug. 6, 2010, letter Gere to Huber).

**129.** Local Rule 26.1(g) provides, in pertinent part, that:

> The attorney asserting the privilege shall ... identify the nature of the privilege (including work-product) which is being claimed and ... [t]he following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information: the type of document ..., general subject matter of the document ... date of the document ... and such other information as is sufficient to identify the document ... including, where appropriate, the author, addressee, and any

other recipient of the document ... and, where not apparent, the relationship of the author, addressee, and any other recipient to each other. S.D. Fla. L.R. 26.1(g)(3)(B).

**130.** For example, ECF No. 39–11, Bates 16110–123 (Feb. 1, 2010, "Correspondence between Brian Miller and Michael Huber re: expense documents requested by Indian Harbor").

**131.** Indeed, Plaintiffs describe the privilege log as containing the "Akerman Senterfitt Documents" ECF No. 77, at ¶ 10.

**132.** The privilege also extends to a prospective client. *Nat'l W. Life Ins. Co. v. Walters*, 216 So.2d 485, 486 (Fla. 3d DCA 1968).

attorney made for the purpose of obtaining or rendering legal advice. The rationale for such privilege is that it encourages clients to fully and completely disclose information to their attorneys in order to allow the attorneys to provide competent legal advice or advocacy, and "thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Because application of the attorney-client privilege obstructs the truth-seeking process, it must be narrowly construed.[133] "[T]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence," and therefore must be "strictly construed." *Univ. of Pa. v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (internal quotations and citations omitted).[134]

As stated in this Court's previous Order, Federal Rule of Evidence 501 directs that this Court look to Florida law as to the attorney-client privilege. Florida Statutes section 90.502 provides, in relevant part: [135]

> (1)(b) A "client" is any person, ... or other organization or entity who consults a lawyer with the purpose of obtaining legal services or who is rendered legal services by a lawyer.
>
> (c) A communication between lawyer and client is "confidential" if it is not intended to be disclosed to third persons other than:

> 1. Those to whom disclosure is in furtherance of the rendition of legal services to the client.
>
> 2. Those reasonably necessary for the transmission of the communication.
>
> (2) A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client.

■ Fla. Stat. § 90.502(1), (2).[136] The attorney-client privilege is far from absolute. For example, at least one court has found that the failure to assert the privilege in a timely manner constituted waiver of the privilege, *Rynd v. Nationwide Mut. Fire Ins. Co.,* 2010 WL 5161838, 2010 U.S. Dist. LEXIS 136626 (M.D.Fla. Dec. 14, 2010) (applying federal procedural law in a diversity action and finding that an untimely assertion of attorney-client privilege constituted a waiver).[137]

### 1. Burden of proof as to applicability of the attorney-client privilege

■ The burden of demonstrating that a privilege applies to a particular communication, i.e., that the confidentiality of the communication is more important than the public interest in transparency, is on the proponent of the privilege. *United States v.*

---

**133.** A narrow construction of the privilege is not in conflict with the importance of the privilege, which this Court previously has described as "a cornerstone of the entire judicial/legal system in this country." *Adega v. State Farm Fire & Cas. Inc. Co.,* 2008 WL 1009719, 2008 U.S. Dist. LEXIS 29025 (S.D.Fla. April 9, 2008).

**134.** *See also, Anderson v. State,* 297 So.2d 871 (Fla. 2d DCA 1974) (because the privilege results in the exclusion of otherwise relevant evidence, it "must be strictly limited to the purpose for which it exists," *quoting* 8 Wigmore, Evidence, § 2291 (McNaughton rev. 1961)); *Gonzalez v. Reno,* 2001 WL 34083812, 2001 U.S. Dist. LEXIS 25015 (S.D.Fla. Jan. 23, 2001) ("since it impedes the full and free discovery of the truth, the privilege is to be narrowly construed and recognized only to the limited extent that excluding relevant evidence transcends the normally predominant principle of utilizing all rational means for ascertaining truth.").

**135.** The statute was adopted in 1979, and codified Florida common law on attorney-client privilege. *Mobley v. State,* 409 So.2d 1031, 1038 (Fla.1982).

**136.** The attorney-client privilege applies to information both to and from the attorney. *Hagans v. Gatorland Kubota, LLC/Sentry Ins.,* 45 So.3d 73, 76 (Fla. 1st DCA 2010) (*citing Upjohn,* 449 U.S. at 390, 101 S.Ct. 677).

**137.** "Although state law governs the existence of a privilege in a diversity case, the time to assert such a privilege is a matter of procedure, which is governed by federal law." *Rynd v. Nationwide Mut. Fire Ins. Co.,* 2010 WL 5161838, 2010 U.S. Dist. LEXIS 136626 (M.D.Fla. Dec. 14, 2010) (citations omitted). *See, also,* Fed.R.Evid. 502(f) ("notwithstanding Rule 501, this rule applies even if state law provides the rule of decision").

*Noriega*, 917 F.2d 1543, 1550 (11th Cir.1990) (denying request to stay enforcement of court order forbidding publication of a conversation between client and counsel). The proponent must establish the existence of the privilege by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (matters of preliminary questions, identified in Fed.R.Evid. 104(a), are to be established by a "preponderance of proof," *citing Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

■ The client, who is the holder of the privilege, *XL Specialty Ins. Co. v. Aircraft Holdings, LLC*, 929 So.2d 578, 585–86 (Fla. 1st DCA 2006), also may waive the privilege voluntarily. For example, waiver can be found by voluntary disclosure, Fla. Stat. § 90.507,[138] as disclosure is inconsistent with the confidentiality requirement of purportedly privileged communications.[139] In the event of such waiver, the communications are no longer protected by the privilege. An attorney is entitled to assert the privilege on her client's behalf, and—absent contrary evidence—is presumed to have the authority to do so, Fla. Stat. § 90.502(3)(e), but after the client waives the privilege it is no longer available for assertion by the attorney.

■ A party seeking to pierce the privilege need only establish a *prima facie case* that the client's privilege was waived.[140] If a waiver has been sufficiently alleged, the party seeking the benefit of the privilege must establish—by a preponderance of the evidence—that the privilege was not waived, as the burden always rests in the final analysis with the party seeking the protection of the privilege.[141]

Federal courts in Florida sitting in diversity (and, therefore, applying Florida law as to privilege, and referring to federal law only for procedural questions) have rejected blanket claims of attorney-client privilege and have required that specific detail as to the content of documents and their authors and recipients be provided in order to permit meaningful judicial review of the asserted privilege. *See, e.g., Commercial Long Trading Corp. v. Scottsdale Ins. Co.*, 2012 WL 6850675, 2012 U.S. Dist. LEXIS 184885 (S.D.Fla. Dec. 26, 2012) (mere assertion of privilege is insufficient to meet the burden); *St. Joe Co. v. Liberty Mutual Ins. Co.*, 2006 WL 3391208, 2006 U.S. Dist. LEXIS 85260 (M.D.Fla. Nov. 22, 2006) (applying Florida privilege law to find that proponent of privilege failed to meet burden); *see, also, CSX Transp., Inc. v. Admiral Ins. Co.*, 1995 WL 855421, 1995 U.S. Dist. LEXIS 22359 (M.D.Fla. July 20, 1995) (conclusory descriptions in a privilege log do not sufficiently establish the elements of the attorney-client privilege). In each of the cited cases, above, the court permitted the party an additional attempt to establish the existence of a privilege.

A review of these decisions demonstrates that—at least in the federal courts—a party

**138.** "A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person ... voluntarily discloses or makes the communication when he or she does not have a reasonable expectation of privacy, or consents to disclosure of, any significant part of the matter or communication. This section is not applicable when the disclosure is itself a privileged communication." Fla. Stat. § 90.507.

**139.** Such disclosure may be assessed to determine whether it was the type of purposeful, substantive disclosure that is considered to be a voluntary waiver of privilege, as compared to mere limited or generalized references to privileged communication. *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 667 (M.D.Fla.2010).

**140.** For example, a party need only establish a *prima facie case* that the privilege was waived, pursuant to Fla. Stat. § 90.502(4)(a), by the client's intent to obtain aid from the attorney in committing a crime or fraud. "[F]our of the five district courts of appeal in Florida have used the *prima facie standard* in determining the crime-fraud exception to the attorney-client privilege." *American Tobacco Co. v. State*, 697 So.2d 1249, 1254–56 (Fla. 4th DCA 1997) (collecting cases from 2d, 3d, 4th and 5th District Courts of Appeal); *see also, First Union Nat'l Bank v. Turney*, 824 So.2d 172 (Fla. 1st DCA 2001); and *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1299 (S.D.Fla.2000).

**141.** "[T]he claimant must establish ... [the elements of the privilege, and that the privilege was] not waived by the client." *Noriega*, at 1550 (*citing United States v. Kelly*, 569 U.S. 928, 938 (5th Cir.1978)).

does not satisfy its burden of proving that a privilege applies by merely asserting a privilege. Nor does a party satisfy its burden by simply asking that the court conduct an *in camera* review of documents which the party hopes to keep confidential—instead, the party first must present some evidence to convince the court that the privilege might apply.[142] In contrast, Florida appellate courts have imposed a burden on the state trial courts to conduct *in camera* review upon a very minimal showing by the proponent of the privilege, and have reversed decisions in which such review was not conducted. "On its face, [the discovery] request required disclosure of attorney-client communications. Therefore, the trial court should not have ordered production of these communications without first conducting an *in-camera* inspection thereof." *Nationwide Mut. Fire Ins. Co. v. Hess*, 814 So.2d 1240, 1243 (Fla. 5th DCA 2002) (although no privilege log was filed by the proponent of the privilege, *in camera* judicial review was required before disclosing documents reflecting communications with attorneys).[143] *See, also, Alliant Ins. Servs., Inc. v. Riemer Ins. Group*, 22 So.3d 779, 781 (Fla. 4th DCA 2009) ("party claiming the privilege is entitled to an *in camera* review of the documents by the trial court prior to disclosure");[144] *but see TIG Ins. Corp. v. Johnson*, 799 So.2d 339, 342 (Fla. 4th DCA 2001) (refusing to reverse

lower court's determination that insurer's failure to prepare privilege log resulted in waiver of attorney-client privilege).

In an attempt to meet their burden of establishing that they are entitled to withhold relevant material from production pursuant to an attorney-client privilege (and, also, work-product immunity, discussed below), Plaintiffs have produced a privilege log, as noted above. The log provides a Bates number for each document or set of documents, the date of the document(s), a very brief description of the document(s) (including a statement as to whether material was redacted therefrom), and the asserted privilege. Plaintiffs have not provided affidavits of Miller or others indicating that any of the documents are, indeed, protected by the attorney-client privilege, nor have Plaintiffs identified the relationships of the multiple individuals whose names appear in the privilege log.[145]

As an initial matter, and because the parties do not agree as to the answer, the Court addresses the question of who is the client on whose behalf the privilege is being asserted and as to what communications. The Court then will address the question of whether the requisite confidentiality was present such that these communications might be protected by the attorney-client privilege.

2. *The "clients" and the communications*

Plaintiffs, three corporate entities, have asserted claims of attorney-client privilege as

142. *See, e.g., Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88 (D.Del.1974). "[A] party resisting discovery on the ground of the attorney-client privilege must by affidavit show sufficient *facts* as to bring the identified and described document within the narrow confines of the privilege. Nor will submitting a batch of documents to the Court *in camera* provide an adequate or suitable substitute because the Court is often without information of what the document concerns or how it came into being or other relevant information which would enable it to determine whether the documents are privileged." *Id.* at 94.

143. The court in *Hess* permitted the party another chance to establish a basis for privilege despite the party's failure to comply with a Florida procedural rule, Fla. R. Civ. P. 1.280(B)(6) (2013), regarding assertions of privilege. Rule 1.280(B)(6), adopted in 1996 and originally numbered as 1.280(B)(5), is derived from, and essentially the same as, Fed.R.Civ.P. 26(b)(5), which requires a party to describe the nature of the purportedly privileged documents in a manner that enables other parties to assess the claim.

144. In *dicta*, the Supreme Court of Florida has observed: "Where a claim of privilege is asserted, the trial court should conduct an *in-camera* inspection to determine whether the sought-after materials are truly protected by the attorney-client privilege." *Genovese v. Provident Life & Accident Ins. Co.*, 74 So.3d 1064, 1068 (Fla.2011) (affirming decision prohibiting disclosure of insurer's attorney-client communications in bad faith action).

145. The Court has spent a significant amount of time attempting to segregate the entries in the privilege log as to authors/recipients and subject matter (i.e., which of the Underlying Matters was at issue, etc.), to the extent possible based on the limited descriptions provided. This is not the first privilege log Plaintiffs provided to Defendant, but rather represents (at least) the Plaintiffs' third attempt at adequately stating a basis for privilege. It is abundantly clear that a greater effort should have been made by Plaintiffs' counsel, as advocates for the privilege, to comply with Local Rule 26.1(g)(3)(C).

to communications with Miller and other attorneys at Akerman Senterfitt.[146] Intervenors also have asserted that they hold the attorney-client privilege as to these same communications, as "joint clients" of Miller and his law firm. Plaintiffs argue that the documents and evidence of communications listed on the privilege log reveal legal advice which had been provided not only to Maple-Wood Partners (the Named Insured in the Policy), but also to the other two Plaintiffs: MapleWood Management and MapleWood Holdings, and to the Intervenors: Glaser, Reale, Levitt, Tillet, Morris, Glosson, and Dell. ECF No. 259 (Intervenors' reply in support of Plaintiffs' motion for reconsideration).·

3. *Intervenors, as corporate representatives, do not have an independent right to assert an attorney-client privilege as to corporate communications with Miller*

▮ As an initial matter, the Court rejects the Intervenors' implied argument [147]

that they are entitled to assert an individual attorney-client privilege as to communications between MapleWood Partners and its counsel. Intervenors have described themselves as "actual joint clients" of Miller, but they have not established that they obtained legal advice as to the Underlying Matters in a distinctly individual, rather than representative, capacity, or that their communications with Miller related to something other than their duties with respect to the MapleWood entities and, thus, any privilege they may have is within the same community of interest as the attorney-client privilege possessed by Plaintiffs.[148]

Six of the Intervenors (Glaser, Levitt, Tillett, Morris, Reale and Glosson) were named as defendants, along with the MapleWood and Julio entities, in the Shashy lawsuit. Several months after the Shashy suit was filed, Miller apparently discussed with Glaser the question of legal representation of these individuals.[149] The record reflects that on

---

**146.** Plaintiffs also asserted a privilege as to communications with Ver Ploeg & Lumpkin, and Dickstein Shapiro, the law firms representing Plaintiffs in the present case, but the present discovery dispute addresses only the communications with Akerman Senterfitt.

**147.** Intervenors claim that they previously have utilized Akerman Senterfitt for "legal advice and counsel on business and individual matters," and they "reserv[e] the right to assert individual objections tailored to specific documents or disclosures" included in the privilege log in this case. ECF No. 214, at 2, 4. If an individual desires to assert a privilege as to communications with a corporate entity's attorney, the individual must clearly identify the basis, either corporate or individual, for asserting that privilege.

**148.** "Ordinarily, the corporation and its agents represent the same community of interest and, therefore, there generally is no problem when the corporation seeks to assert the attorney-client privilege. However, if the corporation waives the privilege, the question arises as to whether the individual agents, officers, or employees of the corporation may be permitted to assert the privilege to prevent the disclosure of information conveyed by them to the corporation's in-house counsel or retained attorney. Several courts have considered and rejected the argument that the individual agents of the corporation have a right to assert the attorney-client privilege over the corporation's waiver of the privilege." *In re: Grand Jury Investigation No. 83–30557*, 575 F.Supp. 777, 778–79 (N.D.Ga.1983) (setting forth

five requirements for former employees to establish a right to assert privilege as to communications with counsel for their former corporate employer) (citations omitted).

**149.** The privilege log reveals that Miller distributed an "outline of representation" to three of the Intervenors in August 2007 (Reale, 16942–48; Levitt, 16938, 16949–52; and Glosson, 16953–59), and two other Intervenors were provided with a "retainer" agreement shortly thereafter (Tillett retainer, Sept. 2007, 16849–55; Morris retainer, Oct. 2007, 16801–03, and Feb. 2010, 16064–66). The record does not include a specific reference to a retainer agreement as to Glaser or as to the Plaintiffs (MapleWood entities), but the privilege log does reference communications between Glaser and the attorneys as to "Litigation representation" in March–April 2007 (14323–25, 14326, 14337, 14343–51) and again in August 2007 (16935); also, in September 2007, the attorneys communicated with Glaser regarding representation of the parties to the Shashy lawsuit (16860, 16865, 16886–87), and a letter was sent to Glaser, Glosson, Reale, Levitt, and "MapleWood Partners" and "Julio Investors" regarding "joint representation" (16839–41, 16842–45). The Court does not find a basis in this record for deeming such retainer agreements and letters from Miller outlining the scope of representation as protected attorney-client communications, as they are not "communications made by the client to a lawyer" for the purpose of seeking legal advice.

only a very few occasions thereafter did Glosson, Morris or Reale communicate with Miller outside the presence of Glaser.[150] Plaintiffs have described the Intervenors as insureds [151] and representatives of Plaintiffs; these individuals apparently were not in need of independent counsel,[152] and were united in all respects with the MapleWood entities as to the Underlying Matters.[153] In light of this record, the Court finds that the Intervenors did not have a reasonable belief [154] that they were consulting Miller as their own independent attorney.

 Even if the Intervenors are viewed as shareholders, and not as representatives (as officers or directors) of the MapleWood entities/insureds,[155] the Court's conclusion that they possess no attorney-client privilege independent of the entity's privilege would not change. In *Omega Consulting Grp. Inc. v. Templeton*, 805 So.2d 1058 (Fla. 4th DCA 2002), a Florida appellate court reviewed a lower court's order which required disclosure of corporate e-mail communications in a shareholder's derivative action brought by a 50% shareholder in the two subject corporations, alleging misappropriation of corporate assets by the other 50% shareholder. The trial court had rejected the corporations' claim that the communications were protected by the attorney-client privilege, and the appellate court approved of that determination, noting that the situation was "closely analogous to the situation 'in which the same

150. Only two of the multiple entries in the log involving Glosson were private communications, i.e., between only Glosson and Miller or other attorneys (regarding Board of Directors issues at Julio & Sons (15840), and regarding the Shashy arbitration (16760)). Morris had only three private communications regarding a deposition and witness preparation (15550, 15551–52, 16210), and another conversation related to an unspecified June 2009 meeting (15564). Reale had only one private communication with Miller regarding the Shashy arbitration (16771), and Levitt and Tillett had no private consultations with the attorneys.

151. Plaintiffs assert that this Court's decision in September 2011 wrongly assumed that each member of the "client group" was treated by Defendant as an "Insured." However, the Court notes that Plaintiffs themselves have described all of the members of the Group as insureds for the purposes of seeking coverage and, while Defendant has not agreed with Plaintiffs' position as to these potential insureds, no final decision on coverage has been made. *See* discussion, *supra*. Also, the Court rejects Plaintiffs' argument that there is "new evidence" supporting the motion for reconsideration, as it is not "newly discovered evidence" that Defendant has viewed MapleWood Holdings (which has no employees) and Glaser as not insured, at least for the purposes of the interim decision on coverage. *See, e.g.*, ECF No. 40, at 4.

152. A lawyer shall not represent a client if there is a substantial risk that the lawyer's responsibilities to another client will materially limit that representation unless "the representation does not involve the assertion of a position adverse to another client [represented by the same lawyer in the same proceeding]." Rules Regulating The Florida Bar, Rule 4–1.7(b)(3). Intervenors had sufficiently similar or aligned interests that Miller could represent them along with the Plaintiffs as to the Underlying Matters, without conflict.

153. Intervenors assert that "[w]hen the Court reviews the log … the Court will find that Mr. Glaser's name appears in *every* log entry." ECF No. 259, at 4 n.4 (emphasis in original). Intervenors—represented by Plaintiffs' counsel in this action apparently—were referring only to those items as to which an attorney-client privilege was asserted, but even this statement is false. Glaser does not appear in any of the following items as to which Plaintiffs asserted an attorney-client privilege: 14151, 14617, 14708–09, 15550, 15756–58, 15830–35, 15840, 15843–44, 15855–77, 15887, 15899, 16052–57*, 16061–63*, 16064–66*, 16101, 16110–23, 16210, 16260, 16301–02, 16403–05, 16412–14, 16415–16, 16417, 16418–19, 16420–30, 16431–49, 16450–51, 16671, 16722, 16760, 16801–03*, 16804, 16808, 16826–27, 16837, 16849–55*, 16899–900, 16942–48*, 16949–52*, 16953–59*, 16984, 17080–81, 17178–80, 17248–92, 17554–56. (*Eight of these items are retainer agreements or an "outline of representation" letter as to certain individuals-copies of which apparently were not provided to Glaser. The remaining 37 items all are purported to be attorney-client communications related to the Underlying Matters.) Mischaracterizations of the record by counsel do not encourage confidence in their position as to the asserted basis for withholding these documents (which have not been seen by the Court).

154. *Valliere v. Fla. Elections Comm'n*, 989 So.2d 1242 (Fla. 4th DCA 2008) (rejecting claim that communications with political advisors were protected by attorney-client privilege, as clients did not demonstrate that they had a reasonable belief that the contact was for legal advice).

155. Some of the Intervenors are limited partners in MapleWood Partners, the insured. A limited partner's interest in a limited partnership is analogous to the interests of a stockholder in a corporation. *Renda v. Peoples Fed. Sav. & Loan Ass'n*, 538 So.2d 860, 863 (Fla. 1st DCA 1988).

attorney acts for two or more parties having a common interest [and] neither party may exercise the privilege in a subsequent controversy with the other.'" *Id.,* at 1060. In other words, the corporation and the shareholder, although adversaries and represented by opposing counsel at the time, could not be denied access to communications to which they arguably would have been entitled to access in an earlier context.[156]

The court in *Omega Consulting* noted that "the corporation might successfully assert the attorney-client privilege against a stockholder under some circumstances," *id.* at 1059–60, and referenced the seminal decision in *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970).[157] In *Garner,* the Court of Appeals for the Fifth Circuit announced the "neither new nor world-shaking" proposition that:

> The corporation is not barred from asserting [the attorney-client privilege] merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Id.* at 1103–04. Thus, applying the reasoning of the *Garner* decision, if the MapleWood

entities and their shareholders were to become adversaries in an action, any claim of privilege asserted by the entities would be subject to the shareholders' ability to show cause why the privilege should be not be invoked. This example illustrates that Intervenors' attorney-client privilege is dependent upon the privilege possessed by the MapleWood entities, and also that the privilege is not absolute.[158]

In summary, to the extent that Miller (and his law firm and team of colleagues) represented any of the Intervenors it was only in the Intervenors' role as corporate representatives of the MapleWood entities,[159] and the Court finds that all of those entries in the privilege log involving Glaser or any Intervenor and any of the attorneys from the Miller-led defense team are communications which fall within the same attorney-client privilege shared among Plaintiffs.

### 4. The Julio entities and their directors or employees are clients of Miller's team

As a secondary matter, the Court returns to the question of the relationship between the Plaintiffs and Julio & Sons. As the Court concluded, above, there is no relevant difference between Plaintiffs and Julio Investors, nor Julio & Sons, as to the discovery issue before the Court today, as the same individual or individuals controlled the company and the entities' interests were aligned for all relevant purposes.[160] When Glaser was deposed in this case he attempted to make jokes regarding his "multiple roles" with re-

**156.** Plaintiffs criticize this Court's September 2011 Order and argue that no court in Florida has found *Omega Consulting* to stand for the broad proposition that parties do not need to be joint-clients in order for the common interest exception to apply. That is correct, and this Court also did not make such a pronouncement. This Court did not rely solely on *Omega Consulting* for the determination that Plaintiffs cannot shield the Akerman Senterfitt communications from disclosure; instead, I made my own determination that "the lack of official status as joint clients is not fatal to the application of the common interests exception in cases where the substance of the litigants' relationship to the underlying defense counsel fulfills the statutory requirements of the common interests exception." ECF No. 187, at 9.

**157.** "Because of the division between ownership and control in the modern corporation that may result in a divergence of interest between a corporation's owner-shareholders and its managers, special rules have evolved to govern application

of the attorney-client privilege in shareholder litigation." John E. Sexton, *A Post–Upjohn Consideration of the Corporate Attorney Client Privilege,* 57 NYU L. Rev 443, 514 (June 1982) (citations and notes omitted).

**158.** Although, as noted above, an attorney may assert a privilege on his client's behalf, it is not clear that Miller has taken an independent position in this action as to his clients' privilege other than to comply with the advice of counsel presently representing Plaintiffs before this Court.

**159.** Officers, agents, middle-level and lower-level employees all are considered to be within the reach of the corporate entity's status as a client. *Upjohn,* 449 U.S. at 391–94, 101 S.Ct. 677.

**160.** All of the co-defendants in the RRGC action, including the Plaintiffs, Glaser, and Julio & Sons, had a uniform interest in defeating that action. In the Shashy matter, Julio & Sons had separate counsel but it is unclear that it was an ethical

spect to the MapleWood and Julio's entities. Glaser Dep. Julio's, ECF No. 153–3, at 4. "So when I sat there listening, I wasn't able to differentiate whether I was listening for Julio or for MapleWood at times. But if any formal decisions were taken, they were taken in a formal capacity role." *Id.* Glaser's bold pronouncement is consistent with this Court's finding that Glaser was the controlling voice of the MapleWood and Julio's entities.[161]

Any communications between Plaintiffs (and their attorneys) and the Julio entities or their attorneys were made in relation to the Plaintiffs' defense of the Underlying Matters and, in light of the record of unified control exerted by Glaser over all of these entities,[162] the Court finds that such communications fall within the same shared attorney-client communications for the purposes of a privilege analysis, i.e., the Julio entities do not possess an independent privilege which can be asserted in this matter as to these communications and, instead, are considered to be a co-client, with Plaintiffs and Intervenors, of Miller's team.[163]

In light of the above, the Court finds that any entries in the privilege log which include representatives of the Julio entities (e.g., Steve Bratten [164]), or counsel for those entities (i.e., Adams or Cox, and their respective law firms), will be considered as within the shared attorney-client privilege. In other words, these communications with the Julio entities represent communications with a client who possessed no independent attorney-client privilege but instead was Miller's client along with Plaintiffs and the Intervenors and, therefore, was subject to a shared privilege as co-clients.

### 5. Glaser was the controlling voice of the clients

 The application of attorney-client privilege to corporate entities requires a determination of whether the communication at issue was between the corporate client-represented in all cases by an individual, whether they be an officer, manager, or employee-and the corporation's counsel.[165] In *Upjohn,* the United States Supreme Court rejected a "control group" approach to the determina-

---

necessity. Miller testified that his law firm was not asked to represent Julio & Sons in the Shashy matter, but that the firm did represent all other defendants in that action, including "officers and directors of Julio & Sons" and that Miller had determined that he could represent all of the defendants in the Shashy lawsuit on a joint basis without having a conflict of interest. Miller Dep., at 31–32; *see, also,* ECF No. 153–7 (Miller Dep. excerpts). It is evident from a review of the record that the attorneys for the MapleWood entities and the attorneys for Julio & Sons acted as a unified team in defending the Underlying Matters, with Miller as the leader.

**161.** During discovery in this case, Defendant sought communications between any MapleWood related entities (defined to include Julio Investors and Julio & Sons) and any other insurer. Defendant argued that, pursuant to Fed. R.Civ.P. 34, Plaintiffs were required to produce documents in their "possession, custody, or control," and that—as to any documents not in Plaintiffs' possession—Plaintiffs must produce documents which Plaintiffs had the right to obtain. Specifically, Defendant argued that Plaintiff MapleWood Management, as managing member of Julio Investors, had direct control over responsive documents even if such documents were in the possession of Julio Investors or Julio & Sons and were not possessed by Plaintiffs. ECF No. 39–9 (Aug. 6, 2010, letter Gere to Huber). Plaintiffs disagreed with Defendant's interpretation of Rule 34, but committed to provide

any such documents in their possession, control or custody that were responsive to the request. ECF No. 39–10 (Aug. 12, 2010, letter Huber to McNutt). The Court construes this statement as Plaintiffs' concession that relevant Julio Investors/Julio & Sons documents should be disclosed to Defendant.

**162.** While the Julio entities are not before the Court, and did have separate counsel in the Underlying Matters, it is evident from the record that their attorney-client relationship was not materially independent from the relationship with the MapleWood entities and their counsel. As discussed above, MapleWood Partners (or any of the Plaintiffs) has no interest in the issue before the Court distinct from the interest of Julio Investors or Julio & Sons.

**163.** Plaintiffs themselves have described the interests of the MapleWood and Julio entities as joint, as they "faced common litigation opponents." ECF No. 40, at 16 n.10. Even if the Julio entities are viewed as independent members of a joint defense group, discussed in more detail, *infra,* any such communications shared with Glaser or other Intervenors are subject to a shared attorney-client privilege with Plaintiffs.

**164.** Steve Bratten (or Bratton) is the chief financial officer of Julio & Sons. Miller Dep., at 28.

**165.** "The fictitious legal entity is the client that cannot speak, but that entity is personified by the

tion of which level of employee might be considered as a representative of the client for the purposes of privilege assertions,[166] but did not articulate an alternative standard. *Upjohn*, 449 U.S. at 396, 101 S.Ct. 677 (internal corporate investigation revealed improper payments made to foreign officials, corporation properly asserted attorney-client privilege as to employee's statements to its attorney during the internal investigation).[167] The Supreme Court focused on the function of the privilege, i.e., to encourage the communication of relevant information by employees of the client to those attorneys rendering legal advice to the client—thereby promoting "compliance with securities and tax laws, foreign laws, currency regulations, duties to shareholders" as well as effective judicial administration. *Id.,* at 394, 101 S.Ct. 677.

In a particularly significant decision announced after *Upjohn,* the Supreme Court of Florida applied a heightened level of scrutiny to claims of corporate privilege in order "to minimize the threat of corporations cloaking information with the attorney-client privilege in order to avoid discovery." *Southern Bell Telephone and Telegraph Co. v. Deason,* 632 So.2d 1377, 1383 (Fla.1994) (reports of internal audits conducted at the direction of counsel were not privileged—but were protected as fact work-product). The decision in *Dea-*

*son* provides clear guidance on this issue,[168] setting forth five factors to determine whether a corporation's communications are protected by the attorney-client privilege:

1. the communication "would not have been made but for the contemplation of legal services";

2. employee making the communication did so at the direction of his or her corporate superior;

3. the superior made the request of the employee as part of the corporation's effort to secure legal advice or services;

4. the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties, and

5. the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Deason,* 632 So.2d at 1383. The court in *Deason* held that employee statements made directly to corporate counsel during the internal audits were privileged such that managers in human resources department were not required to divulge communications from corporate counsel regarding those employees' earlier statements, but the reports which summarized those statements were not attorney-client privileged.[169]

---

employees who represent its interests and speak on its behalf. Consequently, [the attorney-client privilege] protects communications between those employees and corporate legal counsel on matters within the scope of their corporate responsibilities, as well as communications between corporate employees in which prior advice received is being transmitted to those who have a need to know in the scope of their corporate responsibilities." *In re Vioxx,* 501 F.Supp.2d 789, 796 (E.D.La.2007).

**166.** The "control group" approach required a finding that only those members of a corporate entity with ability to control the entity's decision after receiving legal advice were the "client" for purposes of attorney-client privilege. *Upjohn,* 449 U.S. at 390–92, 101 S.Ct. 677.

**167.** "*Upjohn* provided an opportunity for the Supreme Court both to explain its willingness to extend to corporations a privilege originally designed for individuals and to define precisely the scope and meaning of the corporate privilege. The *Upjohn* Court allowed the opportunity to pass, however." John E. Sexton, *A Post–Upjohn*

*Consideration of the Corporate Attorney Client Privilege,* 57 N.Y.U. L.Rev. 443, 443–44 (1982).

**168.** In a pre-*Deason* decision, a Florida appellate court held that the power to exercise the attorney-client privilege of a corporate client rested with the corporation's management. *Tail of the Pup. Inc. v. Webb,* 528 So.2d 506 (Fla. 2d DCA 1988) (vacating trial court order requiring disclosure of corporation's communications with its counsel, as prior director and 25% shareholder of corporation was no longer authorized to access privileged documents of corporation against wishes of current board of directors).

**169.** In applying the fifth factor of the *Deason* test, at least one court has observed that legal advice would be "useless" to a company if the advice could not be "disseminated to the few key individuals who were intimately involved" with the subject issue, but such disclosure is limited to those who had a "common legal interest." *Tyne v. Time Warner Entm't Co., L.P.,* 212 F.R.D. 596, 600 (M.D.Fla.2002) (Florida law of attorney-client privilege protects correspondence between employees of corporation and legal department if for purposes of securing legal advice).

An attorney representing a corporate entity often must gather facts through communications to and from the entity's employees, regardless of the employees' decision-making status with the entity; the *Deason* factors assure that courts will not apply privilege protections broadly and instead will focus on those communications which were made confidentially, with authority and in order to obtain legal advice for the corporate entity's use.[170] This interpretation of attorney-client privilege as applied to corporations represents a functionally practical approach to what are often complicated questions.[171]

As an artificial construct, a corporation cannot speak, nor can it waive its own attorney-client privilege—each of these actions is taken by individuals empowered to act on behalf of the corporation. Such empowered individuals must act in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not in service of their personal interests. *Rogan v. Oliver*, 110 So.3d 980, 983–84 (Fla. 2d DCA 2013) (former officer of homeowner's association could not assert or waive the association's

attorney-client privilege), *citing Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (quotations omitted).

In the present case, it is easy to identify Glaser as the lead voice of the Plaintiffs due to his ownership interests and control.[172] Others also may have represented Plaintiffs (and the Julio's entities) in privileged communications with the entities' attorneys, to the extent that such person had the requisite authority, according to *Deason*, and the other elements of privilege were met. Any e-mails or communications other than Glaser's must be shown to have been sent at the direction of a "superior" at the entity, and be within the scope of the sender's duties for the entity, and not distributed beyond the list of persons who needed to know the information. *Deason*, 632 So.2d at 1383.

For example, there is an entry in the log which refers to correspondence between MapleWood Partners' employee Ronald Augustine (or Augustin) and an attorney at Akerman Senterfitt, *see* ECF No. 39–11, at Bates 16260.[173] Although Plaintiffs did not address this point, the Court finds that Augustine's

**170.** The attorney-client privilege is not absolute, nor does it cover every communication between an attorney and her client-a particularly important observation in a world in which communications are immediate and, often, may be made directly by the attorney instead of by her administrative assistant. For example, communications between an attorney and her client may include e-mails, text messages, or other immediate methods of communicating as to topics which may have little to do with the obtaining of "legal advice or assistance," and may simply relate to routine scheduling matters or billing invoices-items which clearly are not protected by a privilege. *See, e.g., In Re Grand Jury Proceedings (Twist)*, 689 F.2d 1351, 1352 (11th Cir.1982) (matters concerning identity of a client or the receipt of fees from a client generally are not included within the privilege). The attorney-client privilege only extends to confidential communications whose primary or predominate purpose is to seek or provide legal advice or assistance. *See, e.g., Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684 (S.D.Fla. 2009) (privilege does not extend to communications with an attorney related solely to business advice). As others have also observed, the "advent of email has added to the difficulty of determining the purpose and intent of communications that involve corporate legal counsel." *United States ex rel. Baklid–Kunz v. Halifax Hosp.*, 2012 WL 5415108, 2012 U.S. Dist. LEXIS 158944 (M.D.Fla. Nov. 6, 2012) (*citing In re: Vioxx Prods. Liab. Litig.*, 501 F.Supp.2d 789, 798 (E.D.La.2007)).

**171.** For example, in *Applied Digital Solutions, Inc. v. Vasa*, 941 So.2d 404 (Fla. 4th DCA 2006), the state appellate court observed that the "question of privilege was not a simple one" where a former officer and majority shareholder of a corporate entity later sued another entity for breach of an agreement relating to the merger of the two entities. The officer, through his counsel, requested and obtained copies of files maintained by counsel who had represented the first entity (but not the officer) during the merger—even though such files belonged to the second entity pursuant to the merger. The trial court determined, and the appellate court agreed, that it was not unreasonable to assume that an officer and majority shareholder were represented by the same attorney representing a corporate entity, and that the inadvertent disclosure of these privileged documents did not automatically disqualify the officer's attorney from representation. *Id.*, at 408.

**172.** Glaser controlled MapleWood Partners, as well as MapleWood Management and MapleWood Holdings—the latter two of which had no employees.

**173.** The Court discerned from a painstaking review of the record that Augustine was the controller for MapleWood Partners, and Jack Aru served as accountant. Glaser Dep. MapleWood, at 51–52. Plaintiffs have not provided a list with the names of the authors/recipients of the communications included in the privilege log to facil-

(and other MapleWood Partners' employees') communications with Akerman Senterfitt may be considered to be within the scope of the corporate clients' attorney-client privilege if all other elements of privilege are present (e.g., the communication would not have been made "but for" the provision of legal services, etc.).[174]

6. *The content of the communications must relate to the obtaining or providing of legal advice and the communications must have been made in confidence*

■ A review of Plaintiffs' privilege log reveals that many of the withheld materials do not meet the test of Fla. Stat. § 90.502, or the *Deason* factors. Plaintiffs have failed to offer evidence that all of these allegedly privileged communications were from an agent of Plaintiffs to or from Akerman Senterfitt attorneys [175] specifically for the primary purpose of seeking legal advice, i.e., the communication would not have been made "but for" the contemplation of legal services. *Deason*, 632 So.2d at 1383.[176] Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that the privilege applies, and generally have failed to do so.

For example, disclosure to an adverse party eliminates the basis for an assertion of privilege under either statutory or common law. Plaintiffs' privilege log includes 85 entries which reflect correspondence with an adverse party or its counsel (e.g., individuals related to RRGC, or Shashy or Green, and their attorneys); none of these documents-approximately 10% of the total documents included in the log-are protected by attorney-client privilege.[177] To the extent that other materials in the privilege log are communications which included an unknown party, the Court finds that such documents also are not protected by the attorney-client privilege. Plaintiffs failed to indicate any confidential or privileged nature of the these unknown persons' relationship to Plaintiffs and, despite this Court's extensive review of the record, the Court was unable to identify the role of 47 names of individuals who appear in the privilege log in a total of 71 documents. The Court has prepared a "Directory" of all relevant names, which is included at the end of this Order. Thus, the Court finds that Plaintiffs have failed to demonstrate that any

itate the determination of whether each entry includes a "client" or a third party—instead requiring this Court to spend a significant amount of time matching the names in the log with names included in other items in the record. (Defendant's privilege log did include a listing of names and a description of the person's role in the case, and otherwise complied with the requirements of the Local Rule.)

174. To be clear, these employees are not separate clients of Akerman Senterfitt but rather are representatives of MapleWood Partners, the insured (which is a client of Akerman Senterfitt). Alternatively, if Augustine and Aru are not considered to be within the scope of Plaintiffs' privilege with their attorneys, then the law firm's communications which include these two men would not be construed as privileged, as they lack the client confidentiality element.

175. The Court's review of the privilege log was made more difficult because Plaintiffs did not segregate specific e-mail communications in the log. *See, e.g.*, 15541–43 "Email Chain Communications between [Glaser, Glosson, Levitt, Tillett, Reale, and others] regarding Results of hearing." Each e-mail communication should be listed individually on a privilege log. *United States ex rel. Baklid–Kunz v. Halifax Hosp.*, 2012 WL 5415108,

2012 U.S. Dist. LEXIS 158944 (M.D.Fla. Nov. 6, 2012).

176. "[T]he communication between the attorney and client is privileged, but the underlying facts are discoverable." *Deason*, 632 So.2d at 1387. Clearly, to the extent that any of the communications listed on the Plaintiffs' privilege log do not include an attorney or his/her staff member, such communications are not protected by the attorney-client privilege. Nor are communications which merely were copied to the attorneys at Akerman Senterfitt considered to be privileged; an e-mail sent between employees of an entity that is simply copied or forwarded to an attorney is not viewed as a legally privileged communication. *In re Seroquel Products Liability Litigation*, 2008 WL 1995058, 2008 U.S. Dist. LEXIS 39467 (M.D.Fla. May 7, 2008) (attorney-client privilege not extended to communications in which attorneys' role is "incidental at best"). "The attorney-client privilege ... protects only 'disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.'" *Slep–Tone Entertainment Corp. v. Johnson*, 2013 WL 1943426, 2013 U.S.App. LEXIS 9515 (11th Cir. May 10, 2013).

177. Nor are they protected as work-product. See discussion, *infra*.

communications involving those unidentified persons were made with the necessary confidentiality to qualify for privileged protection.[178]

In Defendant's original discovery demand, Plaintiffs were asked to produce "all" documents and communications relating to the Underlying Matters—there was no qualifier that the request sought only those communications related to legal advice. Similarly, Defendant's motion to compel sought all "communications with defense counsel" regarding the Underlying Matters. Presumably, Plaintiffs would have produced responsive documents relating to non-privileged communications, and only asserted privilege as to those communications relating to legal advice; however, a review of the privilege log reveals that Plaintiffs have included many items as to which the descriptions do not indicate that the communications had the primary purpose of seeking or providing legal advice.

For example, the Court notes that approximately two dozen entries in the privilege log are related to invoices or billing,[179] or scheduling,[180] or service of process[181] and, as such, evidently were not communications made for the purpose of legal advice (i.e., these specific communications arguably would have been made even absent the provision of legal ad-

vice).[182] In any event, the Court need not go through the nearly 800 documents in the privilege log in further detail at this time in light of the Court's conclusion, discussed below, that categorical production is required.

In summary, the "clients" as to whom privilege is being asserted are the Plaintiffs, the purported insureds,[183] along with their co-clients, the MapleWood entities and individuals identified above as having identical interests, and the Julio entities and individuals with an identical interest[184]—and they all shared an attorney-client privilege as to the defense of the Underlying Matters. As to the communications which Plaintiffs seek to withhold, the Court finds that Plaintiffs have failed to demonstrate that all of the hundreds of documents included in the privilege log were for the primary purpose of seeking legal advice, i.e., would not have been made "but for" the purpose of obtaining or providing legal services to defend the clients in the Underlying Matters.[185] Those documents which do not meet the definition of privilege are identified in the "Chart" at the end of this Order and shall be disclosed immediately to Defendant. In addition, as to those few remaining documents which do appear to have been communications for the purpose of legal services, such items are subject to an attorney-client privilege only if all of the

178. Plaintiffs are not entitled to an opportunity to attempt to make a record at this late stage of the proceedings, as they failed to make a reasonable effort earlier to provide a listing of the names in the log and have failed to comply with Local Rule 26.1(g).

179. Plaintiffs asserted an attorney-client privilege, or a combined attorney-client privilege and work-product protection argument as to twelve distinct items relating to fees (15750, 16252–54), bills (15141, 15185–87, 15189–90, 15197), invoices (15758, 15887), and payment (15207–12, 15213–17, 15754–55, 15887 (this item is also listed here as related to an invoice), 17403–04). None of these documents are protected by attorney-client privilege.

180. Plaintiffs asserted an attorney-client privilege, or a combined attorney-client privilege and work-product protection argument as to ten items relating to scheduling (14139–41, 14155–60, 14161–62, 14203–08, 14211–13, 14262–63, 14363, 14365–66, 15291, 16041–42). None of these documents are protected by attorney-client privilege

181. Plaintiffs asserted an attorney-client privilege, or a combined attorney-client privilege and work-product protection argument as to two items relating to service issues (14335–36, 16722). Neither of these documents are protected by attorney-client privilege.

182. For example, courts do not recognize an attorney-client privilege as to communications from an attorney acting merely as a conduit for a message relating to the client.

183. It is undisputed that MapleWood Partners is an insured.

184. Miller and his law firm, Akerman Senterfitt, were assisted in the representation of the clients by the Kessler Collins law firm, and also by the attorneys hired to represent the Julio entities, Cox and Adams and their respective firms.

185. For example, there are four documents included in the privilege log which are indicated to be "non-responsive" (14359, 14784–85, 15683–88, 15689–94) and, as such, need not be dis-

other elements of the privilege are present, as discussed below.

### 7. Confidentiality in "common" with others

The confidentiality element of the attorney-client privilege can be viewed as a limit on the scope of the privilege, i.e., the privilege does not extend past the boundary within which the attorney and client maintain confidentiality in common. Two doctrines protect from disclosure those items as to which a court might otherwise conclude that the privilege had been waived by a failure to maintain confidentiality: the "joint client" and the "common legal interest" doctrines. These two doctrines are distinct and do not overlap.[186]

▇▇▇▇ The joint client doctrine simply recognizes that the attorney client privilege can apply to joint clients of the same attorney, in the same litigation. The doctrine provides that disclosure by a client or her attorney, which otherwise might constitute a waiver of the attorney-client privilege, is not considered a waiver if the disclosure is made to a co-client of that attorney. For example, as discussed, *supra*, the Intervenors and Plaintiffs are co-clients of Miller's legal team. There is no need to evaluate whether the legal interests of such co-clients are in common or aligned because the clients are joint clients of a single attorney[187] and are entitled, jointly, to a continuing attorney-client privilege. According to Florida law, there is no attorney-client privilege protecting from disclosure those communications made to a co-client when the clients later are in litigation as adversaries.

> There is no lawyer-client privilege under this section when ... a communication is relevant to *a matter* of common interest between two or more clients, or their successors in interest, if the communication was made by any of them to a lawyer *retained* or consulted in common when offered in a civil action between the clients or their successors in interest.

Fla. Stat. § 90.502(4)(e) (emphasis added).[188]

In comparison, the common legal interest doctrine considers parties with separate counsel to nevertheless be aligned for the purposes of a privilege analysis when those parties have legal interests which are allied, as long as the parties' communications were with a lawyer "consulted in common." Fla. Stat. § 90.502(4)(e).[189] The common legal interest doctrine, which was codified in the Florida Statutes in 1992, recognizes that there are certain limited circumstances in which the parties' sharing of otherwise privileged communications advances the policy behind the privilege.[190]

### 8. Joint clients of the same attorney

Plaintiffs (and the related MapleWood entities, Julio's entities, and Intervenors) all are

---

closed and should not have been included in the log.

**186.** There are examples in the case law of confusion of these two distinct doctrines. *See, In re: Teleglobe Communications Corp. v. BCE Inc.*, 493 F.3d 345, 363 n. 17 (3d Cir.2007) (noting that confusion exists, and describing differences between the two doctrines). "Federal courts continue to confuse the allied lawyer doctrine, which applies when parties with separate lawyers consult together, and the joint client doctrine, which applies when two clients share the same lawyer, by using the 'joint defense privilege' to mangle the two concepts.... Having lost its proper moorings in the privilege, the doctrine is spreading like crabgrass...." Wright and Graham, 24 Fed. Prac. & Proc, § 5493 n.91 (2013 supp.).

**187.** The clients also may be joint clients of that attorney's law firm, or multiple law firms if those firms are working cooperatively as co-counsel to the co-clients as to all issues, without conflicts of interest. Such is the case here regarding the several law firms jointly representing the Maple-Wood entities, Julio's entities, and Intervenors, under the leadership of Miller.

**188.** The "matter" in common refers to one "transaction, event, or occurrence" and will not extend to other matters handled by same attorney as to separate clients. *Cone v. Culverhouse*, 687 So.2d 888, 892 (Fla. 2d DCA 1997).

**189.** "There is no lawyer-client privilege ... [as to] a matter of common interest between two or more clients ... or their successors in interest, if the communication was made by any of them to a lawyer retained or *consulted in common* when offered in a civil action between the clients." Fla. Stat. § 90.502(4)(e) (emphasis added).

**190.** According to one commentator, the application of attorney-client privilege to the allied client situation is a relatively recent development ("[o]nly four cases applied the privilege to the allied lawyer setting before 1965"), and is subject to reasoned criticism. "[B]y abolishing the privilege for the allied lawyer situation, courts would simply be making a correction to a recently taken jurisprudential wrong turn." Grace M. Giesel, "End the Experiment: The attorney-client privilege should not protect communications in the allied lawyer setting," 95 Marq. L.Rev. 475, 489 (2011).

joint clients of Miller and his legal team and, therefore, shared an attorney-client privilege with all the benefits and responsibilities that accompany the privilege. The Court now must address whether the insurer was also a joint client of Miller during the defense of the Underlying Matters, such that the insurer is entitled to access the otherwise privileged communications of Plaintiffs.[191] "As a general matter, no co-client is entitled to have a lawyer withhold material information from another. There is no reason to make insurance defense representations an exception to this rule." Ellen S. Pryor and Charles Silver, "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 Geo. J. Legal Ethics 29, 86 (2001) (citations and notes omitted).

The Supreme Court of Florida has not addressed the question of what duty is owed to the insurer by an insured's hired attorney when defense expenses are being indemnified by the insurer. However, The Florida Bar has adopted Rule 4–1.7(e), regarding the representation of insureds in such circumstances.

A lawyer must inform clients of the scope of representation "upon undertaking" the representation of an insured client at the expense of the insurer, and ascertain whether the attorney will be representing both the insurer and the insured as clients or only the insured.

The Comment to this Rule notes that there is a "unique tripartite relationship of insured, insurer, and lawyer."[192] Further, Ethics Opinion 97–1, issued by The Florida Bar and available at www.floridabar.org (last visited June 9, 2013), provides that if interests diverge, and would adversely affect the attorney's representation of the client insured, the attorney must withdraw and must act in the best interest of the insured. Op. 97–1, The Florida Bar.[193] "As long as the representation continues, the attorney's primary duty is to the insured." Id, The Ethics Opinion specifically does not state that the attorney's "sole" duty is to the insured and, as such, can be interpreted as recognizing that the attorney's secondary duty is to the insurer.

A number of courts have found that the interests of an insurer providing defense coverage essentially merge with the interests of its insured being defended. In other words, the insurer becomes the third-party beneficiary of the relationship between the insured and the attorney hired (by the insurer) to represent the insured.[194] "The majority of jurisdictions to decide the issue ... have

191. The fact that Indian Harbor communicated through its own counsel, who was hired to investigate the Plaintiffs' claim in the capacity of a claims adjuster or monitor (but who is now representing the insurer in this coverage), is irrelevant to the question of whether Plaintiffs properly withheld discovery. *Cutrale Citrus Juices USA, Inc. v. Zurich Am. Ins. Group,* 2004 WL 5215191, 2004 U.S. Dist. LEXIS 22487 (M.D.Fla. Sept. 10, 2004) (no privilege attaches to work performed by an attorney performing investigative work, e.g., in the capacity of a claims adjuster, or claim investigation monitor).

192. *See, also, Camacho v. Nationwide Mut. Ins. Co.,* 287 F.R.D. 688, 692–94 (N.D.Ga.2012) (finding that "both insurer and insured [are] co-clients of the firm in the absence of a conflict of interest"). "Although no Georgia court has yet to expressly hold that the privilege vanishes when the same attorney represents both the insurer and the insured under the joint-defense exception, several courts including in Florida, North Carolina, and Iowa have held in the context of a claim for third-party bad faith by an insured against her insurer that the protection of the attorney-client privilege did not apply.... The Court of Appeals of North Carolina noted ... that in construing the effect of the tripartite relationship between an attorney, an insurer, and an insured, several courts across the country have held that the 'common interest' or 'joint client' doctrine applies. Under this doctrine, communications between the insured and the retained attorney are not privileged to the extent that they relate to the defense for which the insurer has retained the attorney." (rejecting claims of attorney-client privilege as to defense of insured in the underlying action) (citations and internal quotations omitted).

193. There is no evidence that Miller informed Indian Harbor as to the scope of Miller's representation of Plaintiffs, or ascertained whether he would be representing both the insurer and insured. Indeed, it appears that Miller and his client, MapleWood Partners, acting through Glaser, freely communicated with Indian Harbor related to the underlying litigation—at least at the beginning of the underlying litigation—without regard to a boundary on the representation. Nor is there evidence that Miller felt a need to withdraw from representation at any time.

194. There may be some guidance to be found in the decision of the Supreme Court in *Allstate Indem. Co. v. Ruiz,* 899 So.2d 1121 (Fla.2005)

concluded that the insurer is in privity of contract with the attorney hired to represent insured individuals or is a third-party beneficiary of the relationship between the attorney and the insured." *Hartford Ins. Co. of the Midwest v. Koeppel*, 629 F.Supp.2d 1293, 1298–99 (M.D.Fla.2009) (collecting cases).

■■■ The principle animating the rule that an insurer and its insured, because they are aligned as to the defense of claims brought against the insured, share an attorney-client privilege has been the law in Florida for more than one hundred years. "It is doubtless the law that where an attorney represents both, or all the parties in a transaction, that conversations and transactions between such parties in the presence of the attorney and each other are not privileged conversations." *Dominguez v. Citizens' Bank & Trust Co.*, 62 Fla. 148, 56 So. 682, 683 (1911) (affirming trial court order prohibiting attorney for bank from testifying as to what opposing party said, as opposing party had consulted same attorney in confidence before filing suit against the bank).[195]

"If the representation was joint, ... defendants possess no information as to which plaintiff could have had any expectation of privacy in relation to the defendants." *Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 173 (5th Cir.1979) (joint representation of family members who mutually owned corporation required disqualification of attorney in subsequent dispute with re-

maining family members, but information learned by that attorney was not privileged).[196] The court observed that parties to a prior joint representation agreement are not entitled to assert attorney-client privilege offensively against each other as to the matters included in that joint representation if the parties are in a subsequent dispute, but they are free to assert the privilege as to outsiders. *Id.* at 172. For example, in this case if RRGC sought access to privileged materials that had been shared between MapleWood Partners and Indian Harbor (e.g., the Pre-trial Report prepared by Miller), presumably both the insured and the insurer would stand together in opposition to RRGC's request.[197]

The record before the Court clearly demonstrates that Plaintiffs, through Glaser and through the Miller-led team of attorneys, intended to, and did, share information with Indian Harbor, including information which was described as attorney-client privileged. The strongest evidence that the parties shared a status as clients of Miller is found in his February 2010 preparation, at Defendant's request and with Plaintiffs' approval, of the Pre-trial Report in the RRGC case. The Report, paid for directly by Defendant, included Miller's assessment of the major issues at trial, key evidence/witnesses, competing expert opinions, potential liability, and damages or settlement value of the case. Indeed, the seven-page Report is marked "Privileged and Confidential Attorney Work-

(interpreting work-product protections in the context of bad faith actions against an insurer). In *Ruiz*, the state's highest court observed the "commonality of legal representation between the insurer and the insured in the underlying action," *Ruiz*, at 1127, as the basis for a lower court's decision in *Boston Old Colony Ins. Co. v. Gutierrez*, 325 So.2d 416 (Fla. 3d DCA 1976), which had concluded that an initial party plaintiff is a third party beneficiary of an insurance contract and, thus, stands in the shoes of the insured and can compel disclosure of the insurer's entire case file.

195. *See also, Ogden v. Groves*, 241 So.2d 756 (Fla. 1st DCA 1970) (finding no error in admission at trial of statements made by adverse parties in the presence of each other and attorney who represented all parties, as such statements were not privileged communications); *Transmark, USA v. State Dep't of Ins.*, 631 So.2d 1112 (Fla. 1st DCA 1994) (co-clients do not need to be present when a communication is made).

196. Disqualification was based on application of ethical standards relating to client loyalty and the duty to preserve confidences, not the rules of privilege. *Brennan's*, at 173. When addressing the question of attorney disqualification in a joint defense group, reviewing courts do not perceive the attorney for a single member of the defense group as having been the attorney for other members of the joint defense group, and only hold the attorney to a duty of confidentiality as derivative to his client's duty of confidentiality toward his co-defendants.

197. Alternatively, if the insured and insurer did not share a joint client relationship as to the Underlying Matters, then disclosures already made to Defendant could constitute a waiver of any privilege Plaintiffs may have possessed, such that the communications no longer would be shielded from others' inquiries.

product Protected" and was provided to Defendant. (The report remains under seal in the Court's file, at ECF No. 39–1). Several months earlier, Miller had provided Defendant with a detailed trial budget for the RRGC litigation, the budget also is marked "Privileged and Confidential Attorney Work-product Protected." (The budget is under seal in the Court's file, at ECF No. 39–2.)

Miller also provided status updates regarding the RRGC litigation "when requested and when something material took place in the litigation," and had multiple conversations with the insurer's counsel regarding expert reports assessing damages in the RRGC action. Miller Dep., at 96, 99–100, 108. At his deposition in this case, Miller recalled "discussing the expert reports and conclusions and damages analysis with Mr. McNutt [counsel for Indian Harbor] on several occasions." *Id.*, at 112. There is no evidence that Miller obtained a waiver from his clients permitting him to have these conversations without waiving any attorney-client privilege, or that Miller (or his clients) objected to these conversations taking place. Indeed, Plaintiffs knew that the detailed Report had been requested by Indian Harbor and, while Plaintiffs objected to paying for Miller's time to prepare the Report in light of the ongoing coverage-related litigation, *id.*, Plaintiffs apparently did not raise any objection to the Report being provided. Such evidence of full cooperation by Miller with the insurer is expected to be found here, as the Policy requires cooperation by the insured, and prohibits the insured from admitting liability or settling a claim without the insurer's consent.[198] Moreover, the Policy imposes a duty, which Plaintiffs accepted in purchasing the Policy, that the insured will

"provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request." *Id.*, (I)(1).

It is clear that Miller and his team of attorneys represented Plaintiffs (and Intervenors), and also that Miller performed at least one piece of litigation work directly for Indian Harbor in addition to communicating openly—without evidence of conflict or objection from his MapleWood entity-related clients—with the insurer. Thus, to at least a certain extent, Miller also represented the interests of the insurer. Despite the inherent tension in such situations, Florida's law on professional responsibility, and Florida caselaw interpreting such responsibilities in the context of insurance disputes, recognize that counsel will act appropriately under such circumstances.[199] An attorney may refuse to disclose matters told to her in private by the insured, in the absence of the insurer, if there was an expectation of privacy. The shared attorney-client privilege extends only to those matters addressed jointly among the clients and counsel. The Rules Regulating The Florida Bar provide that:

> When a lawyer undertakes the defense of an insured . . ., at the expense of an insurance company, in regard to an action or claim for personal injury or for property damages, or for death or loss of services resulting from personal injuries based upon tortuous conduct, including product liability claims, the Statement of Insured Client's Rights shall be provided to the insured at the commencement of the representation.

Fla. Bar. R. 4–1.8(j).[200] There is no evidence before the Court that the Plaintiffs (or any of the Intervenors) ever objected to dis-

---

**198.** This provision does not apply if the insured is facing a relatively small amount of loss, i.e., 50% or less of the amount of the applicable retention, but even in such circumstance, the insured "must promptly advise the Insurer of ay such settlement and provide any information in connection therewith that the Insurer may request. *Id.*, (B)(3).

**199.** The Court observes that in such cases the parties essentially proceed as if a temporary stay is in place as to the coverage dispute, while they continue to work cooperatively in the defense of the underlying action.

**200.** The Statement, referenced in the Rule and included as an appendix thereto, states that there is no lesser duty "of the lawyer to inform clients of their rights in other circumstances [, e.g., when] other types of insurance are involved, when there are other third-party payors of fees, or when multiple clients are represented." *See,* Comment. The Statement provides that if a lawyer learns of information indicating that the insurance company is not obligated under the policy to cover the claim or provide a defense, the lawyer's duty is to maintain that information in confidence. If the lawyer cannot do so, the lawyer may be required to withdraw from the representation without disclosing to the insurance company the nature of the conflict of inter-

closures made by Miller to Indian Harbor prior to the initiation of this lawsuit.[201]

Judge Daniel Pearson, writing the opinion in *Visual Scene, Inc. v. Pilkington Brothers, plc*, 508 So.2d 437, 442 (Fla. 3d DCA 1987), noted that:

> in deciding whether shared information should be protected from disclosure to the third party, one must first answer the questions whether the communication was 'made and maintained in confidence under circumstances where it is reasonable to assume that disclosure to third parties was not intended,' and whether the information was exchanged 'for the limited purpose of assisting in their common cause.

*Id.* at 441 (citations omitted). The rule applies even in a case where the parties are on opposite sides in a matter, as long as their interests were aligned as to the specific matter in common at the time of the allegedly privileged communications. *Id.* at 440–41. "Sharing parties on opposite sides of litigation, being uncertain bedfellows, run a greater than usual risk that one may use the information against the other should subsequent litigation arise between them, yet there is no sound reason not to protect from the rest of the world ... information intended ... to be kept confidential and to be used to further the common litigation interests." *Id.* at 442 (citations omitted).

As the Court's research revealed no reported decisions directly on point, the Court examined cases analyzing related issues arising in insurance disputes in Florida and has attempted to extract from those cases the pertinent principles. The parties disagree as to the relevancy of decisional law in those cases in which an insurer had a "duty to defend" its insured (liability policies), as contrasted with the subject Policy, which provides reimbursement of defense expenses as to "claims made" against an insured being represented by the insured's chosen counsel (indemnity policies). Plaintiffs assert that no court in Florida has applied the "common interest" doctrine to allow an insurance company to invade the attorney-client privilege between an insured and its independently retained counsel (i.e., unlike the decisions applying the "common legal interest" doctrine in cases involving counsel retained and paid by the insurance company to defend the policyholder, based on the court's finding that a fiduciary relationship existed [202]). Defendant argues that the question of attorney-client privilege does not depend on whether the policy at issue is a "duty to defend" or a "duty to advance defense expenses" type of

---

est which has arisen. Whenever a waiver of the lawyer-client confidentiality privilege is needed, your lawyer has a duty to consult with you and obtain your informed consent.... The lawyer is responsible for identifying conflicts of interest and advising you of them.
Statement, ¶¶ 1, 5, 6. There is no evidence that Miller did so.

**201.** The Comment to Rule 4–1.8 provides further clarification:
> When a lawyer undertakes the representation of an insured client at the expense of the insurer, the lawyer should ascertain whether the lawyer will be representing both the insured and the insurer, or only the insured. Communication with both the insured and the insurer promotes their mutual understanding of the role of the lawyer in the particular representation.... The highly variable nature of insurance and the responsiveness of the insurance industry in developing new types of coverages for risks arising in the dynamic American economy render it impractical to establish a statement of rights applicable to all forms of insurance.
Comment, Rule 4–1.8 (noting, for example, that the Statement of Rights mentioned in section (j) of the Rule is inapplicable in the workers' com-

pensation cases). Again, there is no evidence before the Court that Miller communicated with the insurer to clarify whose interests Miller was representing at a given time.

**202.** The Supreme Court of Florida has described the fiduciary duty of an insurer as arising from the dependency created by an assumption of the duty to defend. "[I]nsurers had the power to settle and foreclose an insured's exposure or refuse to settle and leave the insured exposed to liability in excess of policy limits. This placed insurers in a fiduciary relationship with their insureds similar to that which exists between an attorney and client." *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So.2d 55, 58 (Fla.1995). The Supreme Court also has recently observed that "the law imposes the same obligations regarding settlement" and the duty to act in good faith *regardless of whether the policy at issue is an* indemnity or liability policy. *Perera v. U.S. Fid. & Guar. Co.*, 35 So.3d 893, 898–99 (Fla.2010) (liability insurer's duty is to use same degree of care and diligence as a person of ordinary care and prudence would exercise as to his own business).

policy, and points to the Florida statute's absence of any requirement that counsel be controlled by one party or the other, as long as the parties "consulted [the attorney] in common." Fla. Stat. § 90.502. The Court has analyzed the reported decisions, below, with attention to these noted distinctions.

In Florida, and in other jurisdictions, a liability insurer must defend the entire case, even if not all of the claims are covered. In cases where counsel was retained by the insurer to represent the insured, courts have not hesitated to find that the interests of the insured and insurer were allied for the purposes of attorney-client privilege (indeed, the parties are considered to have had a fiduciary relationship),[203] such that documents relating to the underlying litigation against the insured were discoverable even if the parties' interests became adverse in a subsequent bad faith action. *See, e.g., Progressive Express Ins. Co. v. Scoma,* 975 So.2d 461, 466 (Fla. 2d DCA 2007) (reversing trial court order requiring production of documents in third party bad faith action where court had failed to properly apply common interests

doctrine as to communications between insurer, insured, and attorney); *Liberty Mut. Fire Ins. Co. v. Kaufman,* 885 So.2d 905, 907 (Fla. 3d DCA 2004) (where summary judgment had been granted as to coverage and first party bad faith action remained, communications between insurer and the attorney it hired to represent insured were not privileged as the insured and insurer shared a common interest during the underlying proceedings); [204] *see, also, Springer v. United Servs. Auto Ass'n,* 846 So.2d 1234, 1235 (Fla. 5th DCA 2003) (in case alleging slander by attorney, communications concerning matters not pertaining to the defense or resolution of the liability case may be privileged and not subject to disclosure to insurer, e.g., discussion of coverage issues or how to proceed if the case could not be settled within policy limits, even if interests diverge later with regard to coverage; however, common interest in defeating underlying claim bars the assertion of a privilege with regard to communications between the insured and its counsel such that the insurer is entitled to access such communications).[205] *Florida*

203. Because a liability insurer who acts on its obligation to defend its insured has a fiduciary relationship with its insured, "certain interests of the insured and the insurer essentially merge." *Kaufman,* 885 So.2d at 908.

204. Plaintiffs rely on an earlier decision of the Third District, *Eastern Air Lines, Inc. v. U.S. Aviation Underwriters, Inc.,* 716 So.2d 340 (Fla. 3d DCA 1998), for their argument that a policy's cooperation clause does not eliminate an insured's ability to assert attorney-client privilege to prohibit disclosing to its insurer the client's communications with counsel. In Eastern Airlines, the appellate court overturned a lower court's order compelling disclosure of communications between Eastern Airlines and its counsel regarding underlying claims. The lower court had based its determination, inter alia, on the cooperation clause of the subject insurance policy and a view of the parties' relationship only at the time of their bad faith dispute. "[A]t this point in the litigation, Eastern and its insurers are clearly in the most adversarial of positions. No fiduciary relationship now exists." *Id.,* at 343. In overturning the order below, the appellate court observed that a cooperation clause in an insurance policy does not eliminate the attorney-client privilege, but rather is designed to "prevent fraud and collusion," and applies only when the insured and insurer are in a fiduciary relationship. *Id.* "Where that fiduciary relationship exists [e.g., as joint clients], a Florida court may compel production of documents as between the two parties in the relationship." *Id.*

(The decision also referenced a subsequently receded-from decision of the Supreme Court of Florida, *Kujawa v. Manhattan Nat'l Life Ins. Co.,* 541 So.2d 1168 (Fla.1989), for the proposition that when an insured and insurer are not in a fiduciary relationship, i.e., when they are adversaries in a bad faith action, the attorney-client privilege is not waived.) The decision in *Eastern Air Lines* was cited by the court in *Kaufman* for the general proposition that a liability insurer has a fiduciary relationship with its insured. In light of the appellate court's subsequent decision in *Kaufman,* which was written by a judge who was a member of the panel in *Kaufman,* the Court finds that the decision in *Kaufman* more accurately reflects the current state of the law.

205. In the context of a bankruptcy proceeding, the court in *In re: Fundamental Long Term Care, Inc.,* 489 B.R. 451 (Bankr.M.D.Fla.2013), commented that, similar to an insurance coverage case where the insurer has an obligation to retain counsel to defend its insured, a parent company which was contractually obligated to retain counsel to represent its subsidiary and direct the defense of a wrongful death case had to concede that the subsidiary was the insured. "The co-client exception applies regardless of whether both parties are present when the communication is made." *Id.* at 463 (joint client doctrine permitted bankruptcy trustee to obtain communications relating to defense of wrongful death claims brought against debtor's subsidiary so that trustee could continue defense of such claims).

*Sheriff's Self-Ins. Fund v. Escambia Cnty.*, 585 So.2d 461 (Fla. 1st DCA 1991) (in action brought by municipality alleging bad faith against insurer and malpractice against attorney hired by insurer, it was proper to compel disclosure of insurer's attorney's files from underlying negligence action—as to which attorney had represented both entities—over assertions of privilege and work-product protections).[206]

 In contrast to the above-cited cases involving a liability policy (and the insurer's duty to defend), in cases reviewing an indemnity policy, similar to the Policy at issue here (where Plaintiffs retained the right to hire their own defense counsel), courts necessarily focus on the question of notice to the insurer.[207] Providing notice to the insurer begins the process of adjusting a claim and-as recognized by courts—the "insured is in a better position to evaluate a claim and its potential consequences." *Nat'l Union Fire Ins. Co. v. Underwriters at Lloyd's*, 971 So.2d 885 (Fla. 3d DCA 2007) (as notice is the essence of a "claims made" policy, court found notice to one insurer was insufficient, but notice to other insurer who had issued consecutive liability policy was sufficient to trigger coverage).[208]

Plaintiffs contractually gave to Defendant the right to comment on the reasonableness of counsel's fees, participate in (and, to some extent, control) settlement decisions as to any claims brought against Plaintiffs, etc. And, the Intervenors were, at all times, co-clients with Plaintiffs, and are seeking coverage pursuant to the Policy, as discussed above. Indeed, the definitions of the various coverage types provided in the Policy are sufficiently complex that the Plaintiffs reasonably should have anticipated that the insurer would demand extensive information if presented a claim for coverage.

For example, the IAML coverage under the Policy only applies to acts or omissions by insureds "solely by reason of his or her status [as an insured]," which suggests that the insurer could reasonably request information as to the specific allegations in any claim made against an insured, and also would require information from the insured as to the context of the alleged wrongdoing—even if not included in the claimant's pleading. The IAPL coverage applies to claims against an insured for acts or omissions "in the performance of, or failure to perform, Professional Services" and envisions that such Professional Services might include "selection, oversight and direction" by an insured as to another person or entity performing such services on behalf of MapleWood Partners. To investigate whether a claim made by Plaintiffs meets the definitions under this coverage type, the insurer might reasonably demand pertinent information as to all of the employees and agents of Plaintiffs—even if such information is not included

---

**206.** "The relationship between the [insurer] and the County evolved from fiduciary to adversarial, or a combination of the two, with no clear line of demarcation separating them." *Id.*, at 463. "The issues of coverage and possible settlement were matters of 'common interest' to both the County and the [insurer] ... and, notwithstanding any purported limitations on the extent of [the attorney's] representation of the County, he occupied the position of attorney for both clients." *Id.*, at 463–64. "[T]here is no doubt" that the interests of an insurer and an excess insurer were aligned in underlying personal injury litigation, because "[g]enerally, when an insurer accepts the defense obligations of its insured, certain interests of the insured and the insurer essentially merge." *Allied World Assurance Co. (U.S.), Inc. v. Lincoln Gen. Ins. Co.*, 280 F.R.D. 197, 203 (M.D.Penn.2012) (applying Florida law in a bad faith insurance dispute, *citing Kaufman* ).

**207.** "The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless." *Jones v. Fla. Ins. Guar. Ass'n*, 908 So.2d 435, 443 (Fla.2005). "While the duty to defend is ... based on the allegations in the complaint, the duty to indemnify is determined by the facts adduced at trial or during discovery." *Pa. Lumbermens Mut. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 43 So.3d 182, 188 (Fla. 4th DCA 2010) (affirming entry of summary judgment in coverage dispute). Where there is no duty to defend, there is no duty to indemnify. *Colony Ins. Co. v. Total Contracting & Roofing, Inc.*, 2011 WL 4962351, 2011 U.S. Dist. LEXIS 120269 (S.D.Fla. Oct. 18, 2011) (insurer had no duty to defend or indemnify in light of applicability of policy exclusions from coverage).

**208.** The insured's "obligation to provide notice cannot be shifted to the insurer to speculate as to the consequences that may result from specific wrongful acts by sifting through voluminous documents identified in the [underlying complaint]." *Nat'l Union Fire Ins.*, at 889.

in the pleadings in the Underlying Matters. Finally, as to the IFMPL coverage, questions might be raised as to whether an insured person against whom a claim has been brought was acting in his or her capacity "as a director, officer, member of the Board of Managers, general partner, or managing general partner of an Investment Fund."

■ This type of insurance policy is distinguishable from the general liability insurance policy which is the subject of most of the published decisions relied on by Plaintiffs; however, the distinctions between the types of policies do not render the principles applied in those decisions inapplicable here. When the insurance policy includes a duty to defend, the insured who purchases that policy acquiesces to representation by an attorney hired by the insurer, and in a "claims made" policy the insured has acquiesced to involvement by its insurer in the defense of any claims brought against the insured.[209] An insurer's "obligation to advance defense expenses is not materially different from a duty to defend." *Julio & Sons Co. v. Travel-* *ers Cas. and Sur. Co.*, 591 F.Supp.2d 651, 664 (S.D.N.Y.2008) (applying Texas law, and requiring insurer of Julio & Sons to advance defense expenses for Glaser as to the RRGC action). "The whole purpose of advancing legal expenses rather than reimbursing them at the conclusion of litigation is that insured organizations may not have the cash on hand to finance their own defense." *Id.* at 659. Courts presiding over a subsequent coverage dispute will construe the relationship between insurer and insured in the underlying action as a joint client relationship as to the defense of that action (even if the insurer hired the attorney and controls the defense of the insured).

■ The conclusion to be drawn from these decisions is that an insured who brings a bad faith action against its insurer can obtain communications which were made between the insurer and counsel it hired to represent the insured as to those matters in which the insurer and insured had a common interest.[210] In other words, any privilege as to communications between MapleWood

---

**209.** The Court finds additional support for this conclusion in a decision from the Northern District of Florida. In *Doe v. Onebeacon Am. Ins. Co.*, 2012 WL 5876566, 2012 U.S. Dist. LEXIS 166388 (N.D.Fla. Nov. 21, 2012), two attorneys had represented the insureds, the Catholic Diocese of Savannah and two of its employees—one attorney was hired by the insureds directly and later approved by the insurer, and the other attorney was hired by the insurer—in an underlying claim. In the subsequent coverage dispute, the federal court observed that both attorneys had the insured as their client, but the representation was funded by the insurer, and the insurer therefore could assert privilege as to communications with either of these counsel on behalf of its insured. In other words, the insurer and the insured were in the same position as to attorney-client privilege. While the insurer initially agreed to defend the case, hiring counsel and also approving the insured's own hired counsel and agreeing to pay his fees, disputes arose between the insurer and the insured. The insured Diocese rejected the insurer's defense and instead settled the case with their own counsel, then assigned to the plaintiff the right to pursue the insurer for breach of the insurance contract. The court did not order disclosure to the plaintiff who had received an assignment from the insured, as the terms of the assignment did not include a waiver of the insured's attorney-client privilege. The court also noted that if the insured accepts a defense under a reservation of rights, "the insured must cooperate with the insurer throughout the course of the litigation."

*Id.* (absent evidence of waiver the attorney-client privilege prohibited compelled disclosure of confidential materials to assignee of insured in coverage dispute); *see, also, Doe v. OneBeacon Am. Ins. Co.*, 2012 WL 1632222, 2012 U.S. Dist. LEXIS 64843 (N.D.Fla. May 8, 2012) (earlier decision providing background facts).

**210.** When a third party sues an insurer for failing to adequately defend its insured, "any correspondence and communications between the insurer and the insured's [counsel, retained by the insurer to represent the insured,] concerning the defense of the insured are subject to discovery." *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 668 (M.D.Fla.2010), *citing Geico Cas. Co. v. Beauford*, 2007 WL 1192446, 2007 U.S. Dist. LEXIS 29615 (M.D.Fla. April 23, 2007)(in declaratory judgment action filed by insurer against its insured and third party—with whom insured had entered into a consent judgment to resolve underlying lawsuit—insured was entitled to claim file and communications between insurer and the insurer-provided defense attorney including for the period after entry of a consent judgment against her). *See, also, Geico Cas. Co. v. Beauford*, 2006 WL 2789013, 2006 U.S. Dist. LEXIS 70677 (M.D.Fla. Sept. 26, 2006) (compelling deposition of insurer-retained defense attorney by third party after insured had withdrawn a claim of privilege, third party had raised bad faith allegations in counter-claim and such allegations established that counter-claimant had a substantial need for discovery which overcame attorney's work-product protection objection).

Partners, acting through Glaser, and its attorneys was a shared privilege with Indian Harbor if the communications related to the defense of the Underlying Matters and to the extent that there was a pending claim for coverage (i.e., MapleWood Partners had no reasonable expectation of privacy in light of the Policy's mandated cooperation), and litigation had not yet been filed (litigation was not even "anticipated" prior to January 1, 2008, according to the parties).[211]

 However, to be clear, the parties are not aligned as to their coverage dispute before me and, as such, Plaintiffs' communications with coverage counsel as to the present case are not discoverable.[212] Similarly, Defendant's communications with its own counsel are not discoverable, generally, as discussed later in this Order. In litigation involving an insurer's allegedly bad faith conduct, the Supreme Court of Florida has held that, other than in limited circumstances (e.g., where a waiver was established), "when an insured party brings a bad faith claim

against its insurer, the insured may not discover those privileged communications that occurred between the insurer and its [own] counsel during the underlying action." *Genovese v. Provident Life & Accident Ins. Co.*, 74 So.3d 1064, 1068–69 (Fla.2011).[213] Communications between an insurer's adjuster and its outside counsel do not waive the insurer's attorney-client privilege. *See, e.g., Royal Bahamian Ass'n v. QBE Ins. Corp.*, 2010 WL 3637958, 2010 U.S. Dist. LEXIS 101275 (S.D.Fla. Sept. 20, 2010) (after *in camera* review, court determined that communications with insurer's field adjuster were privileged and privilege had not been waived); *but see TIG Ins. Corp. v. Johnson*, 799 So.2d 339, 342 (Fla. 4th DCA 2001) (upholding order, in breach of contract case, compelling production of letters between the insurer and its lawyer hired to investigate underlying claims brought against its insured, presumably because a waiver of the privilege occurred by insurer's failure to provide a privilege log).[214]

**211.** Intervenors argue that they are an "actual" joint client of Miller and, as such, have an absolute right to claim privilege as to all communications to/from Miller regarding legal advice to any actual joint client. Intervenors rely on the statutory provision that: "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client." Fla. Stat. § 90.502(2). The Court finds Intervenors' argument to be flawed in at least two respects; first, the privilege is not absolute in any context, and second, the Intervenors were at all times represented by Miller only as to their identity as corporate representatives.

**212.** Not surprisingly, in a subsequent malpractice action brought by an insured against a separate attorney hired by the insurer, the insured was not required to disclose communications with their own hired attorney (for whom they paid the expenses, at least initially). *Volpe v. Conroy, Simberg & Ganon, P.A.*, 720 So.2d 537 (Fla. 4th DCA 1998). When a client is represented by more than one attorney, the client is not precluded from asserting the attorney-client privilege as to a subject discussed with only one of the client's attorneys. In *Volpe*, the state appellate court noted that there was no evidence that the insureds ever intended to share with their insurer (or the attorney hired by the insurer) all of their communications with their personal attorneys and, instead, there was evidence to the contrary. *Id.* at 539.

**213.** Thus, attorney-client privilege remains available to insurers as to their own counsel, as urged by this Court in *Adega*. "It is hoped that whatever decision is made [by the Supreme Court of Florida], the appropriate consideration is given to the sanctity of the attorney-client privilege." *Adega v. State Farm Fire & Cas. Inc. Co.*, 2008 WL 1009719, 2008 U.S. Dist. LEXIS 29025 (S.D.Fla. April 9, 2008). This Court, and others, erred in predicting what the Supreme Court of Florida might do following its ruling in *Ruiz*. *Id.* (concluding that the state's supreme court might not find that the attorney-client privilege protected material from discovery in a first-party bad faith action); *see also Lender v. Geico Gen. Ins. Co.*, 2010 WL 3743812, 2010 U.S. Dist. LEXIS 105454 (S.D.Fla. Sept. 22, 2010) (same). The ruling in *Genovese* is consistent with the joint client or the "common legal interest" doctrines discussed in this Order, as the insurer and the insured were not joint clients as to communications with the insurer's counsel, i.e., the insured does not "consult in common" the insurer's counsel, nor are the insured's interests aligned with the interests of the insurer when the insurer is in communication with its counsel about—presumably—coverage issues.

**214.** In *Kaufman*, the trial court determined that there was no coverage under the policy but still permitted discovery of the claim file based on the fiduciary relationship between the insurer and insured, as well as the insured's claim of statutory bad faith. Communications and documents (containing comments and evaluations by representatives of the insurer concerning legal work

When an insured brings a bad faith action against his or her insurance company, following the unsuccessful defense of a tort lawsuit, the attorney-client privilege requires special analysis. Under these circumstances, the same attorney may often ethically represent both the insured and the insurer in the tort action. See R. Regulating Fla. Bar 4–1.7(e). That is, the insured and insurer's interests may be aligned, or at least may not be adverse. In many tort actions, then, the lawyer for the named defendant is also the lawyer for the defendant's insurance company, even though the insurance company is not a party to the lawsuit.

 *Scoma*, at 466.[215] The complexity of such dual representation can be addressed by the abatement of the coverage dispute, for example, which recognizes the non-final nature of coverage disputes in these types of cases, raised during the pendency of the defense of the underlying claims. In fact, the Policy in this case specifically envisions that any initial decision to advance defense expenses may be an interim decision, as the Policy includes an exclusion for intentional misconduct or fraud that applies only after "a final adjudication in the underlying action." IAML, Exclusions, (A).

 In conclusion, as a general holding, the Court finds that when an insured has purchased a directors and officers indemnity policy such as the Policy at issue in this case, which provides for the reimbursement of incurred defense expenses as to "claims made" against the insured and includes a cooperation clause and other requirements governing litigation as to underlying claims brought against the insured (e.g., a requirement that the insured not admit liability or settle any claim without the insurer's consent), and when the insured (or its own counsel) discloses otherwise-privileged materials with the insurer, it is proper to find that the insured has selectively waived[216] its privilege as to matters to which its interests with the insurer.[217] The Court finds this approach to be consistent with insurance law and privilege law as developed in Florida. Plaintiffs assert that this Court's September 2011 Order held that any acceptance of reimbursement (i.e., coverage) for defense expenses eliminated an insured's right to assert attorney-client privilege as to any related matter, even if the insured was not a joint client with the insurer. The Court disagrees, as the Court's Order was not a globally applicable statement but rather was focused on the facts alleged before me.[218] The Court has

performed by the insured's retained counsel while representing the insured) were ordered to be produced. *Id.*, at 909.

**215.** "The attorney-client privilege does not generally attach as to communications between an insurer, the insured, and the attorney hired to represent the insured in a third-party claim because these parties agreed to a representation of common interests. Each of these parties is thus unable to claim the privilege as against one of the other parties." *Progressive Express Ins. Co. v. Scoma*, 975 So.2d 461, 466–68 (Fla. 2d DCA 2007).

**216.** *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1423 n. 7 (3d Cir.1991) (rejects selective waiver theory as applied to voluntary disclosures not made for the purpose of seeking informed legal advice). In contrast, the theory of partial waiver recognizes that a party who discloses a portion of otherwise privileged materials (e.g., as to a certain subject matter) may continue to assert privilege as to the remaining portions of the materials. *Id.*

**217.** The theory of selective waiver recognizes, of course, that some disclosures of otherwise privileged communications result only in a waiver of

the privilege as to those select parties (e.g., in the allied interest context, or in responding to government agency inquiries as described in new Fed.R.Evid. 502) but not a waiver of the privilege, generally.

**218.** Plaintiffs argue (in a section titled "the Court overlooked controlling law") that Defendant "did *not* pay a portion of defense fees before all of the underlying suits were settled." ECF No. 217, at 10 (emphasis added). Plaintiffs are referring to this Court's observation that "Defendant paid a portion of the defense expenses before all of the Underlying Matters were settled," which was noted in support of a finding that the parties shared a common interest in defeating liability in the underlying proceedings. While the Court's language may have been unclear to Plaintiffs, the statement was accurate. The last of the Underlying Matters, the RRGC action, was not settled until September 2010, almost two years after Defendant had begun (in January 2009) contributing toward the defense expenses relating to the RRGC action and the Shashy action (which settled in April 2008). Moreover, Defendant attempted to obtain information which might have resulted in a more timely payment, but Plaintiffs and their representatives appeared to be reluctant to respond.

looked at several factors which support the finding that Indian Harbor effectively was a joint client of Plaintiffs as to the Underlying Matters: the parties' voluntarily and affirmatively undertaken contractual obligations pursuant to the Policy, evidence of cooperation and disclosure as to defense counsel's expenses, shared decision-making roles as to material aspects of the litigation—including the question of trial strategy and settlement decisions, frequent attendance at joint meetings by both parties' representatives, frequency and content of correspondence—all done toward the achievement of a common objective of successfully defending against the claims in the Underlying Matters. Defendant had not only a financial interest but, more importantly, a direct legal interest in the outcome of the Underlying Matters.[219]

In summary, the Court finds that—at least in the context of the Policy before me today—that the insurer is deemed to be a joint client as to the specific representation of the Plaintiffs/insureds (as well as the MapleWood and Julio entities and the Intervenors), in the underlying liability action.[220] A question remains, however, as to what time period is covered. A joint client relationship among the Plaintiffs and Defendant can be considered to have existed at least until January 1, 2008, the date on which the parties agree that they first anticipated that they would be in litigation against each other.[221] As such, the approximately 250 documents listed in the privilege log with a date prior are not protected by attorney-client privilege from disclosure to Defendant. (The Court discusses the applicability of work-product immunity, below.)[222]

The situation in which parties are engaging in a coverage dispute at the same time they are cooperating in the defense of an underlying action probably is not unique, although it is somewhat problematic—as evidenced by the multiple discovery disputes in this case. In an analogous context, the Supreme Court of Florida has observed that "when *coverage* and *bad faith* actions are initiated simultaneously, the courts should employ existing tools, such as the abatement of actions and *in-camera* inspection, to ensure full and fair discovery in both causes of action." *Ruiz*, at 1130 (emphasis added). The parties before the Court are now solely in litigation as to the coverage matter, as all of the Underlying Matters have been resolved. In light of this specific situation, the Court finds that all of the communications between Miller and his clients as to the Underlying Matters, including those communications which occurred after January 1, 2008, are subject to disclosure in light of the

219. For example, there was a question as to whether Travelers, the insurer for Julio & Sons, had paid certain of the defense fees and whether Travelers might in turn proceed against Indian Harbor for indemnification. Depending on the resolution of the Shashy matter, for example, Indian Harbor might have faced an action brought against it directly by Travelers.

220. Plaintiffs argue that Defendant does not consider MapleWood Holdings as an insured and, therefore, it should be entitled to assert attorney-client privilege as to any communications in which it was included; moreover, relying on the theory that one joint client cannot eliminate the privilege held by another joint client, then even if MapleWood Partners is an insured and has a joint privilege with Defendant, it cannot compel MapleWood Holdings to disclose communications as to which it holds a privilege. The flaw in this argument is exposed by the fact that MapleWood Holdings has no employees, and is simply another entity in the maze of MapleWood entities. Thus, under Plaintiffs' approach to privilege, any corporation could form a separate entity—without employees or real function—and then not include that entity in any directors and officers liability policy purchased for the corporation. In any communications which might trigger a claim for coverage under the policy, the corporation could include the entity so that such communications would be shielded from disclosure to the insurer in a later coverage dispute.

221. The parties' agreement envisioned that "responsive non-privileged and non-protected documents prepared after January 1, 2008, such as correspondence between the Parties and materials from the underlying RRGC litigation" would be produced. ECF No. 107-3 (Jan. 5, 2010, e-mail Huber to McNutt).

222. The record reveals that Plaintiffs were providing arguably privileged materials to Indian Harbor at least until that date and perhaps even later. "[W]e previously were provided with a copy of a September 4, 2007, demand letter [in the Shashy matter] from the [counsel for the MapleWood entities and individuals]." ECF No. 221-4, at 8. As late as January 2009, Plaintiffs' coverage counsel advised Defendant that: "[w]e have no issue with an adjuster obtaining information [as to the then-pending RRGC matter] for the internal use and evaluation by the carrier." ECF No. 218-1.

shared privilege possessed by the Indian Harbor, unless any of those documents are subject to work-product protections, discussed below.

The Court's conclusions, above, were based on the Court's determination that—under the specific facts of this case, including the terms of the Policy and the status of the clients—the insurer stood in a joint-client relationship with its insured as to the defense of the Underlying Matters and, as such, the question of a shared attorney-client privilege was answered in the affirmative. The answer to the question is more elusive, however, if the insurer and insured are not considered to be joint clients of the defense attorney but instead their relationship is examined to determine whether they shared a "common legal interest" in the Underlying Matters.

9. *The "common legal interest" or "joint defense" approach to confidentiality when more than one attorney or law firm is involved*

■ The joint-defense doctrine developed in the context of criminal procedure, as the coordination of a defense strategy among co-defendants (with different attorneys) facing prosecution serves the general purpose for which attorney-client privilege was created, i.e., to allow attorneys to provide competent legal advice and thereby promote the observance of law and administration of justice.[223] In the context of a criminal prosecution, attorneys of co-defendants are permitted to share confidential information without waiving the privilege as to any other parties.

■ The joint-defense doctrine has expanded to be known as the "community of interest" or "common legal interest" doctrine, and is applicable in both criminal and civil actions.[224] The "common legal interest" rule is an exception to the general rule that disclosure of otherwise privileged communications eliminates, or waives, the privileged status of those communications. This rule "enables litigants who share unified interests to exchange this privileged information to adequately prepare their cases without losing the protection afforded by the privilege." *Visual Scene,* at 440.[225] This rule is "entirely consistent with the policy underlying [attorney-client] privilege." *Id.*[226]

■ Pursuant to this doctrine, attorneys representing clients with similar legal interests can share information without risk of being compelled to disclose such information generally. Interests of the members of the joint defense group need not be entirely congruent.[227] One member of a joint defense group cannot waive the privilege that attached to the information shared by another member of the group without the consent of

---

**223.** "[I]n light of the vast resources of the government, it is perhaps appropriate that co-defendants be given the opportunity to collaborate on defense tactics and exchange information in a confidential fashion without forcing the defendants to hire the same attorney." *U.S. v. Almeida,* 341 F.3d 1318, 1324 (11th Cir.2003).

**224.** The common interest privilege can apply to co-plaintiffs. *Visual Scene,* 508 So.2d at 439.

**225.** The legal interest shared by an insurer and its insured exists, thus, regardless of whether the insurer controls the litigation, as long as the parties shared a unified or allied interest in defending an underlying action. Indeed, an insurer may begin the defense of its insured under a reservation of rights (to deny coverage at a later time) and still be considered to have an allied interest. *Kaufman,* 885 So.2d. at 907 (insurer had reserved right to deny coverage before undertaking defense, i.e., the parties were on notice that they might end up in a subsequent dispute as to coverage).

**226.** "[T]he common interest exception must be examined from the perspective of an objectively reasonable client, not from a particular client's subjective expectation or from the attorney's perspective." *Larson v. Correct Craft,* 2007 WL 1231821, 2007 U.S. Dist. LEXIS 30857 (M.D.Fla. April 26, 2007) (common interest exception did not apply to conversations between employee and attorney for employer, as employee did not present evidence that employer knew that employee believed attorney represented him individually). The decision in *Larson* is of no precedential effect, as the case, which had been removed from state court, *see Larson v. Correct Craft, Inc.,* 2006 U.S. Dist. LEXIS 78028 (M.D.Fla. Oct. 25, 2006), ultimately was dismissed for lack of jurisdiction, *Larson v. Correct Craft, Inc.,* 569 F.3d 1319, 1328 (Fed.Cir.2009), and returned the case to state court.

**227.** A common interest can be found to exist "even if some conflict is present or stands between the clients." *Cone,* at 893, *citing Hamilton v. Hamilton Steel Corp.,* 409 So.2d 1111, 1114 (Fla. 4th DCA 1982) ("once the privilege is waived, and the horse out of the barn, it cannot be reinvoked").

that member, but any defendant could, of course, testify as to her own statements at any time.[228] By agreeing to be a part of a joint defense, she only agrees not to disclose anything learned from her co-defendants through that joint arrangement, nor could any of those co-defendants disclose what she had told them or their attorneys in confidence. However, if the parties to that agreement are later in opposition with each other, statements which were made by one co-defendant to another defendant's attorney are not protected by privilege.[229]

A member of a joint defense group can waive his privilege, of course, as to his own prior statements, but other clients of the joint defense group can keep him from directly or indirectly revealing the privileged communications of the other clients. Plaintiffs' coverage counsel claims that "[U]nder the joint defense agreement .... [t]here is

no waiver of the joint defense agreement privilege simply because one member of the joint defense agreement conveys something that his client conveyed to him through another member." Miller Dep., at 238–39 (comments of counsel). Plaintiffs' counsel forbid Miller to testify as to what Cox might have said on behalf of Julio & Sons. (Miller had testified that "[t]he client came up with" the proposed $1.75 million settlement. Miller Dep., at 237; see, also, ECF Nos. 132–3, 139–1.)

The "common legal interest" doctrine developed, perhaps confusingly so, as an extension of the attorney-client privilege to those situations in which parties sharing a common legal interest are deemed to share a privilege even if the parties are represented by different attorneys. A review of the parties' positions in this case, and the relevant reported decisions,[230] suggests a need for clarity.[231]

228. "Where, however, co-parties communicate regarding issues of common interest to their joint defense to adequately prepare their case, the sharing of information with their co-parties' attorneys implies no waiver of the privilege. That exception covers the situation where one party makes a disclosure to the attorney for a co-party; thus, for the purposes of that communication, the attorney of the co-party becomes the attorney for the other." *Volpe,* 720 So.2d at 539 (citations omitted). Of course, the common legal interest exception to waiver of the attorney-client privilege "does not give a co-party the right to obtain disclosure of all communications shared by a co-party with that party's own attorney." *Id.*

229. The Eleventh Circuit has addressed the issue of co-defendants in a criminal proceeding who entered into an oral joint defense agreement which subsequently evaporated when one of the defendants "decided to defect from the united front." *United States v. Almeida,* 341 F.3d 1318, 1320 (11th Cir.2003). The appellate court reversed the district court's decision to prohibit the loyal defendant from using communications made by the defector while the two defendants were still operating under the joint defense agreement. "When a defendant conveys information to the lawyer of his co-defendant, as opposed to his own lawyer, the justification for protecting the confidentiality of the information is weak. The policy of fostering frank communication with an attorney is already facilitated by privileging those communications made to the defendant's own attorney; little can be gained by extending the privilege [to] those communications made to attorneys that do not represent the defendant." *Id.* at 1324. Citing the *Garner* decision and McCormick on Evidence § 91 (5th ed.1999), the Eleventh Circuit determined that a

limited waiver of confidentiality as a result of the defector's decision to testify for the government was consistent with the policy justifying the common interest exception to privilege and "outweigh[ed] the minimal benefit of the attorney-client privilege [in the joint defense context]." *Id.* at 1326. "[W]hen each party to a joint defense agreement is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of other co-defendants, such communications do not get the benefit of the attorney-client privilege in the event that the co-defendant decides to testify on behalf of the government." *Id.* Applying this holding to the facts before me, any communications made by Plaintiffs (directly or through counsel) to the insurer's attorney during the defense of the Underlying Matters would not be protected from disclosure to Defendant today, in light of the parties' aligned interest (essentially, as co-defendants) during that litigation and their adverse interests in the present litigation.

230. The doctrine has been applied in the allied, or joint defense group context, over the past several decades, with a not entirely consistent, nor clear, sense of direction. The confusion in parties' understanding, or courts' applying these two doctrines, may be the result of the natural tendency to refer to joint clients as having a common legal interest in the matter as to which they jointly retained an attorney. The specific doctrine of "common legal interest" is an entirely distinct concept, however, for the simple reason that there is no need to test for a common legal interest among clients of the *same* lawyer (or law firm, or team of law firms). A need to examine for a "common legal interest" does exist, of course, as to clients who are already repre-

The Court has attempted to rein in what may be considered an overly broad interpretation of the "common legal interest" (formerly "joint defense group") exception to traditional concepts of waiver of attorney-client privilege, and has tried to clearly state the specific narrow rule.[232]

The interests of Plaintiffs (and their entire joint defense group) were aligned with Indian Harbor as all had an interest in minimizing liability in the Underlying Matters.[233] Plaintiffs have declared that: "No legal effort was made in connection with the prosecution of MapleWood's counterclaims in RRGC or Shashy that did not operate to minimize the potential liability of an insured on a claim made against the insured." ECF No. 167, ¶ 153. In other words, all of Miller's efforts were geared toward minimizing liability, which would be the goal of Indian Harbor as well. The law provides that all of these joint clients, including Indian Harbor, could freely communicate (without waiving any privilege) in order to prepare a successful defense. However, a client who is part of that joint defense is entitled to waive the privilege as to its own statements.

When applying the doctrine to the present case, if it is assumed that the insurer shares a "common legal interest" with Plaintiffs (and also the MapleWood entities, Julio's entities and Intervenors), then Miller's communications to Defendant on behalf of all of his clients and as to all details of the RRGC settlement are construed to be two client's "consulting in common" of an attorney. Miller communicated, presumably, at all times with the permission of MapleWood Partners, acting through Glaser. The other clients cannot now claim that certain aspects were privileged, as they apparently raised no objection at the time and, in any event, Glaser apparently granted permission for the disclosures on behalf of the corporate entity holding the privilege.

Plaintiffs oppose the application of the "common legal interest" doctrine to this case and argue, essentially, that once the interests of an insurer and its insured become adverse, the insured's prior communications (even if they previously were required to be disclosed to the insurer pursuant to a cooperation clause) become privileged retroactively. This is a highly impractical result—insurers would have to unring the bell of what they had received, properly, when the insured was satisfied with the insurers' conduct, and return any communications or documents immediately upon being sued in a subsequent coverage dispute. *See Springer v. United Services Auto. Ass'n*, 846 So.2d 1234 (Fla. 5th DCA 2003).

The doctrine has its critics. "[N]o one has ever made a convincing argument that strategy sessions among co-defendants produce a benefit to the legal system that outweighs the cost of the loss of evidence to the courts." Charles Alan Wright and Kenneth W. Graham, Jr., 24 Fed. Prac. & Proc. § 5493 (1986). Recognizing a privilege in the "common legal interest" setting does not render the legal system more efficient, nor does it necessarily serve the purposes of justice. While it may encourage parties to share in-

sented by different lawyers but who choose to consult with a single lawyer "in common." A commentator has noted that any apparent confusion in reported decisions on these issues may be the result of judges' "skepticism of claims arising in entity representation" where employees of an entity "sometimes claim that attorneys representing the entity also represent the individual employees, separately or jointly." Giesel, 95 Marq. L.Rev. at 527–29.

**231.** This Court's Order overruling Plaintiffs' objections to Magistrate Judge Turnoff's Order may not have been sufficiently detailed to advance the jurisprudence in this somewhat confusing area of "common interest" as applied to the question of attorney-client privilege.

**232.** Over breadth and confusion in the approach to the common legal interest exception has rendered the question of privilege vulnerable to ex-

tensive litigation, of which this case is an example, which is contrary to the purpose for the attorney-client privilege doctrine. Thus, while the Court addresses the doctrine in this Order, and finds that it provides an alternative basis to support my conclusion that Plaintiffs must disclose the documents listed in the privilege log, I do so with a healthy skepticism as to the doctrine's worth.

**233.** "In this case, MapleWood and Julio & Sons (d/b/a Uncle Julio's) faced common litigation opponents. Thus, all communications and documents between MapleWood and its attorneys and Uncle Julio's and its attorneys are protected pursuant to the joint defense doctrine." ECF 40, n.10.

formation and, thereby, result in reduced costs for clients (as Miller testified, "[w]e did what we could to try to keep costs down [by not duplicating effort]"), such financial benefits for clients are not a worthy reason for extension of a privilege which by application negatively affects the search for truth. As noted by another critic of the doctrine, "[a]ny possible benefit is outweighed by the damage done to the truth-finding mission of the justice system." Giesel, 95 Marquette L.Rev. at 479.

The policy behind the attorney-client privilege (encouraging candid disclosures by clients which improve the ability of an attorney to provide effective representation) gains little by extending the privilege to communications made to attorneys who do not individually represent the client. For example, it is easy to imagine a situation, particularly in cases involving corporate clients and their officers, in which a party is at risk of entry of an adverse judgment which many others (who have access to information which has been protected from disclosure in the court proceeding) know to be improper. This case presents an example of such risk. While certain members of Miller's joint defense group of clients (and their counsel) obviously were aware of the fact that Julio & Sons was insured by Travelers and had a colorable claim for reimbursement of expenses incurred in defending Glaser in the Underlying Matters, such relevant information was not disclosed to Indian Harbor until April 2008, when a claim for coverage under its Policy had been pending for more than a year. (In March 2008, a lawsuit had been filed against Travelers seeking reimbursement of defense expenses; judgment was entered in December 2008 finding Travelers liable for such expenses.) [234]

Nor does the application of the "common legal interest" doctrine reduce the volume of litigation; indeed, it arguably increases litigation as it creates uncertainty as to the boundaries of privilege. The extensive litigation in this case as to privilege issues demonstrates that there is no resulting decrease in costly and protracted litigation under the "common legal interest" doctrine. Preventing others from access to communications which occurred in a joint defense group simply does not appear to serve the interests of the attorney-client privilege. Two issues illustrate the problems inherent in a "common legal interest" approach to privilege determinations: the proper role of potentially-conflicted counsel, and the management of potential waivers of privilege by multiple entities/individuals as clients/attorneys in the joint defense group.

Plaintiffs argue that extending the attorney-client privilege to apply to relationships that could never become joint client relationships (because of inherent conflicts of interest) "would lead to bizarre results." ECF 139, at 18.[235] They claim that each defendant

---

**234.** In responding to Plaintiffs' demand for reimbursement of defense expenses, Defendant did not ask who was obligated to pay the fees charged by Miller for representation. "It was represented to us that the MapleWood entities would be paying defense counsel's invoices.... I didn't specifically ask which entity would be paying these bills." Pidlak Dep., at 194–196. "Mr. Miller and Kessler Collins folks would submit invoice fees for reimbursement to Indian Harbor ... that would include both Akerman Senterfitt and Kessler Collins." *Id.,* at 280–81. The invoices were reviewed by outside counsel, according to Defendant's billing guidelines, *id.,* for the main purpose of determining "the amount of costs incurred at that point in time," *id.,* at 27. Defendant also would review "whether fees incurred were reasonable," i.e., whether the fees were excessive, *id.,* at 29–31.

**235.** There is evidence that Glaser personally is familiar with application of the "common legal interest" doctrine. According to the published opinions in a set of related proceedings before a federal court in New York, each alleging fraud and breach of fiduciary duty arising out of a credit agreement relating to a loan of up to $16,000,000 provided by Eugenia VI Venture Holdings, Ltd., to AMC Computer Corp., a discovery issue arose involving Glaser, who was alleged to be acting as the chair of the Board of AMC (by virtue of his role with MapleWood Holdings, which owned the majority of the shares of AMC). During a telephonic meeting of the AMC board, a recording was made of Glaser while he was speaking to the board. Plaintiff Eugenia obtained a redacted copy of the recording and requested access to the redacted portions. The court denied the request, finding that the recording was protected by the attorney-client privilege, because Glaser was conveying advice he had received (from Akerman Senterfitt, as counsel to MapleWood Holdings). "Mr. Glaser and [counsel] are bringing that advice to the AMC board of directors.... At the time, [counsel's] advice was being received in a confidential setting by a limited group (the AMC directors) that shared a common legal interest with Mr. Glaser. Mr. Glaser was not a director of AMC,

in a multi-defendant case could never assert a claim of privilege against another defendant because each has a common interest in having the complaint dismissed (even if each defendant was represented by (and had to be so) by separate counsel because the co-defendants did not have a totality of common interests in how the case was litigated that would allow for joint representation. (A co-defendant would get a copy of any privileged communication another co-defendant received.) According to Plaintiffs, "[t]his is a ridiculous result that the framers of the statute were careful to avoid by their limitation of the statute's reach to 'joint clients' and not to any two entities that happen to share 'a' common interest in defeating another party." However, the Court notes that Plaintiffs' "ridiculous" scenario presumes that the privilege question arises in the same litigation in which the co-defendants are aligned as defendants. In the present case, Indian Harbor was not a party to the underlying case, nor did the insured have the right, pursuant to the insurance contract, to join Indian Harbor as a party.[236]

Here, if the parties are not perceived as joint clients, then the actions of MapleWood Partners in communicating freely with its insured, through Glaser and Miller, have waived the privilege. And, the co-defendants in the Underlying Matters who are either joint clients or allied by a common legal interest, cannot preclude the other member of the joint defense group (MapleWood Partners) from having waived the privilege it possessed as to its own statements. "A client who is part of a joint defense arrangement is entitled to waive the privilege for his own statements, and his co-defendants cannot preclude him from doing so." *United States v. Agnello*, 135 F.Supp.2d 380, 383 (E.D.N.Y.2001)(corporation has no independent privilege as to communications between the individual who owned and closely held the corporation and the individual's attorney).[237]

Miller had been representing the Maple-Wood entities for several years before the RRGC case was filed. As defense counsel, Miller is not charged with knowledge of coverage issues.[238] To effectively defend his

but he shared similar responsibilities because he was Managing Partner of MapleWood, which had majority voting control of AMC. Mr. Glaser and the directors each had reason to believe that all of them might be named as defendants in a lawsuit. Mr. Glaser was sharing, with the directors, legal advice that was being given to help him and them to formulate a common strategy to defend themselves. I agree with the defendants that the law ... '[has] not required a total identity of interest among the participants. The privilege applies when a limited common purpose necessitates disclosure to certain parties. Thus, even where a later lawsuit is foreseeable between the co-defendants[,] that does not prevent them from sharing confidential information for the purpose of a common interest.' ... Mr. Glaser and the directors were communicating with each other to formulate a coordinated legal strategy to defend Mr. Glaser and all of the directors. They had a common legal interest, and it was adverse to AMC's primary lender. This conclusion is not altered by the fact that, some two months later, after all of them were sued by AMC's primary lender, Mr. Chabra brought a third-party complaint and a state court lawsuit against the MapleWood entities and some of the directors." *Eugenia VI Venture Holdings, Ltd. v. Chabra*, 2006 WL 1096825, 2006 U.S. Dist. LEXIS 23421 (S.D.N.Y. April 25, 2006) (citation omitted); related proceeding at *In re: Eugenia VI Venture Holdings, Ltd. Litigation*, 649 F.Supp.2d 105 (S.D.N.Y.2008) (Eugenia failed to raise an issue of fact as to any damages suffered, i.e., Eugenia suffered no out-of-pocket loss, and therefore failed to establish breach of fiduciary duty, fraudulent inducement, fraud, etc.), *aff'd*, 370 Fed. Appx. 197, 198 (2nd Cir.2010). The record reveals that Defendant was aware of Plaintiffs' involvement with Eugenia, as the Policy specifically excludes from coverage any claim related to Eugenia Ventures. Policy, Specified Claims Exclusion.

236. According to the Policy, the insured does not have the right to join the insurer as a party nor may the insured implead the insurer. (L(2).)

237. In *Agnello*, the court rejected, as inconsistent with the rationale for the attorney-client privilege and the exception thereto provided by the common interest rule, that any privilege by a corporate officer about his own conduct is necessarily also shared by the corporation, such that any time a corporate officer wishes to waive his own privilege he can do so only with permission of the corporation. "A rule that automatically barred a corporate officer from testifying [in support of his own release from custody] without obtaining the permission of the corporation would be unwise." *Id.*, at 384. The court also noted that the Second Circuit employs a strict interpretation of the common interest rule, and only protects "those communications made in the course of an ongoing common enterprise and intended to further the enterprise." *Id.* at 382.

238. According to Plaintiffs' counsel at Ver Ploeg & Lumpkin, the firm of Akerman Senterfitt only

clients, Miller needed the trust and confidence of his clients, and his primary objective was loss minimization in the Underlying Matters, an objective shared by the clients who hired him and the "client" who was potentially responsible for any judgment, and for Miller's fees. Miller was not being compensated to establish coverage (or lack thereof), but rather was contracted to advance his clients' interests, as they defined them, in the Underlying Matters. Nor should Miller, or any defense counsel, need to spend much time deciding who they represent as a client. Miller could get a waiver from Plaintiffs as to his ability to communicate with the insurer and, if his clients are not willing, then perhaps they need other counsel. If Miller is going to disclose information to Indian Harbor that might be adverse to the coverage question, then Miller needs to tell his clients in advance. If the clients object to the disclosure, then they face the risk that the cooperation clause of the insurance policy will have been breached and there will be no coverage. If the clients agree to the disclosure, then Miller might need to withdraw as defense counsel rather than straddle the line between two sets of interests. There is no rational basis to burden Miller or other defense attorneys with the dual role of protecting privileged items while also trying to obtain reimbursement for defense expenses as to underlying claims defended before the insured ends up in litigation against its own insurer. Thus, the conception of a joint client relationship as to all communications relating to the Underlying Matters provides clear guidance as to boundaries of privilege.

Here, as noted above, Plaintiffs and Defendant consulted Miller in common. Miller prepared a "Pre-trial Report" for Defendant containing an assessment of the financial and legal risks of the RRGC action, and the potential damages or settlement value. As another example, it appears that Miller was scheduled to have (and may have had) a conference call with counsel for Indian Harbor on March 24, 2008, regarding his assessment of the RRGC and Shashy actions, including his "thoughts on potential liability

and damages, prospects for settlement, and your proposed strategy for proceeding with the defense in the absence of an opportunity for a reasonable settlement." ECF No. 185–3 (March 3, 2008, e-mail from Wahl to Miller, outlining topics for upcoming conference call).

The Court finds that Plaintiffs' communications, through Miller, with Indian Harbor did not bear a badge of confidentiality. Initially, Miller apparently never declined a request by Indian Harbor for information. Nor does it appear that Miller sought his clients' informed consent each time before he disclosed a potentially privileged matter to Indian Harbor (whether Miller had a duty to do so or not is not relevant to the question before me—were these parties in a relationship which was more fiduciary in nature or more adversarial in nature during the defense of the Underlying Matters?). Defendant also was engaged in Plaintiffs' settlement discussions, as required by the Policy's explicit terms which Plaintiffs accepted when purchasing the Policy,[239] It is evident that Defendant shared a common legal interest in defending its insured in the underlying proceedings. This interest was legal, and not just financial, because of the multiple additional issues—including, e.g., the question of whether other entities might proceed against the insurer in the event of an unsatisfactory result.

In further support, the Court notes that as late as January 2009, Plaintiffs' coverage counsel advised Defendant that: "[w]e have no issue with an adjuster obtaining information [as to the then-pending RRGC matter] for the internal use and evaluation by the carrier." ECF No. 218–1. Plaintiffs acknowledge that counsel for the insurer "was directly involved in investigating the RRGC suit from the outset, including an evaluation of that suit for the purposes of potential settlement." ECF No. 177, at 4 (Plaintiffs' motion to strike a supplemental filing by Defendant). "At his deposition, Attorney Miller further debunked any notion that [counsel for the insurer] was not acting in an investigatory capacity, confirming that [coun-

---

served as defense counsel in the Underlying Matters and "did not act as MapleWood's coverage counsel." ECF No. 39–7.

**239.** *See e.g.,* ECF No. 40–11, at 2 (April 11, 2008, letter Lumpkin to Simon seeking confirmation that Defendant consented to the settlement of one of the Underlying Matters).

sel] communicated with him directly on issues that had relevance to the formulation and maintenance of Indian Harbor's coverage position." *Id.*, at 5. Thus, the Court finds that all RRGC-related communications and documents in the log are subject to disclosure, absent a work-product protection.

Miller's deposition testimony supports this view, as he testified that he provided updates to Indian Harbor (through its counsel) when requested and also on his own initiative when "something material" occurred in the litigation, and had multiple conversations with Indian Harbor regarding his mental impressions as to the defense of the RRGC action. To the extent that Miller possessed any information potentially inconsistent with a claim for insurance coverage, Miller would have been required to notify his client and, possibly, withdraw from representation, pursuant to Florida Bar Rules and ethics opinions.

> For example, a policyholder might tell a defense lawyer that he or she lied when applying for insurance or when reporting the facts of an occurrence so as to obtain insurance coverage. In such a situation, may a defense lawyer help a policyholder maintain the flow of benefits from an insurance company by withholding information from the insurer-client? We think not. Although the lawyer may not have to communicate the information, at least the lawyer must refrain from assisting the conduct and withdraw. Because some of the benefits of the fraud flow to the lawyer as fees, the danger of being found to be complicit in it should lead any reasonable attorney to follow this course.

Ellen S. Pryor and Charles Silver, 15 Geo. J. Legal Ethics 29, 89 (2001). The record

reveals that while the MapleWood entities had a financial interest in the Julio entities for several years before purchasing the Policy, Glaser was not on the board of Julio & Sons until February 2007. There is no evidence that Miller knew about the Travelers insurance policy issued to Julio & Sons (and Glaser's status as an insured thereunder), nor that Miller had a duty to disclose such information if he did know about it,[240] but the question has been at issue for several years in this litigation.

Accepting that Plaintiffs had a joint defense oral agreement, the Court finds that they collectively were joint clients with Indian Harbor or, at least had a common legal interest in the outcome of the Underlying Matters. This joint client status, when applied to communications where the exchange of information is "for the limited purpose of assisting" in the parties' common, litigation-related cause,[241] results in an order compelling disclosure.

The communications which are subject to disclosure under this theory must have been those communications made in furtherance of an ongoing common legal interest,[242] the relevant question being: "whether the information was exchanged [between the clients] 'for the limited purpose of assisting in their common cause.'" *Id.*, at 441 (citation omitted). In this case, the Court has determined that Plaintiffs and Defendant had a common legal interest in minimizing liability or exposure to a judgment in the Underlying Matters. The privilege log includes communications or documents which relate to calculations of settlement value or options (which also may reveal information as to the respective liability of the defendants in the Underlying Matters),[243] litigation outcomes (which may include an

---

**240.** Glaser boasted of his prior lawsuits against insurers. "I've sued two others and collected $10 million from them. We'll see how much I get from you" Glaser Dep. MapleWood, at 222.

**241.** *Visual Scene, Inc. v. Pilkington Brothers, plc,* 508 So.2d 437, 441 (Fla. 3d DCA 1987)(reversing trial court order requiring production of documents reflecting communications between two parties to a subsequent action; sunglasses distributor (VSI) sued supplier (Pilkington, and Chance) and processor (Metro) alleging that glass was defective, supplier sought documents relating to communications between distributor and processor).

**242.** The doctrine only applies "where the parties undertake a joint effort with respect to a common legal interest," and the doctrine is "limited strictly to those communications made to further an ongoing [common] enterprise." *United States v. BDO Seidman, LLP,* 492 F.3d 806, 816 (7th Cir.2007), *citing United States v. Evans,* 113 F.3d 1457, 1467 (7th Cir.1997)

**243.** *See e.g.,* 16105–07, 16039–40, 16128–31, 16132–33.

assessment of the respective value of each claim in the Underlying Matters),[244] and the representation of individual defendants and questions regarding attorneys' fees payments (which may reveal information as to the apportionment of attorneys' fees among clients/subjects).[245] Such documents appear to qualify as attorney-client privileged documents (or, perhaps, are immune from production as attorney work-product) but even if so-they are still discoverable by Defendant in light of this Court's conclusion that Defendant is a joint client with Plaintiffs or, alternatively, that Defendant was an allied party with a common legal interest.

 In contrast, documents simply shared between clients are not protected by privilege. "If sharing documents, among co-defendants automatically shielded all those underlying documents as attorney-client communications, then any defendant in a multi-defendant lawsuit could shield each and every relevant document from the plaintiffs discovery requests by the expedient method of simply shipping all of its documents to a co-defendant." *Platypus Wear, Inc. v. Clarke Modet & Co.*, 2007 WL 4557158, 2007 U.S. Dist. LEXIS 94327 (S.D.Fla. Dec. 21, 2007).[246] Not all communications and documents between MapleWood entities, the Intervenors, and Julio entities and the group's attorneys are protected pursuant to the "common legal interest" doctrine which is shared among them because of their allied interest in defending against the Underlying Matters. Only those communications which were to aid in litigation, in which the parties shared a common interest, qualify for protection from disclosure to others.

Plaintiffs argue that they do not share a common interest with Indian Harbor with respect to how to categorize the relative exposure of the underlying litigation or settlements. However, the subject matter of the documents at issue appears to be the same as the subject matter of communications and documents already produced to Defendant, either pursuant to the cooperation clause (e.g., the Pre-trial Report prepared by *Miller*, Miller's proposed litigation budget, e-mail exchange between Miller and McNutt reflecting Miller's willingness to discuss his analysis of the case and whether trial continuance would have impact on settlement discussions, etc.), or in discovery in this case.

The Court's ruling today does not completely eliminate the confidentiality of Plaintiffs' communications with its counsel, but instead finds that Plaintiffs participated in what was, in effect, a joint client relationship with Indian Harbor as to the Underlying Matters and therefore cannot continue to withhold documents from production to that entity and on that topic. Indian Harbor must, of course, maintain the confidential nature of these documents and may not disclose, absent court order, anything which would otherwise be privileged or protected as to outside interests.[247] The Court reminds the parties that full disclosure by an insured to her insurer is a matter of public policy, with the correlated benefit that accurate coverage decisions can be made, and made promptly.[248] Indeed, in Florida there is a statutory provision that permits an insurer to avoid coverage if an application for insurance contains a fraudulent statement or omits information which is "material either to the

---

**244.** *See e.g.,* 15926–27, 15928–31, 15932–38.

**245.** *See e.g.,* 14323–25, 14326, 14343–51, 15141, 15153, 15185–87, 15189–90, 15197, 15286, 15758, 16839–41, 16842–45, 16860, 16865, 16886–87.

**246.** Communications among corporate representatives which are copied to an attorney are not eligible for attorney-client privilege protection, nor are they protected by the "common legal interest" doctrine. For example, 17068 is a communication in May 2008 from Glaser, presumably for the corporate entity, to other individuals, "with copy to" Cox, Adams, Miller and Kessler.

**247.** The parties have entered into a stipulation of confidentiality, adopted by this Court in January 2010, *see* ECF No. 30 (Stipulated Confidentiality Order).

**248.** "The concern that carriers deny coverage too frequently is misplaced.... In ... the real world, discussion of the propriety of secret-keeping has proceeded on the basis of the factual assumption that the information at issue bears adversely on the existence of coverage for the insured. *Given this, in the cases where secrets might be kept, some basis for a coverage denial necessarily exists.* In other words, a decision to deny coverage would not be wholly arbitrary." Ellen S. Pryor and Charles Silver, 15 Geo. J. Legal Ethics 29, 89 (2001).

acceptance of the risk or to the hazard assumed by the insurer." Fla. Stat. § 627.409.

As observed by Judge Gerald Tjoflat, writing for the former Fifth Circuit, "Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent." *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 174 (5th Cir.1979).[249] This Court's review of the relevant jurisprudence revealed that several of the decisions provided incomplete guidance; a number of courts clearly have struggled to marshal these complex areas of the law (attorney-client privilege/work-product protections, indemnity insurance issues, corporate entity representation) and render helpful precedent. The Court has expended a significant amount of time to prepare this opinion and, hopefully, this opinion will advance the law in this area and protect my judicial colleagues from the burdens presented by the level of intimate review of discovery matters which appears to be increasingly demanded by litigants.

Judges must do their best to interpret the law, as provided by the legislature, such that clear bounds of privilege are established. In this case, Plaintiffs voluntarily purchased an insurance policy which included a cooperation clause and other provisions which made it obvious, particularly to a corporate customer such as the MapleWood entities-with their apparent sophistication, that the insurer and insured would share the same legal agenda if faced with any claims made against the insured. Plaintiffs in this situation can either decide that the insurer gets the information (and no one else does) under the joint client or the common legal interest theory, or they can refuse to disclose additional documents to Defendant. However, the materials al-

ready disclosed would then be outside the protection of privilege and render other items vulnerable to disclosure under applicable theories of waiver. Indeed, such example underscores the rational basis for the Court's conclusion today; while Plaintiffs and Defendant may be "uncertain bedfellows" as to the information related to the defense of the Underlying Matters, they nevertheless were aligned sufficiently at one time such that they would jointly protect the confidentiality of such information against intrusion by an outside party, e.g., a newspaper reporter.

■ In conclusion, the Court finds that Plaintiffs and Defendant essentially were co-clients of Miller (and the related attorneys) as to the defense of the Underlying Matters and, thus, have no privilege to assert against the disclosure of communications or documents to each other which were shared between any party and Miller (and the related attorneys) on that subject.[250] This conclusion is based on the Court's finding that Plaintiffs purchased the Policy, a directors and officers liability policy with a cooperation clause, and subsequently made a claim under the Policy, effectively inviting the insurer into the Plaintiffs' relationship with its selected counsel, at least temporarily and only as to this subject matter. This is analogous to the situation in which a general liability insurer, with a duty to defend, has a shared interest with its insured for the purpose of the defense of the action, as recognized in Florida law.

Alternatively, even if Plaintiffs and Defendant were not effective co-clients, they—at a minimum—had a common legal interest in the defense of the Underlying Matters such that they are not entitled to avoid disclosure between themselves as to otherwise privileged materials.[251] The Court's conclusion does not require Plaintiffs to disclose commu-

---

**249.** The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**250.** Plaintiffs have claimed an attorney-client privilege, without any work-product protection, as to a total of 34 items listed in the privilege log. In this Court's Order of September 2011, the Court referenced 22 such documents as those were the documents created prior to January 1,

2008, the parties' stipulated "anticipation of litigation" date. In light of the Court's ruling today as to Defendant's status as a joint client, effectively, with Plaintiffs, or an allied party with a common legal interest, the Court concludes that all 34 of these items are discoverable.

**251.** If neither of the joint client nor "common legal interest" doctrines apply here, then the inevitable conclusion is that the disclosure required by the cooperation clause would eliminate Plaintiffs' ability to assert attorney-client privi-

nications purely relating to the pending coverage dispute before this Court, but does require disclosure of all documents relating to the RRGC settlement or any of the Underlying Matters-regardless of the date.[252]

### 10. Plaintiffs raised the issue of whether Defendant made a proper decision as to allocation

 Filing a claim based on a matter which ordinarily would be privileged constitutes an implied waiver of the right to assert the privilege. In *Savino v. Luciano*, 92 So.2d 817 (Fla.1957), the Supreme Court of Florida articulated what is known as the "at-issue" doctrine, *id.* at 819 (vacating ruling that accountant-client privilege extended to audit and report where defendant waived such privilege by relying on such items in his

lege as to any communications which already were disclosed to (or held with) Indian Harbor. This Court doubts that insurers would find a market to sell a policy of insurance which required an insured to waive her attorney-client privilege generally in order to receive coverage; instead, the record suggests that the Policy, which was purchased voluntarily by Plaintiffs, was understood to require cooperation and the sharing of information and opinions which would occur within a shared protective cloak of privilege.

**252.** If Plaintiffs elect not to share communications as to which they persistently allege a privilege applies, the Court may permit Defendant to argue that such conduct constitutes a breach of the cooperation clause of the Policy.

**253.** *Coates v. Akerman Senterfitt & Eidson, P.A.,* 940 So.2d 504 (Fla. 2d DCA 2006) (reversing trial court's order requiring production, pursuant to "at-issue" doctrine of documents as to which defending law firm's former clients claimed privilege) The state appellate court determined that disclosure was not required because the law farms former clients were not necessarily going to rely on documents reflecting communications with other professionals, i.e., the plaintiffs had not put "at-issue" those communications. For example, a memo was prepared by an attorney hired by plaintiffs the memo details "some of the many tax deficiencies of the structure that was marketed [by attorneys from the law firm]." *Id.* at 507 (the memo already had been produced to the law firm when it was representing plaintiffs). The appellate court found that the plaintiffs had not put the documents at issue, nor did the disclosure of the memo in an earlier context eliminate the former clients' privilege as to all communications with other professionals, but rather that the defending law firm sought the documents "in the hope that they will contain information helpful to the lawyers' defense or third-party claims." *Id.* at 508. Noting that the

affirmative defense and counterclaim to be proven at trial).[253] Also, the Florida statute defining attorney-client privilege includes several examples of issue-based waivers of the privilege, e.g., when a client sought an attorney's service in furtherance of a crime or fraud, when a communication is relevant to claims of attorney malpractice, etc. Fla. Stat. § 90.502(4)(a),(c).

 In Florida, "a party who bases a claim on matters which would be privileged, the proof of which will necessitate the introduction of privileged matter into evidence, and then attempts to raise the privilege so as to thwart discovery, may be deemed to have waived that privilege." *Home Ins. Co. v. Advance Machine Co.,* 443 So.2d 165, 168 (Fla. 1st DCA 1983).[254] The Eleventh Cir-

law firm had not demonstrated that their former clients would "necessarily offer the disputed documents at trial to prove their claims," *id.,* the court rejected the firm's attempt to access such documents through claiming an at-issue waiver or selective disclosure. *Id.,* at 512.

**254.** In *Home Ins. Co. v. Advance Machine Co.,* the Florida appellate court determined that the mere bringing of a lawsuit pursuant to Fla. Stat. § 768.31 for contribution (among tortfeasors) toward a settlement-when such statutory-based action requires an allegation that the settlement was reasonable-is not enough, in itself, to constitute a waiver of attorney-client privilege as to the plaintiffs' communications with its counsel as to the reasonableness of the settlement, as plaintiffs had not "injected into the litigation issues going to the very *heart* of the litigation." *Home Ins. Co.,* 443 So.2d at 168 (emphasis in original, citations omitted). In comparison, in *GAB Bus. Servs., Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11th Cir.1987), the Eleventh Circuit determined that the issue of reasonableness of a settlement and the potential liability of a defendant as to the settled claim was at the "very heart" of an indemnity action brought by a claims adjuster against the insurer for whom it was the agent, seeking reimbursement for a settlement the adjuster had paid to the owner of an insured racehorse which died under suspicious circumstances. The adjuster had paid a small sum to settle the underlying claim, and the insurer—which also had been sued by the racehorse's owner—had paid the full policy limits; in the action brought by the adjuster against the insurer, the insurer filed a counterclaim also seeking indemnification for what it paid to settle the underlying claim. The Court of Appeals noted that the insurer—in order to prevail on its indemnity counterclaim—was required to introduce evidence as to the strength of the claim against which it had defended and, by injecting

cuit has found that waiver of the attorney-client privilege [255] under Florida law may occur when a party affirmatively injects a privileged communication directly into the litigation, as necessary to prove an element of a claim or defense. *GAB Bus. Servs. Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir.1987) (reversing lower court which failed to permit discovery into issue raised by party, as the attorney-client privilege is intended to be applied "as a shield, not a sword" and a party may not use the privilege to prejudice an opponent's case).[256]

Plaintiffs argue that they did not raise the issue of allocation, and did not make an issue

of the facts related to the "relative exposure" analysis required under the Policy,[257] but they continue to complain that Indian Harbor erred in apportioning the claim as to what was a covered loss, i.e., Plaintiffs challenge Defendant's application of the Policy's allocation clause. Specifically, Plaintiffs argue that the "relative exposure" prong of the allocation clause never need be reached because Plaintiffs' coverage claims are made up entirely of "Loss" and thus they have no "loss" presented in the claim.[258] Plaintiffs also complain that Defendant failed to apply "best efforts" and that it didn't advance as "undisputed" allocated amounts as much as it previously had allocated to "Loss" in prior correspondence.[259]

into the indemnity action the issue of the reasonableness of its attorneys' conduct in settling the claim, the insurer had waived the attorney-client privilege.

**255.** The Eleventh Circuit has announced that the "at-issue" (i.e., a subject matter which has been placed "at-issue" in litigation) waiver doctrine does not extend to materials protected by work-product immunity, *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1422–23 (11th Cir.1994), nor does the decision in *Garner* (as to shareholder's access to privileged materials of a corporation) extend to work-product, *Cox*, at 1423.

**256.** Application of the "at-issue" waiver, which is based on the principle of fairness, requires careful review of the issues which have been injected into the proceeding by the party resisting disclosure of privileged communications—even when those issues are somewhat ill-suited to judicial review. *See, e.g., Cuillo v. Cuillo*, 621 So.2d 460 (Fla. 4th DCA 1993) (reversing order requiring production of privileged communications, finding that wife's claim of misrepresentation by husband as to his financial status when executing a prenuptial agreement did not require disclosure of wife's communications with her attorney, despite husband's argument that such communications would be relevant as to whether wife had knowledge of true financial picture at the time she executed the agreement, nor was wife's former attorney required to disclose what he told her current attorney). One member of the appellate panel in *Cuillo*, writing in a special concurrence, observed that "[f]rankly, I confess to having some difficulty in understanding how the courts ever got into the business of deciding whether a prenuptial agreement makes sufficient provision for one spouse." *Id.* at 463. That judge observed, however, that "[a]s long as we continue to allow unhappy spouses to attack the fairness and reasonality of the prenuptial agreement's provisions in the dissolution of marriage setting, we must expect that lawyers will seek to make inquiries of this kind [and we] are thus forced to permit *certiorari* review of orders such as here that allow inquiry into the prospec-

tive spouse's advice from a lawyer at the time of contracting." *Id.* at 464.

**257.** Plaintiffs complain that this Court referenced earlier versions of the complaint in noting that "Plaintiffs have haled Defendant into court by bringing the instant suit, and they have specifically contested Defendant's interim allocation between covered and uncovered losses." (*See* ECF No. 187, at 16.) The Court reminds Plaintiffs that the motion to compel was at issue while the Amended Complaint was the operative pleading, and this Court is analyzing the parties' positions with respect to the now-operative pleading, the Supplemental Amended Complaint. Moreover, Plaintiffs' argument is of questionable merit, as the key paragraphs relating to the allocation issue are identical across the versions of the complaint. *See* ECF No. 1, ¶ 61; ECF No. 21, ¶ 65; and ECF No. 100, ¶ 66 ("The Policy is silent as to the calculus for allocating between covered and uncovered claims, and between covered and uncovered entities, other than to state that: [citation to allocation clause]."). And, the allegations of breach are substantially the same. *See* ECF No. 1, ¶ 215; ECF No. 21, ¶ 231; and ECF No. 100, ¶ 224.

**258.** In addition, Plaintiffs assert that the Underlying Matters are based on a "unitary injury arising from a concerted course of conduct," and that even though there were distinct theories of liability in the three matters, all of the claims related to a singular course of conduct and a unitary injury.

**259.** Plaintiffs' argument, as summarized in its motion for partial summary judgment, is that Defendant "breached two antecedent obligations under the Allocation Clause: (i) it failed to propose a 'best efforts' allocation; and (ii) it advanced far less than the amount of the undisputed portion of the claim." ECF No. 150, at 29. (*See, also,* Plaintiffs' statement of facts, ECF No. 167, ¶¶ 156–173, which relate to allocation.)

Defendant responds that Plaintiffs unilaterally terminated discussions relating to allocation and, therefore, Defendant paid those defense expenses which were undisputed, and contributed the amount requested by Plaintiffs for settlement of the RRGC action. Defendant argues that, in light of their failure to reach a "fair and appropriate" allocation decision jointly with their insured, the Policy only required Defendant to provide coverage for the amount not in dispute and, as such 25% was a proper allocation.[260]

The Court's review of Plaintiffs' pleading reveals that it rests, at least in part, on Plaintiffs' argument that Indian Harbor is mistaken as to who is a covered person.[261] For example, Plaintiffs allege that "the Insurer unilaterally determined to pay and paid a tiny fraction (roughly 6%) of the total Loss incurred by the *Policyholders*, claiming this was its 'good faith' effort to first improperly allocate, and then to arrive at an interim 'undisputed' allocation." ECF No. 100, ¶ 132 (emphasis added). "The insurance contract obligated the Insurer to perform certain duties, including the duty to timely pay Loss including Defense Expenses, and, to seek allocation in good faith and only if required by the Policy." *Id.*, at ¶ 223.

The inescapable inference from the Plaintiffs' pleading is that the Plaintiffs are bringing this coverage action to challenge Defendant's allocation determination, which

necessarily requires an evaluation of how the allocation clause applied to Plaintiffs' claims, and did Defendant apply the allocation clause properly. As Florida law requires that the insured bear the burden of proving that a claim against it is covered by the policy, *LaFarge Corp. v. Travelers Indemnity Co.*, 118 F.3d 1511 (11th Cir.1997), the Court finds that Plaintiffs have placed these coverage questions at issue for the purposes of applying the "at-issue" doctrine. In addition, the Court is not persuaded by Plaintiffs' argument that the allocation clause is an exemption to coverage and, therefore, it is Defendant's burden to establish applicability. Although "allocation clauses recognize that covered and non-covered claims may coexist in the same action, the allocation clause is not what makes them so." *PowerSports, Inc. v. Royal & Sunalliance Ins. Co.*, 307 F.Supp.2d 1355, 1362 (S.D.Fla.2004).[262]

In order to make the Defendant's decision as to allocation, Pidlak testified that she referred to the subject Policy, and "reviewed all of the pleadings, all of the discovery, all of the coverage correspondence sent on behalf of [Defendant and on behalf of Maple Wood], [ ] participated in numerous telephone calls with defense counsel, coverage counsel[, ] participated in mediations [and] consulted with counsel on allocation obligations under

---

260. The Court may need to address these arguments in greater detail in a subsequent order, but the above summary of the parties' positions is sufficient for the purposes of understanding the present discovery dispute.

261. Plaintiffs' complaint identifies MapleWood Partners, MapleWood Management, and MapleWood Holdings as "the Policyholders," but that is an over generalization which mischaracterizes the evidence in the record—as discussed, *supra*.

262. Plaintiffs claim, in ECF No. 217, at 13, that the Defendant admits, in ECF No. 188, at 10, that an allocation clause operates like an exclusion. Plaintiffs are wrong. Defendant quoted an excerpt of the decision in *PowerSports, Inc. v. Royal & Sunalliance Ins. Co.*, 307 F.Supp.2d 1355 (S.D.Fla.2004), an action for declaratory relief as to a directors and officers liability insurance policy which granted summary judgment for an insurer because the claim was subject to an "insured versus insured" exclusion to coverage. The court stated:

Allocation clauses only become relevant in the event that a loss involves both covered and

uncovered claims. Whereas this action involves uncovered claims only, the allocation question is moot. Although [another decision] relied on an allocation clause as a basis for making an exception to application of an [insured versus insured] clause, [that court] had already concluded that the losses involved both covered and uncovered claims. As previously noted, [that court] reached that conclusion to avoid transforming a covered claim into an uncovered claim. Such is not the case here, where the action was uncovered from its inception.

Furthermore, although allocation clauses recognize that covered and non-covered claims may coexist in the same action, the allocation clause is not what makes them so. Indeed, if the Court viewed the allocation clause in Royal's policy as a grant of coverage for The Heaton Companies, Inc.'s claims, it would read the [insured versus insured exclusionary] clause out of the policy.

*Id.*, at 1362.

Florida law." Pidlak Dep., at 63. She testified that she reached the decision to support a 25% allocation as a result of looking at the "totality of the circumstances." *Id.*, at 66–67. Pidlak evaluated the merits of the claims against MapleWood and also evaluated the relative merits of the claims against Maple-Wood compared to the claims against other defendants in the RRGC action (Julio & Sons, Glaser), Pidlak Dep., at 84–90, i.e., she evaluated the potential success "against all parties" (including uninsured parties), *id.*, at 91, and evaluated the relative exposure as to all entities or persons seeking coverage under the Policy.[263] Pidlak "listened to the recommendations of defense counsel ... because he was the attorney defending the MapleWood entities at that point." *Id.*, at 86, 284. "His analysis was one thing that I considered, but I also have my independent analysis and the analysis of counsel to assist me in formulating positions." *Id.*

According to Pidlak, the initial coverage letter was "not a denial" but rather a "reservation ... [a]s we learn more information, we can further rely or not rely on that exclusion." *Id.*, at 187. At the time of her deposition (in April 2011), she testified that there remained "open issues as to ... which insured is potentially covered under various coverage forms," *id.*, at 186, and stated that at the time of the early coverage letter, the insurer was "not sure if Uncle Julio's or Julio's & Sons may have been claiming some kind of coverage under, for example, Maple-Wood Management or any of the funds under the investment fund management liability coverage form," *id.*[264]

Plaintiffs admit that a "relative exposure" analysis will derive from a review of the merits of the Underlying Matters but argue that there is no need to reach the question of the allocation clause, as Plaintiffs believe it does not apply. The Court concludes, however, that the issue of the applicability of the allocation clause to Plaintiffs' claimed loss is at the center of this dispute and was placed there by Plaintiffs-thus, discovery as to that issue is permissible. Also, the Court finds that Plaintiffs bear the burden of establishing that coverage exists under the Policy as to their claims for indemnification. A liability insurer's responsibility to defend its insured when a claimant sues the insured must be determined from the allegations of the complaint,[265] but the insurer's narrower duty to indemnify the insured for any damages ultimately awarded is subject to proof by the insured that coverage exists, or proof by the insurer that an exclusion applies.[266] Thus, while Plaintiffs may argue—and may be correct in doing so (the issue is not before me at this time) that Defendant should have decided whether to reimburse defense expenses simply by examining the complaints in the Underlying Matters, it is evident that the insurer was entitled to withhold approval for indemnification of any settlement amounts until Plaintiffs proved that the claims were covered.

In an attempt to avoid the consequences of any waiver of privilege which occurred when Miller and his clients communicated with the insurer (or others), Plaintiffs have stipulated that they will not seek to use privileged communications or their content in pursuing their claim, ECF Nos. 70, at 5; 217, at n.11, and that, even though Miller is still on Plaintiffs' witness list, Plaintiffs will not call on him to testify as to a relative exposure analysis. Plaintiffs also assert that their expert testimony is not dependent on Miller's opinion work-product. In light of these assertions, Plaintiffs argue that the

---

**263.** Similarly, in the Shashy matter she also evaluated the merits of the claims relative to other defendants. *Id.*, at 90.

**264.** Pidlak testified that the insurer wasn't "sure exactly how the MapleWood entities were connected as per the corporate structure diagram, and so we reserved our rights at that point because we needed to get more information from the insured as to the corporate structure." *Id.*, at 195. Pidlak admitted that she had reviewed the underwriting file at some time. *Id.*, at 272. However, Plaintiffs argue that the underwriting file would have answered the insurer's questions

about the MapleWood entities' corporate relationships, and Plaintiffs' counsel asserted that the application included a list of insured entities. *Id.*, at 273–74 (counsel's statements).

**265.** *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir.1997) (upholding decision that pollution exclusion barred coverage, *citing Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810, 813 (Fla. 1st DCA 1985))

**266.** *Id. citing Hudson Ins. Co. v. Double D Mgmt. Co., Inc.*, 768 F.Supp. 1542 (M.D.Fla.1991)

"at-issue" doctrine has been eliminated as a basis for disclosure. Alternatively, Plaintiffs request that the Court conduct a complete *in camera* review of all documents in the privilege log in order to assess the relevancy of each specific document to the issue of allocation, relevant to a determination of the potential liability of the parties (and their specific identities as insureds, or uninsureds) in the Underlying Matters. The Court is not persuaded by Plaintiffs' argument, nor is their request for a full *in camera* review well taken.

Plaintiffs have alleged that Defendant breached the contract of insurance by, at least in part, mis-applying the allocation clause of that contract. Defendant is entitled to discover information "relevant to any party's claim or defense" which is reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Pidlak testified specifically as to what Defendant relied upon in making its interim coverage decision: analysis and recommendations of Miller, participation in mediations, and evaluation of the merits of the claims against insureds relative to other defendants in the RRGC and Shashy matters.[267] She also noted that there were several open questions as to, e.g., which insured(s) might be covered under the three different types of coverage in the Policy, or the nature of the relationship between the MapleWood entities and Julio entities as to the allegations in the underlying claims.

Defendants describe the withheld documents and communications as necessary and at "the very heart of Plaintiffs' claims" for coverage in this lawsuit, ECF No. 37, at 6, 9, and seek the requested documents in order to assess the accuracy of Miller's evaluation of the claims and their relative merits. In light of Pidlak's testimony, and a review of the record, the Court finds that Defendant has a need for the materials which have been withheld by Plaintiffs—all of which relate to the defense of the Underlying Matters.

**267.** Pidlak also reviewed the pleadings in the Underlying Matters and other public, or already-provided, materials, e.g., discovery and expert witness reports in the Underlying Matters.

**268.** The Court has discussed each alternative basis for this ruling, *supra,* in the interest of making

■ In conclusion, consistent with Florida statutes and the relevant caselaw, the Court finds that none of the documents listed in the privilege log are protected from disclosure to Defendant pursuant to the attorney-client privilege. Plaintiffs, who bore the burden, failed to establish by a preponderance of the evidence that all of the requisite elements of privilege are present. Even if Plaintiffs (and Intervenors), proponents of the privilege, had established that an attorney-client privilege attached to their communications, the Defendant demonstrated that either the Defendant was a joint client or, alternatively, was an allied party with a common legal interest in the communications such that Defendant held a shared attorney-client privilege with Plaintiffs for the limited purpose of the defense of Plaintiffs in the Underlying Matters. Alternatively, if Defendant is not considered to be a joint client, or an allied client with Plaintiffs, then the Plaintiffs' conduct in voluntarily communicating with Defendant as to privileged topics constituted a selective waiver of the privilege as to those topics, and Plaintiffs have failed to rebut sufficiently that evidence of waiver.[268]

### C. Work-product protections

■ The work-product doctrine prohibits unwarranted inquiries into the files and opinions of an attorney and "reflects the strong 'public policy underlying the orderly prosecution and defense of legal claims.'" *United Kingdom v. United States,* 238 F.3d 1312, 1321 (11th Cir.2001), quoting *Hickman v. Taylor,* 329 U.S. 495, 509–10, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (witness statements need not be produced). The rationale for the doctrine is the belief that "the privacy of an attorney's course of preparation is ... essential to an orderly working of our system of legal procedure." *Hickman,* at 512, 67 S.Ct. 385. An attorney must be able to prepare cases without fear that her work-product, as reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless oth-

a full record for any future review. As noted above, the Court also finds a basis for applying the "at-issue" doctrine as a waiver of Plaintiffs' attorney-client privilege at least as to communications related to the issue of allocation, as a result of Plaintiffs' affirmative decision to rely on the allocation issue in this coverage action.

er tangible and intangible ways," will be used by her client's adversaries. *Id.*, at 511, 67 S.Ct. 385.[269]

This case is being heard pursuant to the Court's diversity jurisdiction and, therefore, federal law provides the rule as to work-product immunity. Rule 26(b)(3) of the Federal Rules of Civil Procedure provides the pertinent definition and scope of the protection:

(3) Trial Preparation: Materials.

(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3).[270] While the Rule generally bars discovery of work-product materials, the bar is not absolute and can be overcome if the party seeking production can demonstrate that the disclosure permitted under sub-section (A) applies. In *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Supreme Court held that "the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *Id.* (work-product protection extended to material prepared by investigator working for attorney was waived by offering investigator as witness), at 239.

Immunity from production of work-product materials may be asserted by either the attorney or the client, and each can waive that immunity, but only as to herself, as both the attorney and the client benefit from the privilege.[271] The work-product doctrine protects materials if they were prepared for any litigation (even litigation which has terminated) as long as such materials were prepared for a party to the litigation in which the protection is being asserted. *FTC v. Grolier, Inc.*, 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (government agency's attorney work-product exempt from disclosure under Freedom of Information Act without regard to status of litigation for which prepared).[272] Work-product immunity extends to materials even if they were never disclosed to the client, of course, as it is conceivable that an attorney would not share with her client all memoranda or other products of her work as she prepares for litigation on behalf of that client. While work-product immunity has a broader reach than attorney-client privilege,[273] it must be kept in mind that "[m]utual knowledge of all the relevant *facts* gathered by both parties is essential to proper

---

**269.** "Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Hickman*, at 511, 67 S.Ct. 385.

**270.** *See, also,* Fed.R.Evid. 502(g)(2), which defines work-product protection as applying to "tangible material (or its tangible equivalent) prepared in anticipation of litigation or for trial."

**271.** In contrast, the client is the holder of the attorney-client privilege and, while an attorney may assert the privilege on her client's behalf, the privilege is solely for the client's benefit.

**272.** *See, also, Tambourine Comercio Internacional SA v. Solowsky*, 312 Fed.Appx. 263 (11th Cir. 2009) (work-product did not protect documents prepared by expert witness hired by attorney for client, when the client was not in the present litigation against the attorney, as the rule only protected the client for whom the documents were prepared, and that client was not a party to the dispute).

**273.** The work-product doctrine is more protective of privacy than the attorney-client privilege,

litigation." *Hickman*, at 507, 67 S.Ct. 385 (emphasis added).[274]

### 1. Burden of proof as to applicability of the work-product immunity doctrine

The Eleventh Circuit has held that while the disclosure of fact work-product can be compelled upon a requisite showing, opinion work-product "enjoys a nearly absolute immunity" and cannot be discovered merely upon a showing of substantial need and an inability to secure the materials by alternate means without undue hardship, i.e., the test under Rule 26(b)(3)(A)(ii), but rather is only discoverable in "very rare and extraordinary circumstances." *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.1994) (crime-fraud exception constitutes "extraordinary circumstances" justifying a waiver of opinion work-product, but "at-issue" implied waiver based on party's reliance on "advice of counsel" defense was not applicable to work-product immunity), *modified on other grounds* by 30 F.3d 1347 (11th Cir.1994).[275]

The burden rests on the party advocating for the protection. Fed.R.Civ.P. 26(b)(5)(A); *see, also, Bridgewater v. Carnival Corp.*, 286 F.R.D. 636 (S.D.Fla.2011) (party claiming protection must provide underlying facts

demonstrating existence of the privilege; *citing International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 94 (D.Del.1974)). Courts have rejected blanket claims of work-product immunity, and have found that the protection was waived when a party failed to provide sufficient detail as to the subject of memoranda or their authors.[276] *See, e.g., Auto Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199 (N.D.Fla.1990) (insurer filed no affidavits to show that documents were prepared in anticipation of litigation and otherwise failed to show that documents were protected work-product; however, claim file and claims manuals created in ordinary course of business were discoverable).[277]

 Waiver also is found where a lawyer or the lawyer's agents disclose work-product materials "in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information." *Stern v. O'Quinn*, 253 F.R.D. 663, 681 (S.D.Fla.2008) (quotations omitted). Plaintiffs' privilege log includes 85 entries which reportedly were communications with actual adversaries of Plaintiffs, e.g., RRGC, Shashy, Green, and, therefore, such communications clearly are

as the doctrine applies to materials that would not be protected by the attorney-client privilege, such as witness statements notes, related to her representation of the client in litigation. *Hickman*, at 508, 67 S.Ct. 385. Thus, the doctrine is "distinct from and broader than the attorney-client privilege." *U.S. v. Nobles*, 422 U.S. at 238, 95 S.Ct. 2160 n11.

**274.** A waiver of attorney-client privilege under Florida law does not in itself constitute waiver of Florida work-product immunity. *Visual Scene*, 508 So.2d at 442.

**275.** In *Cox*, the Eleventh Circuit, consistent with *Hickman v. Taylor* and the codification of that opinion in Fed.R.Civ.P. 26(b)(3), identified two categories of work-product immunity: fact work-product and opinion work-product. *Cox*, 17 F.3d at 1422. Fact work-product includes documents and tangible things prepared in anticipation of litigation or for trial, and opinion work-product consists of materials prepared in anticipation of litigation or for trial that reflect an attorney's mental impressions, conclusions, opinions, or legal theories concerning the litigation. Fed.R.Civ.P. 26(b)(3); *see, also, Callaway v. Papa John's USA, Inc.*, 2010 WL 4024883, 2010 U.S. Dist LEXIS 113274 (S.D.Fla. Oct. 12, 2010) (documents which were created by third parties, or

which do not reflect counsel's opinions or investigative or litigation strategies are not protected by work-product doctrine). The heightened protection of opinion work-product is revealed in the Rule's requirement that discovery ordered by the court must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney concerning the litigation." Fed.R.Civ.P. 26(b)(3)(B).

**276.** Florida law similarly rejects blanket assertions of work-product protections. *See, e.g., Wal–Mart Stores, Inc. v. Weeks*, 696 So.2d 855, 856 (Fla. 2d DCA 1997).

**277.** Florida state courts enforcing Florida Rule of Civil Procedure 1.280(b)(5), which was derived from Fed.R.Civ.P. 26(b)(5), "generally recognize that an implicit waiver of an important privilege as a sanction for a discovery violation should not be favored, but resorted to only when the violation is serious." *Bankers Security Ins. Co. v. Symons*, 889 So.2d 93, 95 (Fla. 5th DCA 2004) (reversing trial court order compelling production of allegedly protected documents as a sanction for delay in submitting a privilege log, holding that untimeliness alone is not sufficient to create a waiver of work-product immunity).

not entitled to either fact or opinion work-product protection. An additional number of entries in the log involved communications with persons as to whom no relationship to Plaintiffs was described, i.e., the Court was unable to categorize the author/recipient of such communication as being affiliated with Plaintiffs.[278] As such, the Court finds that Plaintiffs have failed to carry their burden that any of these documents—those involving communications with adversaries or with uncategorized persons—are entitled to work-product protection.

Plaintiffs argue that by requesting documents containing "estimates, evaluations and/or assessments of your potential legal liability and/or settlement values in the Underlying Matters" (a reference to one of Defendant's document requests), Defendant seeks production of Miller's opinion work-product. Plaintiffs also appear to be claiming opinion work-product protects all documents responsive to Defendant's other document request, which sought "[a]ll documents and communications between [Plaintiffs and Akerman Senterfitt attorneys] pertaining to the Underlying Matters," as Plaintiffs assert that all[279] of the total "700 or so" documents withheld on the basis of work-product are protected as opinion work-product. ECF No. 66, at 17 (Plaintiffs' Objections to Order Granting Motion to Compel).[280]

As an initial matter, it must be determined whether the withheld documents qualify as the type of highly protected opinion work-product defined in Rule 26(b)(3). A review of the privilege log reveals that Plaintiffs have extremely broadly interpreted the definition of an attorney's "mental impressions, conclusions, opinions, or legal theories." For example, Plaintiffs claim work-product immunity (and assert no other basis for non-production) as to e-mail communications regarding a modification to a scheduling order (14607–08, February 2008), a problem with overlapping Bates numbering (15055–57, May 2008), the scheduling of a hearing (15947–48, August 2008/2010),[281] and a "payment issue" (15532, July 2009); none of these documents reflect the type of materials which are protected as opinion work-product and to protect such documents from disclosure would be inconsistent with the rationale of the work-product doctrine.[282]

Documents created for a concurrent purpose, i.e., not made "because of" the anticipation of litigation but rather for other purposes in addition to the preparation for litigation, are not protected by work-product immunity.[283] This causation test is

278. In addition to the 85 entries involving an adversary, another 71 entries relate to communications with individuals whose role has not been described by Plaintiffs and who, therefore, may be representatives of an adversary or in some other way the disclosure to these individuals "increases the opportunity for a potential adversary to obtain the protected information."

279. Plaintiffs appear to not make any claim that the documents identified in the privilege log are protected as fact work-product.

280. Plaintiffs' privilege log includes more than 500 documents which were created before commencement of this action and which were prepared while defending against the claims brought in the Underlying Matters. (Eight items created in 2003, 2005, 2006—prior to initiation of the RRGC lawsuit—also appear to be relevant to the Underlying Matters, as indicated by their inclusion by Plaintiffs in this privilege log.) Plaintiffs' privilege log also includes approximately 200 documents created after this action was commenced in December 2008, and Plaintiffs have claimed opinion work-product as to all but four of these documents. According to this Court's Local Rules, which expand upon the requirements of Fed.R.Civ.P. 26(b)(5)(A)(ii), a party

claiming a work-product protection must prepare a privilege log, but that log need not contain "work-product material created after commencement of the action." S.D. Fla. L.R. 26.1(g)(3)(C).

281. The Court notes that the privilege log included multiple typographical errors as to the Bates numbering and the dates on which documents were created, which the Court has corrected (by examining the description of the item in comparison with other items), where possible, without further comment.

282. These e-mail communications, presumably printed out as documents, as to administrative or scheduling matters obviously were communications held "because of" Miller's work as he "anticipated" litigation or prepared for trial, but that does not imbue the documents with the special protection afforded to work-product as they are not the type of "documents and tangible things" envisioned by Fed.R.Civ.P. 26(b)(3).

283. In *Deason*, 632 So.2d at 1384, the Supreme Court of Florida held that fact work-product protections were not applicable to documents created for an independent business purpose—but such protections did apply to an internal audit

read along with a test of the reasonableness of the party's assertion that the documents were prepared in anticipation of litigation or for trial. In *1550 Brickell Assocs. v. Q.B.E. Ins. Co.*, 253 F.R.D. 697 (S.D.Fla.2008), the court noted that where an insurer had not yet denied a claim, there was an open question as to which documents in the insurer's claim file were prepared "in anticipation of litigation" and which were prepared before litigation was anticipated.[284]

The Court observes that the nature of the parties' unique relationship—adversaries before this Court, but allies as to the defense and settlement of the RRGC action, which was concluded in September 2010, has blurred what should otherwise be clearly demarcated boundaries as to what is discoverable. Miller's work defending Plaintiffs was—at least in part—being paid for by Defendant as the insurer,[285] and this Court has determined, as announced above, that the parties were effectively joint clients of Miller (and the team of attorneys representing Plaintiffs) for the purposes of applying attorney-client privilege protections. As joint clients, the parties share a joint work-product protection from disclosure to others outside the boundaries of their shared protections. Also, as there has been no final decision on coverage[286] and, moreover, the Plaintiffs and Defendant continued to cooperate as to the defense of the RRGC action through September 2010 (the most recent

document in the log is dated August 2010), there may be a rebuttable presumption that the materials in the Plaintiffs' privilege log are discoverable by Defendant, i.e., are not entitled to opinion work-product protection from disclosure to Defendant.

### 2. Were the documents created for a party with a "common legal interest"?

■■■ The documents Indian Harbor seeks may be available pursuant to the "common legal interest" doctrine, discussed above as applying to questions of attorney-client privilege, which also has been applied to questions of federal work-product immunity. "[T]he joint defense doctrine is an extension of the work-product doctrine and allows parties facing a common litigation opponent to exchange privileged communications and attorney-work-product in order to prepare a common defense without waiving either privilege." *Fojtasek v. NCL*, 262 F.R.D. 650, 654 (S.D.Fla.2009) (incident report prepared by tour operator was protected work-product under the joint defense theory because at the time the report was prepared, the tour operator and cruise line had a common interest in defending any claim related to the zip-line incident); *see, also, Mitsui Sumitomo Ins. Co. v. Carbel, LLC*, 2011 WL 2682958, 2011 U.S. Dist. LEXIS 74148 (S.D.Fla. July 11, 2011). As noted by Magistrate Judge Jonathan Goodman, the "question is not, as in the case of the attorney-client privilege, *whether* confidential communications were disclosed, but *to whom* the disclosure is made—because

performed in response to a regulatory agency investigation and in anticipation of litigation. The court found that personnel managers' summaries were not work-product even though they summarized employee interviews, which were conducted in anticipation of litigation and which would be work-product themselves. In cases in which a long-serving general counsel to a corporate entity also serves as defense counsel in litigation, e.g., Miller's role as attorney for Maple-Wood Partners, this Court echoes the observation of the court in *Deason:* "the line between law-related communications and business communications is especially blurry." *Id.*, at 1385.

**284.** The court in *1550 Brickell* determined that the date the action was filed was the relevant date, and rejected the insurer's affidavit stating that litigation was anticipated the day after a hurricane struck because the damages claimed by the insured were excessive. *Id.* at 699. The court also rejected, when raised in a motion for

reconsideration of the ruling, the insurer's late attempt to establish that the insured had specifically threatened litigation months prior to filing the action at issue—determining that such information was not "new evidence" justifying reconsideration. *1550 Brickell Assocs. v. QBE Ins. Corp.*, 597 F.Supp.2d 1334 (S.D.Fla.2009).

**285.** Defendant sent the first payment to Plaintiffs in January 2009 for covered defense expenses—which included payment for Miller's work performed in prior years. In February 2008, Indian Harbor had confirmed its "consent" to the hiring of Akerman Senterfitt the prior year.

**286.** The Defendant has not issued a final decision as to coverage, but the parties have stipulated that they anticipated litigation as of January 1, 2008, with the expectation that documents created after that date will be subject to work-product immunity.

the protection is designed to protect an attorney's mental processes from discovery by *adverse* parties." *Id.* (emphasis in original).[287]

█ The definition of "common legal interest" in the work-product context is not construed as limited only to co-parties in litigation. " 'So long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the trial preparation efforts.' " *Visual Scene* 508 So.2d at 442–43 (*quoting United States v. American Telephone & Telegraph Co.*, 642 F.2d 1285, 1299–1300 (D.C.Cir. 1980)).[288]

The federal rule on work-product, Fed. R.Civ.P. 26(b)(3), speaks of "substantial need" and inability—without undue hardship—"to obtain [the] substantial equivalent [of the requested work-product] by other means." Plaintiffs claim that the Defendant never needed the mental impressions and analyses of counsel in the Underlying Matters and has not proven that it needs any of the demanded documents or communications. For example, Plaintiffs argue that a determination of allocation or an insured's relative exposure in the Underlying Matters is a fact-based analysis and does not need opinion

work-product protected documents.[289] The Court finds, however, that Defendant has made at least a minimally sufficient showing of such need, and the inability to obtain this protected material without undue hardship.

█ Expert reports in the Underlying Matters already have been disclosed, and Plaintiffs made available to Defendant at least 27 boxes worth of documents in response to other discovery requests as to the performance of Professional Services (as defined in IAPL and IAML coverage parts of the Policy) by any of the MapleWood entities in connection to the allegations in the Underlying Matters were made available to Defendant for inspection and copying.[290] The Court's review of the Underlying Matters and the interim coverage decisions suggests that the application of the Policy term "Professional Services" is one notable example of the insurer's need for Plaintiffs' otherwise confidential communications and documents. The type of conduct, i.e., the providing of "financial, economic or investment advice or investment management services" which allegedly resulted in the claims brought against Plaintiffs in the Underlying Matters is of a very private nature, and not likely to be discernable from publicly available sources.[291] Indian Harbor requested more

---

287. "Under the 'common interest' exception to waiver, a party may share its work-product with another party without waiving the right to assert the privilege when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is legal, and not solely commercial." *Mitsui* (citations omitted).

288. Plaintiffs argue that because MapleWood Holdings, which appears to be a non-insured—according to Defendant's interim coverage decision, is included in the attorney-client communications then opinion work-product immunity cannot be waived by application of the common legal interest doctrine. This argument is flawed in several respects, most obviously so because MapleWood Holdings had no employees, and there is no evidence presented that proves, by a preponderance of the evidence, that Glaser was speaking as MapleWood Holdings in any of the communications reported in the privilege log. Moreover, Plaintiffs have claimed insurance coverage as to all Intervenors (and others), and the presence of any of these putative insureds in Miller's attorney-client communications does not prohibit the application of the common legal interest doctrine, as discussed above.

289. Plaintiffs also emphasize that Defendant never claimed a breach of the cooperation clause of the Policy and, therefore, should be considered to have conceded that it had all the information necessary to make a determination. The Court rejects this argument, as Defendant's coverage decision consistently was described as an "interim" allocation decision.

290. *See*, ECF No. 39–9, and ECF No. 39–10 (correspondence in August 2010, reporting that Plaintiffs were making documents available in response to Requests Nos. 20 and 24, of Defendant's First Set of Document Requests). Defendant's had requested "orders, decisions, judgments, pleadings, expert reports, settlement agreements, awards, motions and other filings" in the RRGC action. ECF No. 39–9.

291. On September 8, 2011, two days after the entry of this Court's Order, Defendant's expert witness, Don Colleluori, was deposed by Plaintiffs. Colleluori stated that he reserved the right to amend or supplement his opinions "based on such additional information [relating to several pending discovery disputes]." ECF No. 255–8, at 2 n.1. The report of Defendant's rebuttal expert, Bernd G. Heinze, was filed on

detailed information in response to the demand for coverage, and the Court finds that such discovery is permissible.

In summary, Plaintiffs' privilege log does not sufficiently establish that the documents listed therein are subject to work-product immunity, nor have Plaintiffs supported their opinion work-product claims with affidavits or other evidence.[292] The Court now will discuss "at-issue" waiver as yet another alternative theory for disclosure, as applied only to documents which would otherwise constitute fact work-product.[293]

### 3. "At–Issue" waiver of work-product immunity

■■■ While work-product immunity preserves the adversarial nature of litigation, the doctrine of "at-issue" waiver rests on the principle of fairness. "At-issue" waiver applies when a party injects the work-product directly into the litigation, as necessary to prove an element of a claim or defense. *Cox*, at 1422–23. According to the decision in *Cox*, the "at-issue" waiver cannot apply to opinion work-product materials, *id.*,[294] and, therefore is only applicable—if at all—to claims of fact work-product protection.

■■■ To establish waiver under the "at-issue" doctrine Defendant must establish a

*prima facie case* that Plaintiffs' assertion of the protection results from some affirmative act by Plaintiffs, and through this affirmative act, Plaintiffs put the protected information "at-issue" by making it relevant to the case, such that application of the fact work-product protection would deny the Defendant access to information vital to its defense. *See, e.g., Stern*, 253 F.R.D. at 676 (deposition of defense investigator to learn what she disclosed to non-party author regarding allegedly slanderous statements by defendant was allowed because of possible waiver as to subject). Defendant argues that it has met this test, as it is clear that Plaintiffs brought this coverage lawsuit and through that act have placed "at-issue" their own otherwise protected work-product which is relevant to the case, specifically as to the question of whether the allocation clause was applied properly.[295]

As discussed, *supra*, as to the "at-issue" waiver of attorney-client privilege, Plaintiffs have alleged that Defendant failed to make a "fair and appropriate" allocation of covered loss, and failed to properly take into account the relative legal and financial exposures of the defendants (Plaintiffs herein) in the Underlying Matters.[296] The Court notes that at Miller's deposition he was instructed by

September 22, 2011 (ECF No. 231–1), and notes the outstanding discovery matters and specifically reserves "the right to respond further in my testimony and additional reports as may be appropriate."

**292.** This determination does not, however, eliminate the parties' ability to assert privilege or protection against third parties. The parties also remain bound by the Stipulated Confidentiality Order, entered in this case in January 2010. ECF No. 30.

**293.** The discussion as to fact work-product may be irrelevant, as it appears that Plaintiffs have raised no claims of fact work product protection; nevertheless, the Court includes a brief analysis of the issue, in the event that the Court has overlooked Plaintiffs' statement of the argument.

**294.** The Court of Appeals discussed the "subject-matter waiver" doctrine as applicable when a party injects into a case *"an issue* that in fairness requires an examination of communications otherwise protected by the attorney-client privilege." *Cox*, at 1422 (emphasis added).

**295.** Intervenors assert that there is no evidence that they took action which put a topic "at-issue," and that there is no caselaw "where the action of one co-holder of the opinion work-product immunity was held to 'waive' another

co-holder's right to enforce that immunity." ECF No. 259. However, the Court views these Intervenors simply as representatives of the MapleWood entities/insureds, possessing only those privileges or rights to assert immunity which are possessed by Plaintiffs.

**296.** In *Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co.*, 1992 WL 486801, 1992 U.S. Dist LEXIS 20860 (N.D.Cal. Dec. 8, 1992), the court addressed a similar allocation clause in a directors and officers liability insurance policy, as to which the parties disagreed on allocation (as to relative exposure of plaintiffs officers and directors as compared to uninsured parties). The court held that "discovery into areas protected by ... the work-product doctrine is appropriate" because the plaintiff put those documents and other sources of information at issue by bringing suit and contesting the defendant's allocation. *Id.* The decision was clarified on denial of reconsideration, at 1993 WL 739643, 1993 U.S. Dist. LEXIS 2006 (N.D.Cal. Feb. 5, 1993), to state that an analysis of "relative exposure" or *"potential liability* of the parties at the time of settlement" was relevant to determining the reasonableness of an allocation decision and that "limited allocation discovery," with *in camera* review available, was appropriate as to the decisions, conclusions, and mental state of the attorney, despite

Plaintiffs' coverage counsel not to answer Defendant's questions as to his opinions of the relative strength of the claims in each of the Underlying Matters.

Plaintiffs make a compelling argument that Defendant does not need the work-product of Miller in order to assess the relative liabilities of the parties as to the Underlying Matters, and rely on a state court opinion which evaluated the issue as to a question of attorney-client privilege. In *Chomat v. N. Ins. Co. of N.Y.*, 919 So.2d 535, 538 (Fla. 3d DCA 2006), the state appellate court held that a party's position as to the reasonableness of a settlement entered in an underlying tort case (which the party claimed the insurer had wrongly refused to defend) may rely on the advice of counsel without the party waiving attorney-client privilege[297] as to all matters, as reasonableness is measured by a "reasonable person" standard and can be established through expert witnesses.[298] However, the Eleventh Circuit-ruling as to an issue of attorney-client privilege and not work-product protection-has observed that the issue of reasonableness of a settlement and the potential liability of parties to an underlying settled claim, can be at the "very heart" of an indemnity action. *GAB Bus. Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987).

Defendant describes the withheld documents as necessary and at "the very heart of Plaintiffs' claims" for coverage in this lawsuit. The Court finds that the Defendant has a substantial need for any work-product which might be included in the withheld documents. For example, an outstanding issue between the parties is the question of the payment of defense fees by Travelers insurance. This is the type of information which necessarily is contained within Plaintiffs' fact work-product materials, and as to which Defendant has a substantial need and appears to be unable to get without a showing of need. While Defendant did obtain a statement from Travelers indicating what amounts were paid and on what dates, the statement was not specific as to whether each specific defense invoice had been paid— such records will be in Plaintiffs' possession, of course.

In conclusion, to the extent that Plaintiffs have placed "at-issue" the application of the allocation clause or any other subject matter, such affirmative acts by Plaintiffs have selectively waived any fact work-product protection as to documents containing discussions in those areas. In light of Defendant's need for the materials, discussed in more detail above, the Court concludes that production should be ordered.[299]

### 4. Work-product of attorneys at Ver Ploeg & Lumpkin

The Court has reviewed the 28 documents submitted by Plaintiffs in September 2011 for *in camera* review, as purported opinion work-product of the Ver Ploeg & Lumpkin firm. ECF No. 222 (the documents remain under seal). The Court finds that several of the documents, identified below, do not contain work-product of attorneys at Ver Ploeg & Lumpkin:

—Letters which are invoices from Akerman Senterfitt for document copies provided to Ver Ploeg & Lumpkin, e.g., 15954–57 and 16152–55,[300] are not opinion work-

objections based on attorney-client privilege or work-product protection. *Id.* (emphasis in original). In the Eleventh Circuit, however, opinion work-product is not subject to an "at-issue" waiver.

297. Although the plaintiffs in *Chomat* had asserted work-product protection in addition to attorney-client privilege, the state court did not explicitly address the question of work-product in its opinion but, presumably, that court would not have found a blanket waiver as to the plaintiffs' work-product. 919 So.2d at 537.

298. While both attorney-client privilege and work-product protection were at issue, the court's analysis in *Chomat* only addressed the privilege question *Chomat*, 919 So.2d at 539.

299. Plaintiffs also argue that Defendant's response to Plaintiffs' motion for judgment was filed after the Court's September 2011 Order and is new evidence, justifying reconsideration of the Order, that Defendant considers the allocation clause to be a "exclusion" and, thus, the law requires the insurer to carry the burden *LaFarge Corp. v. Travelers*, 118 F.3d 1511 (11th Cir.1997). While it may be a correct statement of the law to say that an insurer carries the burden of proving application of an exclusion from coverage, the Court disagrees with Plaintiffs that Defendant's response constitutes "new evidence."

300. Although Plaintiffs submitted these documents to the Court as a single four-page document 16152–55, Plaintiffs' privilege log lists two separate two-page entries, 16152–53, 16154–55,

product. Similarly, 14613–14 (a duplicate of which is found at 16607–08) is a letter from Miller to Lumpkin in February 2008 which forwards copies of letters to and from the insurer and Glaser/Miller—this is not Lumpkin's opinion work-product.

—E-mail communications, primarily authored by Glaser, which contain no work-product of Ver Ploeg & Lumpkin (nor is any attorney from the firm included in the exchange of e-mails), e.g., 14598, 14612, 14728, 15559–61, 15728–31, 15732–34, 15739–40, 15958–61, 16013–14, 16124

—e-mail communications which include Lumpkin but do not include any opinion work-product, e.g., 15124–26 (Lumpkin is mentioned but is not the author of 15124), 15178–80 (September 2008 discussion which does not address coverage dispute).

—"Claimants' Confidential Mediation Statement", 17248–93, does not appear to contain the work-product of anyone identified to be an attorney at Ver Ploeg & Lumpkin. The document is subject to disclosure as it was provided for use at a mediation which Defendant attended (the document was provided to the mediator but not provided to the respondents, Shashy and Green, nor to Indian Harbor). Even if this document does contain the opinion work-product of a mystery lawyer at Ver Ploeg & Lumpkin, Plaintiffs' assertion of the protection is overruled, based on the Court's determination that the parties are effectively joint clients for the purposes of defending the Underlying Matters and, thus, were aligned parties at the mediation.

In addition, although the Ver Ploeg & Lumpkin firm was not retained by Plaintiffs until early 2008, the firm has claimed an opinion work-product protection as to documents authored by others in late 2007, 14729–30 and 14731–40 (attorney discussion regarding coverage issues as to Julio's, and draft coverage analysis), which this Court rejects.

The other claimed basis for withholding the above documents from production is that

they are protected by attorney-client privilege (Plaintiffs presumably are claiming that Glaser is the "client" in each of these communications), or that they reflect the opinion work-product of Miller, who does not represent the Plaintiffs in this coverage action. Neither of these arguments are persuasive, in light of the Court's ruling that Plaintiffs' client relationship with Miller was shared with Defendant as a joint client.[301]

The Court has determined that Plaintiffs' opinion work-product objections are sustainable only as to select pages of the following nine documents, although other pages in each of these documents—most of which include e-mails sent from Glaser to the attorneys—are subject to disclosure under the principles stated above: 15723–27 (two pages, 15726–27, of this set of documents reflect Lumpkin's theories or legal opinions and need not be disclosed), 15751–53 and 15754–55 (the opinions of Lumpkin are found on 15754, and in a brief e-mail authored by Lumpkin at 15751–52, which need not be disclosed), 15826–27 and 15828–29 (brief note to Glaser from Huber in December 2008, found at 15826, need not be disclosed), 15925 and 15944 (August 9, 2010, correspondence from Huber to Miller seeking documents responsive to Defendant's discovery request—the Court sustains Plaintiffs' objection to disclosure of these two documents), 16101 (opinion work-product protected statement of Huber which need not be disclosed), and 17233–37 (e-mails in April 2008 reporting Lumpkin's opinion work-product, which need not be disclosed).

### D. Shashy matter mediation documents, miscellaneous documents

Plaintiffs have withheld from production five documents (related to the mediation of the Shashy matter—which concluded five years ago) as to which Plaintiffs assert solely a mediation privilege, pursuant to Fla. Stat. § 44.405. Florida law provides that all mediation communications shall be confidential, and participants shall not disclose a mediation communication to a person "other than

---

based on the separate dates of these two documents.

**301.** And, as Plaintiffs did not include the specific document previously identified by this Court, in

its September 2011 Order, as potentially protected by the firm's work-product, 16110–23, the Court overrules Plaintiffs' work-product objection to production of that document.

another mediation participant or a participant's counsel." Fla. Stat. § 44.405(1). Defendant and its counsel attended the Shashy mediation.[302] As the prohibition on disclosure of mediation communications does not apply among participants to the mediation, Plaintiffs' objection to disclosure is overruled; 16967–70, 16997–98, 17052, 17057, 17061 shall be produced.[303]

In addition, Plaintiffs assert attorney-client privilege and work-product immunity as to other items in the privilege log which relate to the Shashy mediation, e.g., the "Claimants Confidential Mediation Statement" in the Shashy mediation, which was submitted to the mediator by Miller and his colleagues on March 27, 2008 (but not provided to the respondents, Shashy and Green). This document, 17248–93, was provided to the Court for *in camera* review as purportedly containing the opinion work-product of attorneys at Ver Ploeg & Lumpkin. The Court discussed this document, *supra*, and overruled Plaintiffs' objection to its disclosure.

Finally, there are two entries in the privilege log as to which Plaintiffs failed to assert either an attorney-client privilege or work-product immunity, 16971–76 and 17094–156. The first of these documents apparently includes "personal financial information" which the Court finds may be redacted before production. The second document purports to be between two attorneys and encloses a "settlement document." Absent further information, which it was Plaintiffs' burden to provide, the Court finds that no privilege attaches to that communication between counsel.

Plaintiffs argue that the Court should conduct an *in camera* review not only as to the

documents purportedly representing opinion work-product of the Ver Ploeg & Lumpkin firm, but as to *all* documents on the privilege log (nearly 800 total documents) to see if the withheld documents correspond to any issue or subject matter allegedly waived, and note that Defendant does not object to such procedure; however, Plaintiffs have misunderstood the relevant legal standards. The Court does not conduct an *in camera* review lightly, nor simply because a party requests it, but rather this Court holds the proponent of non-disclosure to the appropriate evidentiary burden.[304] The Court did review documents submitted by Plaintiffs which purportedly were opinion work-product of Plaintiffs' coverage counsel, and found that the majority of such documents did not meet the federal standards for immunity from production.

If Plaintiffs' privilege log had revealed other items that might qualify as opinion work-product and which were not subject to disclosure under the common legal interest doctrine or any documents which were otherwise protected from disclosure under either a work-product protection or attorney-client privilege theory, the Court would have considered conducting an *in camera* review. However, after multiple attempts at producing a sufficient privilege log, and at least three attempts to convince a federal judge of the merits of their position,[305] Plaintiffs have failed to meet their burden of establishing, by a preponderance of the evidence, a basis for protection. Moreover, as the parties have agreed to a confidentiality order, the Court does not find that Plaintiffs (or Intervenors) will suffer an "extreme and unexpected hardship" (which might justify reconsideration of this Court's earlier decision).

---

**302.** *See* ECF No. 40–11 (Lumpkin says that it was a pleasure meeting them "during the MapleWood/Shashy mediation.").

**303.** Moreover, it is not clear that the statute applies to invoices for mediators' fees e.g., 16967–70.

**304.** As observed by Magistrate Judge Chris McAliley, in *Campero USA Corp. v. ADS Foodservice, LLC*, 2012 WL 6838937, fn. 4, 2012 U.S. Dist. LEXIS 184497, fn. 4 (S.D.Fla. Dec. 13, 2012):

Courts make a principled attempt to try to avoid *ex parte* proceedings, including *in camera* review of documents, as it is fundamentally

contrary to our adversarial system of dispute resolution. *In camera* review puts the Court in the undesirable position of attempting to think of arguments that the excluded counsel might make if he or she had access to the documents in question, and the Court can never do the job of counsel, as well as counsel can. Thus, it is wise for the Court to not consider an *in camera* review until the party asserting privilege has done all that it reasonably could to establish privilege.

**305.** Plaintiffs argued their position before Magistrate Judge Turnoff, then objected to the order he entered and, finally, objected to this Court's Order overruling Plaintiffs' objections to that order.

In conclusion, the Court finds that Plaintiffs have not established that an *in camera* review is required as to any of the documents in the privilege log.[306] The Court has reached its conclusions, stated above and in the Court's Order of September 2011, based on the arguments presented by the parties and any evidence offered in support thereof. The Court's conclusions as to all documents in the privilege log are included in a chart, provided as an appendix to this Order, along with a directory of names included in the privilege log, to facilitate counsel's compliance with this Court's ruling.

### E. Other discovery disputes

#### 1. Plaintiffs' motion to compel production and proper responses to discovery

Plaintiffs filed a motion to compel production of documents[307] and proper responses to Plaintiffs' Requests for Admissions (ECF No. 81), seeking production of Defendant's "electronic claim notes," prepared and maintained in the ordinary course of business, relating to Plaintiffs' claims for coverage.[308] Defendant has provided its claim file notes—most of which were authored by Pidlak, as the claims adjuster—other than items as to which it asserts a privilege or protection: communications with outside counsel (Troutman Sanders, or Ross, Dixon, and Bell) and any notes generated after the parties' agreed-upon date as of which they anticipated litigation (January 1, 2008).[309]

As noted above, Florida law governs the question of privilege, and federal law provides the scope of the work-product protection. Florida state courts have observed that an insurer's claim file is "not relevant" to a coverage dispute, and have held that documents prepared by an insurer (including claim files and claims-handling manuals) before the final determination of insurance coverage are privileged and work-product protected in coverage actions.[310] *See, e.g., Seminole Cas. Ins. Co. v. Mastrominas,* 6

---

**306.** My review in this case was conducted with care that I not simply resort to reviewing all of the documents on the privilege log *in camera* and announce my conclusions based on such review, despite the temptation to do so. Indeed, in an understandable attempt to save time and render more final guidance to the parties, many courts are likely to proceed directly to conducting a review of the withheld documents and then making a ruling as to whether privilege applies. Such rulings may, however, be affected as much by a court's determination of the relative value of the particular document, i.e., the "this is not damaging evidence, so why not disclose it" approach, as by the merits of the legal arguments as to privilege. That approach seems contrary to the law as developed by the Supreme Court which recognizes that both the attorney-client privilege and the work-product doctrine have purposes which are, in the final analysis, to promote the observance of law, the administration of justice, and the orderly working of our legal system—none of these worthy goals are met by placing on judicial officers a burden which instead should be borne by a party to litigation.

**307.** Plaintiffs' First Request for Production sought the "complete claim file" and any documents that the insurer intended to rely on in support of its affirmative defenses, including "claims manuals."

**308.** Plaintiffs also sought the Defendant's claims manual and claims handling guidelines, alleging that they learned that such items had not been produced when they deposed Pidlak, Indian Harbor's corporate designee, in April 2011. Defen-

dant responds that Plaintiffs had only requested the claims manual if Defendant "intended to rely on it," *see* ECF No. 86, at p. 16 (Defendant's Corrected Responses to Plaintiffs' First Request for Production), and that, in any event, Defendant subsequently produced the two versions of its claims manual in effect during the period when Plaintiffs' claims were being processed, along with the "Claim Audit Review Requirements" Appendix to the manual.

**309.** Defendant disclosed notes prepared before January 1, 2008, unless they reflected communications with outside counsel, and provided any notes prepared after that date other than those to which Defendant asserts work-product protection.

**310.** However, as to cases brought by an insured against its insurer under Florida's bad faith statute, the Supreme Court of Florida has decided that fact work-product in the insurer's claim file (including documents, memoranda, and letters in the underlying claim file, and related litigation file material created up to and including the date of resolution of the underlying action) is discoverable, *Allstate Indem. Co. v. Ruiz,* 899 So.2d 1121 (Fla.2005), but other than in limited circumstances (e.g., where a waiver was established), "when an insured party brings a bad faith claim against its insurer, the insured may not discover those privileged communications that occurred between the insurer and its [own] counsel during the underlying action." *Genovese v. Provident Life & Accident Ins. Co.,* 74 So.3d 1064, 1068–69 (Fla.2011).

So.3d 1256, 1258 (Fla. 2d DCA 2009) (reversing lower court decision compelling production of claim file in liability insurance coverage dispute as disclosure of claim file materials during coverage dispute would cause irreparable harm, but recognizing that some materials could be discoverable if relied on at trial); *GEICO Gen. Ins. Co. v. Hoy*, 927 So.2d 122 (Fla. 2d DCA 2006) (coverage dispute not resolved by insurer paying portion of claim, and claim file not required to be produced during litigation of coverage issues). Other Florida courts have held that there is a rebuttable presumption against disclosure of an insurer's claim file in a coverage dispute, requiring an insured to show good cause and a need for access. *See, e.g., State Farm Fla. Ins. Co. v. Aloni*, 101 So.3d 412, 414–15 (Fla. 4th DCA 2012) (insurer's claim file was not discoverable in property insurance coverage dispute absent showing of need and inability to obtain equivalent information without hardship).

In contrast, federal courts in Florida generally have found that no work-product protection attaches to an insurer's claim file (even if an employee handling the claim is an attorney, or if the insurer hired outside or monitoring counsel to assist with the claim processing) because the claim file is a business record, prepared in the ordinary course of the insurer's business, until the date on which coverage is denied. *See, e.g., 1550 Brickell Assocs. v. Q.B.E. Ins. Co.*, 253 F.R.D. 697, 698 (S.D.Fla.2008) (where an insurer had not yet denied a claim, there was an open question as to which documents in the insurer's claim file were prepared in anticipation of litigation, and which were not); *Cutrale Citrus Juices USA, Inc. v. Zurich Am. Ins. Group*, 2004 WL 5215191, 2004 U.S.

Dist. LEXIS 22487 (M.D.Fla. Sept. 10, 2004) (responsive documents in insurer's claim file created prior to final decision on coverage are not protected work-product, even if prepared by counsel). As has been observed, "[m]any courts have noted the difficulty in determining whether documents prepared by an insurance company or its representatives are entitled to work product protection because it is an insurer's business to investigate and adjust claims." *Essex Builders Group, Inc. v. Amerisure Ins. Co.*, 2006 WL 1733857, 2006 U.S. Dist. LEXIS 40932 (M.D.Fla. June 20, 2006) (adopting rebuttable presumption that documents prepared before a final coverage decision are not work product, and documents produced after such decision are work product).[311]

This Court must apply federal law to work-product protection claims, but even without this mandate, the Court would reject the confusing and inconsistent state court jurisprudence because it is contrary to the direction provided by the Supreme Court of Florida's decision in *Deason*, which held that documents prepared for an independent business purpose[312]—even if prepared at the direction of an attorney—do not qualify as fact work-product. *Deason*, 632 So.2d at 1384. Applying the federal work-product doctrine to the dispute before me, I conclude that anything Pidlak authored (even if to outside counsel who were acting as monitoring counsel) before January 1, 2008,[313] shall be disclosed as a record made in the ordinary course of business, but anything she authored to Indian Harbor's outside counsel after that date that otherwise would qualify as trial preparation materials (prepared because of, and in anticipation of, litigation) is protected by work-product immunity and not subject to disclosure.[314]

311. "Regrettably, in the insurance context the boundary between [documents subject to disclosure and documents not subject to disclosure] is not always clear because an insurance company investigates claims in the ordinary course of its business." *1550 Brickell*, at 698.

312. As persuasively argued by Plaintiffs, Defendant's own policies require that the claim adjuster comment on file notes.

313. Defendant has not issued a final decision as to coverage, as such, the Court has imposed a discovery boundary of January 1, 2008, based on the parties' stipulation that January 1, 2008, was

the date as of which they anticipated litigation was forthcoming.

314. As discussed, *supra*, the Court has required Plaintiffs to disclose documents as to which they asserted an attorney-client privilege which the Court has found was a privilege shared with Defendant as a joint client or, alternatively as an aligned party with a common legal interest; however, the record does not reveal that Plaintiffs shared the privilege held by Defendant as to communications with its outside counsel, i.e., counsel hired to represent Indian Harbor. The Court's conclusion that the parties were effectively joint clients of Miller and his team as to the defense of Plaintiffs in the Underlying Matters,

As to the Defendant's original privilege log (prepared April 1, 2010), ECF No. 87, all items prepared by Pidlak and dated before January 1, 2008 (or undated: 144, 155, 627–8, 629, and 714) shall be produced: 262–63, 273–74, 284–85, 484–85, 2271–72, 2475, 2476, 2784–85, 4268, 4269, 4621–22, 4625–27, 4639–41, 4654–56, 4661–62, 4665–66, and 4681–82. In addition, the following items prepared by Pidlak after January 1, 2008, and directed to outside counsel must be disclosed, as Defendant has not established, by a preponderance of the evidence, that such items were prepared in anticipation of litigation: 216–221, 766–767, 4842–5, 4926–7, 4946–8, 4949–51, 5478–79, 5507–08, 5877–78, 6058–60, 6287–88, 6374–77, 6461–63,[315] 6491–92, 6552–55, 6717–18, 6971–73, 6980–82, 7006–07, 7055–56, 7065–67, 7090–97, 7135–40, 7162–63, and 7170–75. The Court also finds that all of the items included on the Supplemental Privilege Log (prepared May 6, 2010), ECF No. 107–2, shall be provided to the Plaintiffs, with the exception of 10465, reported as a communication by Pidlak to outside counsel on April 7, 2011, regarding claim file notes.[316]

In addition, communications from outside counsel to Pidlak are subject to disclosure unless such communications or opinions were provided to Defendant by outside counsel after January 1, 2008, and were related to the provision of legal advice in anticipation of litigation; if the legal advice was provided before January 1, 2008, then such advice is not protected as work-product (as until that date it was not reasonable to anticipate this litigation), nor is such communication subject to attorney-client privilege, as Defendant has not demonstrated that the primary purpose of the communication was to obtain or provide legal advice, as compared to business-related advice [317] (since outside counsel was fulfilling a role as claims monitoring counsel, and Defendant's claims investigation process is its business function), and the insurer implicitly has conceded that it did not reasonably anticipate litigation at that time.

Plaintiffs assert that Defendant already has disclosed an e-mail received from outside counsel, dated November 30, 2007, which references the allocation issue. ECF No. 107–4 (filed under seal). This disclosure suggests that Defendant—even if only inadvertently—at least put the key in the lock to open the door of the barn to let the horse out.[318] However, as discussed above, federal law in the Eleventh Circuit does not recognize a subject matter waiver of opinion work-product immunity. Regardless of this allegedly inadvertent disclosure by Defendant, the Court has determined that Defendant shall produce any communications or advice it received from outside counsel to the extent such counsel was serving in the capacity of monitoring counsel, but Defendant need not disclose those materials which include an

does not apply to the relationship between Indian Harbor and its outside attorneys, Troutman Sanders (or Ross, Dixon and Bell). The evidence does not suggest that the parties were joint clients of these outside attorneys nor that they were allied parties with a common legal interest.

**315.** As an example of a document which does not appear to be prepared for litigation, this document simply refers to a file number for the processing of the Green counterclaim. Defendant has not sufficiently supported its claim of work-product protection as to this document.

**316.** All of the other items in the Supplemental Privilege Log (other than the 2008 Claim Handler Guidelines—which already was provided to Plaintiffs, but remains under seal in the Court's file) were authored by Pidlak and the recipient is the "File." ECF No. 107–2. The Court observes that the Supplemental Privilege Log includes documents identified as 10471–10476 and described as notes prepared by Pidlak, but such identification numbers also refer to the 2007 version of Defendant's Claim Handler Guide-

lines, *see, e.g.,* ECF No. 118–1, at 2 (filed under seal).

**317.** *See, e.g., In re: Denture Cream Prods. Liab. Litig.,* 2012 WL 5057844, 2012 U.S. Dist. LEXIS 151014 (S.D.Fla. Oct. 18, 2012) (employee's handwritten notes reflecting corporate counsel's legal advice regarding a future meeting with regulatory agency and specifically referencing future litigation were protected by attorney-client privilege despite business aspects of the advice, as primary purpose was the soliciting of legal advice).

**318.** "It is black letter law that once the privilege is waived, and the horse out of the barn, it cannot be reinvoked." *Hamilton v. Hamilton Steel Corp.,* 409 So.2d 1111, 1114 (Fla. 4th DCA 1982). However, according to Fed.R.Evid. 502(b), waiver will not be found if the disclosure was inadvertent, and the holder of the privilege had taken reasonable steps to prevent the disclosure and also promptly took reasonable steps to rectify the error.

opinion of counsel prepared in anticipation of litigation and generated after January 1, 2008.

Plaintiffs also demand that Defendant provide better answers to Plaintiffs' Second Request for Admissions. For example, Plaintiffs demanded that Indian Harbor admit that Glaser is an Insured under each of the policy's coverage parts in connection with the underlying matters. Defendant responded that Plaintiffs' phrasing of each of the requests for admission rendered it impossible to answer properly, as the requests asked for a determination of whether an entity or individual was an "Insured" under the different coverage types in the policy, and whether there was "coverage" with respect to each of the specific Underlying Matters-thereby conflating the concepts and making an "admission" impossible to provide. Having reviewed the requests, the Court finds merit in Defendant's argument.

Based on the above, the Court GRANTS, in part, Plaintiffs' motion to compel, consistent with the discussion, above. (Plaintiffs' request for attorneys' fees as to the motion is DENIED.)

### 2. Defendant's motion to compel additional deposition testimony by Miller

Defendant seeks leave to conduct an additional deposition of Miller, arguing that while Miller already had disclosed some documents revealing his "mental impressions" and attorney work product, e.g., the Pre-trial Report, discussed, *supra*, and other documents,[319] he nevertheless refused to answer several related questions when deposed in this case. Plaintiffs oppose any further questioning of Miller, and argue that although he communi-

cated with counsel for Indian Harbor in presenting Plaintiffs' claim, such communication was only in the nature of a report to an adversary, as required by the Policy, and is not evidence that the parties were his joint clients or shared a common legal interest.

The Court has weighed the arguments made by the parties and concludes that Defendant is entitled to an additional opportunity to depose Miller, in light of my decision, announced *supra*, that communications between Plaintiffs and Miller pertaining to the defense of the Underlying Matters shall be made available to Defendant. This additional deposition shall not require Miller to answer questions in new areas of inquiry, but rather shall be limited to questions in those areas of inquiry already raised in the first deposition.

The Court's conclusion rests on my view that the parties were effectively joint clients of Miller or, alternatively, that the parties shared a common legal interest in the defense of the Underlying Matters. The parties' joint client status or, alternatively, their status as allied parties sharing a common legal interest, eliminated any claims of privilege or protection as between them as to the defense of the Underlying Matters—even though the interests of Plaintiffs and Defendant have become adverse.[320] In light of the Court's ruling, the Court directs that Defendant is entitled to depose Miller again, but only as to those specific areas as to which Miller refused to testify at his original deposition.

### IV. CONCLUSION

This Court's exhaustive, and exhausting,[321] review has compelled me to conclude that Defendant is entitled to obtain almost every

---

319. *See, e.g.*, ECF No. 132–6 (letter dated November 20, 2007, from Brian Miller to Pam Wahl, with copy provided to Robert V. Glaser). "[T]his letter constitutes Akerman Senterfitt's Initial Report regarding [the RRGC litigation]." The letter outlines the litigation and very briefly describes the defense strategy.

320. *See, Springer*, 846 So.2d at 1235 "communications between an insured and his counsel that pertain to the common interest held by the insured and the insurer—i.e. the defense of the [underlying] claim-are available to the insurer and this right of access would continue even if their interests become adverse."

321. Perhaps this Court's patience, after thirty-six years on the federal bench, is wearing thin or, perhaps, this case is a perfect illustration of the flaws, identified above, in the current state of the legal practice as to insurance coverage disputes and the determination of questions of attorney-client privilege or work-product immunity in these "unique tripartite relationships." In the end, I am duty-bound to use the tools of the judging trade and I have done so, attempting to carefully set out my assessment of the facts and the governing law, and the proper application of the latter to the former.

one of the nearly 800 documents included in Plaintiffs' privilege log, with the exception of a total of fourteen pages which reflect the opinion work-product of Ver Ploeg & Lumpkin attorneys as to the coverage dispute being litigated before this Court. My conclusions have been stated at some length, with supporting reasoning, in light of the complex and important legal issues and the inherent tension between disclosure and protection which is at issue whenever a claim of privilege or immunity is challenged.

In summary, the Court has engaged in an extensive review of the relevant authorities and submissions and I find no basis for disturbing my prior conclusions—other than as to any minor aspects noted above.[322] Magistrate Judge Turnoff correctly concluded that the materials in the Plaintiffs' privilege log are discoverable, and this Court correctly overruled Plaintiffs' objections to the Magistrate Judge's Order. The Defendant's motion to compel has been granted, and Plaintiffs' objections consistently have been overruled. Thus, it is

ORDERED AND ADJUDGED that the Plaintiffs' Motion for Reconsideration or for Clarification (ECF No. 217) is DENIED.[323]

For the parties' ease of reference, and to facilitate prompt production of discoverable materials, the Court has summarized its rulings in an attachment to this Order ("Rules of Production") and the Court has provided two charts as an appendix to this Order: a directory of names and a listing of each document with the Court's ruling as to disclosure.

Plaintiffs shall make the necessary disclosures to Defendant within five (5) days. In addition, it is

ORDERED AND ADJUDGED that the Plaintiffs' motion to compel (ECF No. 81) is GRANTED, in part, as stated above. Defendant shall produce the identified documents to Plaintiffs within five (5) days. Further, it is

ORDERED AND ADJUDGED that the Defendant's motion to compel (ECF No. 132) is GRANTED, in part, as stated above.[324] Plaintiffs shall cooperate in the scheduling of Miller's deposition.

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343)* [1]

RULE A–1

| Authors/recipients | Basis for production/non-production |
| --- | --- |
| MapleWood entities and Glaser (and his assistant, Carmen Lima), attorneys representing MapleWood entities (communications | Defendant is entitled to the production of all such documents despite Plaintiffs' assertion of attorney-client privilege and work-product protection, as Plaintiffs and Defendant were, effectively, joint clients, or were parties with a "common legal interest" as to the defense of the Underlying Matters. This rule applies not |

**322.** I am compelled to observe that the quantity of judicial time and resources required to be devoted to this matter was excessive, particularly in light of the weakness of Plaintiffs' request for reconsideration. Indeed, the Court might have simply entered a brief order denying the motion for reconsideration; however, the Court has expended time and resources in order to clarify an otherwise muddled record in an effort to move this case forward.

**323.** Plaintiffs' Request for Oral Argument (ECF No. 226) is DENIED, as MOOT. Also, as this Court already granted, on September 21, Plaintiffs' request for a stay as to the Court's Order of September 6, 2011, the earlier-filed Motion to Stay is DENIED (ECF No. 70), as MOOT.

**324.** The relief requested by Plaintiffs in their Motion to Strike (ECF No. 137) is DENIED as to the request to strike the Defendant's Motion to Compel Additional Deposition Testimony.

**1.** The subject matter of anything contained in Plaintiffs' privilege log is presumed to relate to the Underlying Matters (as stated in the Defendant's request for discovery from Plaintiffs). Also, the Court accepts Plaintiffs' statement that three items in the log were "non-responsive," and has marked those three items as "NR." The Court has not included 14784–85 in that category, as Plaintiffs—in addition to stating that the document was not responsive—also asserted attorney-client privilege and work-product immunity.

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343) [1]—Continued*

| | |
|---|---|
| with expert witness Zucarello are included within this group) | only to all documents dated before January 1, 2008 (stipulated date on which parties anticipated litigation), but also to all documents on the privilege log (the latest date of which is August 2010) because the parties continued to work as allies in defense of the RRGC action (until settlement in September 2010), the Shashy matter (settlement in April 2008), and Green claim (dismissed in October 2008).<br><br>Alternatively, to the extent that the communications and documents already shared by MapleWood Partners, Glaser, and Miller (and his firm) with Defendant were as to the same subject matter as the documents in the privilege log, Plaintiffs (and counsel) have waived their argument as to privilege or immunity, i.e., have affirmatively selectively waived their privilege/immunity. |

(Note that all documents which are indicated as Rule A–1, also meet the terms of Rule A–2 and Rule A–3 below.)

**RULE A–2**

| Authors/recipients | Basis for production/non-production |
|---|---|
| Intervenors (Reale, Levitt, Tillett, Dell, Morris, and Glosson— i.e., any documents including at least one Intervenor other than Glaser, as Glaser documents already are in group A–1, above), MapleWood officers/directors/employees (Dagrosa, Stabile; Aru, Augustine, Gordon), attorneys representing MapleWood entities (but not if such documents already are listed in A–1) | Intervenors claim to be "representatives" of the Plaintiffs and are either members (Reale, Dell, Tillett), partners (Reale, Dell, Tillett), employees (Reale, Levitt, Tillett,), or served on the Executive and Investment Committees (Reale, Dell, Tillett, Morris) of Plaintiffs, or are a partner in a related MapleWood entity (Glosson, MapleWood Equity Partners), and, thus, at least as to the Plaintiffs' allegations for coverage under the insurance Policy, these individuals have not established an individual basis for asserting privilege or protection and, instead, are serving as representatives of Plaintiffs' interest. Thus, Defendant is entitled to the production of all such documents despite Plaintiffs'/Intervenors' assertion of attorney-client privilege and work-product protection, as Plaintiffs/Intervenors and Defendant were, effectively, joint clients, or were parties with a "common legal interest" as to the defense of the Underlying Matters. This rule applies not only to all documents dated before January 1, 2008 (stipulated date on which parties anticipated litigation), but also to all documents on the privilege log (the latest date of which is August 2010) because the parties continued to work as allies in defense of the RRGC action (until settlement in September 2010), the Shashy matter (settlement in April 2008), and Green claim (dismissed in October 2008).<br><br>Alternatively, to the extent that the communications and documents already shared by MapleWood Partners, Glaser, and Miller (and his firm) with Defendant were as to the same subject matter as the documents in the privilege log, Plaintiffs (and counsel) have waived their argument as to privilege and immunity, i.e., have affirmatively selectively waived their privilege/immu- |

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343) [1]—Continued*

nity, and Intervenors do not have an independent basis for assertion of privilege/immunity.

## RULE A–3

| Authors/recipients | Basis for production/non-production |
|---|---|
| Julio Investors, Julio & Sons, Uncle Julio's, officers/directors/employee s of the Julio's entities (Conger; Bratton—but not including Shashy or Green), attorneys representing MapleWood or Julio's entities, i.e., any documents including at least one Julio's representative other than Glaser, as Glaser documents already are in group A–1, above) | At least as to the Plaintiffs' allegations for coverage under the insurance Policy, these entities/individuals have not established an independent nor individual basis for asserting privilege or protection and, instead, are serving as representatives of Plaintiffs' interest. Thus, Defendant is entitled to the production of all such documents despite Plaintiffs'/Intervenors' assertion of attorney-client privilege and work-product protection, as Plaintiffs/Intervenors and Defendant were, effectively, joint clients, or were parties with a "common legal interest" as to the defense of the Underlying Matters. This rule applies not only to all documents dated before January 1, 2008 (stipulated date on which parties anticipated litigation), but also to all documents on the privilege log (the latest date of which is August 2010) because the parties continued to work as allies in defense of the RRGC action (until settlement in September 2010), the Shashy matter (settlement in April 2008), and Green claim (dismissed in October 2008).<br><br>Alternatively, to the extent that the communications and documents already shared by MapleWood Partners, Glaser, and Miller (and his firm) with Defendant were as to the same subject matter as the documents in the privilege log, Plaintiffs (and counsel) have waived their argument as to privilege or immunity, i.e., have affirmatively selectively waived their privilege/immunity, and the Julio entities and individuals do not have an independent basis for assertion of privilege/immunity. |

### Rule B

| Authors/recipients | Basis for production/non-production |
|---|---|
| any, if document was included within the 28 documents provided to this Court for *in camera* review on September 19, 2011 (ECF No. 222) | The Court's review revealed that several items did not meet the definition of opinion work-product and, thus, they shall be produced—these items are identified on the Chart as B–1 documents. Other documents reviewed by the Court included several pages which meet the requirements to be entitled to opinion work-product immunity and, thus, the document shall be produced with the exception of the pages, as noted in the opinion—these documents are identified on the Chart as B–2 documents. The Court has found four documents which meet the definition of opinion work-product and which need not be produced, and these are identified as B–3. |

### Rule C

| Authors/recipients | Basis for production/non-production |
|---|---|
| any (if document related to Shashy mediation) | The Court overrules Plaintiffs' objections raised under Fla. Stat. § 44.405 |

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343)* [1]—Continued

### Rule D

| Authors/recipients | Basis for production/non-production |
| --- | --- |
| identified others (persons identifiable, but neither clients nor attorneys, e.g., mediators, expert witnesses) | Defendant entitled to all documents as Plaintiffs failed to establish basis for withholding such documents under attorney-client privilege or work-product immunity, as Plaintiffs did not establish requisite element of confidentiality as to each document. |

### Rule E

| Authors/recipients | Basis for production/non-production |
| --- | --- |
| adversaries (RRGC, Shashy, Green) or officers/directors/employees of adversaries (Shashy— and his secretary Nancy West, Green, Hamming, Harberg, Lawrence, Masinter) and attorneys representing these adversary entities/individuals | Defendant entitled to all documents as Plaintiffs failed to establish basis for withholding such documents under attorney-client privilege or work-product immunity, as Plaintiffs did not establish requisite element of confidentiality. |

### Rule F

| Authors/recipients | Basis for production/non-production |
| --- | --- |
| uncategorized entities/individuals (see Directory) | Defendant entitled to all documents as Plaintiffs failed to establish basis for withholding such documents under attorney-client privilege or work-product immunity, as Plaintiffs did not establish requisite element of confidentiality. |

**MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC vs. Indian Harbor Insurance Company**

Case No. 08cv23343—Directory

| Name | Relevant Description | Firm Name |
| --- | --- | --- |
| MapleWood Entities | | |
| MapleWood Equity Partners | | |
| MapleWood Equity Partners (Offshore), Ltd. | | |
| MapleWood Holdings, LLC | | |

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343)* [1]—Continued

| | |
|---|---|
| MapleWood Management, LP | |
| MapleWood Partners, LP | |
| MapleWood Officers/ Directors/Employees | |
| Bill Tillet | Director of Julio & Sons and Uncle Julio's, and served on Investment Committee of MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC. |
| Carmen Lima | Robert Glaser's assistant |
| Glen Dell | Member of MapleWood Holdings, LLC, limited partner of MapleWood Management L.P. and MapleWood Partners, L.P., and served on Executive Committee and Investment Committee of MapleWood Partners, L.P., MapleWood Management L.P., and MapleWood Holdings, LLC. |
| Greg Morris | CFO of Julio & Sons, served on Investment Committee of MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC. |
| Jack Aru | Accountant for MapleWood Partners |
| Joseph DaGrosa | Member of MapleWood Holdings, LLC, limited partner of MapleWood Management L.P. and MapleWood Partners, L.P., served on Executive Committee and Investment Committee of MapleWood Partners, L.P., MapleWood Management L.P., and MapleWood Holdings, LLC. |
| Rick Levitt | Director of Julio & Sons and a former employee of MapleWood Partners, L.P. |
| Robert Glaser | Managing member of MapleWood Holdings, LLC; limited partner of MapleWood Management, L.P.; employee of MapleWood Partners; Chair of Executive Committee and Investment Committee of MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC; and is director of MapleWood Management, L.P. offshore. |
| Robert Reale | Member of MapleWood Holdings, LLC, limited partner of MapleWood Management L.P. and MapleWood Partners, L.P., director of Julio & Sons and Uncle Julio's, and served on Executive Committee and Investment Committee of MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC. |
| Ronald Augustin (Augustine) | Controller for MapleWood Partners |
| Scott Gordon | Executive hired by MapleWood to assist in the acquisition of Tia's restaurant. |

*Rules of production as to documents Plain-*
*tiffs' privilege log (ECF No. 39–11, Case*
*No. 08CV23343)* [1]—Continued

| | | |
|---|---|---|
| Wayne Stabile | Former employee of MapleWood Partners, L.P., former member of MapleWood Holdings, LLC, and served on Investment Committee of MapleWood Partners, L.P., MapleWood Management, L.P., and MapleWood Holdings, LLC. | |

*Attorneys Affiliated with MapleWood*

| | | |
|---|---|---|
| Hugh Lumpkin | Counsel | Ver Ploeg & Lumpkin |
| Judith Martinez | Legal Secretary | Ver Ploeg & Lumpkin |
| Maria Caldera | Counsel | Ver Ploeg & Lumpkin |
| Michael Huber | Counsel | Ver Ploeg & Lumpkin |
| Susana Lagasse | *Unknown* | Ver Ploeg & Lumpkin |
| | | |
| Jeff Schulman | Counsel | Dickstein Shapiro |
| John Schryber | Counsel | Dickstein Shapiro |
| | | |
| Andi Light | Senior Litigation Paralegal | Akerman Senterfitt |
| Brian Miller | Counsel | Akerman Senterfitt |
| David Dapper | Mediator & Arbitrator | Akerman Senterfitt |
| Donald Duffy | Counsel | Akerman Senterfitt |
| James Bombulie | Counsel | Akerman Senterfitt |
| Jeffrey Cook | Counsel | Akerman Senterfitt |
| Kelly Connolly | Miller's Legal Assistant | Akerman Senterfitt |
| Lucy Eagan | Collection Manager | Akerman Senterfitt |
| Marci Poliakoff | Shareholder | Akerman Senterfitt |
| Mary McLees | Legal Assistant | Akerman Senterfitt |
| Martin Burkett | Counsel | Akerman Senterfitt |
| Teddy Klinghoffer | Counsel | Akerman Senterfitt |
| | | |
| Brad D'Amico | Counsel | Kessler Collins |
| Gary Kessler | Counsel | Kessler Collins |
| Judith Womack | Assistant | Kessler Collins |
| Lisa Tulk | Counsel | Kessler Collins |
| Pamela Crosby | Legal Assistant | Kessler Collins |
| Vicki McDougal | Assistant to D'Amico | Kessler Collins |
| Julio & Sons Entities | | |
| Julio & Sons Company | | |
| Julio Investors, LLC | | |

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343)* [1]—Continued

### Julio & Sons Officers/Directors/Employees

| | |
|---|---|
| Todd Conger | Director of Julio & Sons |
| Burton ("Buster") Glosson | Director of Julio & Sons and Uncle Julio's and indirect limited partner in Equity |
| Steve Bratton | CFO, Julio & Sons |

### Attorneys Affiliated with Julio & Sons

| | | |
|---|---|---|
| Jamie Farris | Counsel | Parker Poe Adams & Bernstein |
| Janice Stafford | Legal Assistant | Parker Poe Adams & Bernstein |
| Jonathan Crotty | Counsel | Parker Poe Adams & Bernstein |
| Lisa Leskody | Legal Assistant | Parker Poe Adams & Bernstein |
| Michael Adams | Counsel | Parker Poe Adams & Bernstein |
| Todd Sprinkle | Counsel | Parker Poe Adams & Bernstein |
| David McLean | Counsel | Patton Boggs (Hughes & Luce LLP) |
| Joseph Cox | Counsel | Patton Boggs (Hughes & Luce LLP) |

### Adversaries and their Officers/Directors/Employees

### Shashy, Green

| | |
|---|---|
| Abdo Shashy ("Joey Shashy") | President of Julio & Sons—Director of Uncle Julio's |
| Gerald Green ("Jerry Green") | Vice President of Julio & Sons |
| Nancy West | Secretary to Abdo Shashy |

### Retail and Restaurant Growth Capital

| | |
|---|---|
| Eric Lawrence | General Partner, RRGC |
| Joseph Harberg | General Partner, RRGC |
| Mark Masinter | General Partner, RRGC |
| Raymond Hemming | General Partner, RRGC |

*Rules of production as to documents Plaintiffs' privilege log (ECF No. 39–11, Case No. 08CV23343)* [1]—Continued

### Attorneys Affiliated with Adversaries

| | | |
|---|---|---|
| John Crouch | Counsel | Kilgore & Kilgore |
| Theodore Anderson | Counsel | Kilgore & Kilgore |
| W.D. Masterson | Counsel | Kilgore & Kilgore |
| | | Concepcion Sexton & Martinez |
| Bruce Hallet | Counsel | Hallet & Perrin, PC |
| Edward Perrin | Counsel | Hallet & Perrin, PC |
| Brian Shields | Counsel | Friedman & Feiger |
| Ernest Leonard | Counsel | Friedman & Feiger |
| Kathy Donalds | Paralegal | Friedman & Feiger |
| Larry Friedman | Counsel | Friedman & Feiger |
| Margaret Apgar | Counsel | Friedman & Feiger |
| Michael Gaubert | Counsel | Friedman & Feiger |
| S. Wallis Dunwoody | Counsel | Friedman & Feiger |

### Defendant's Employees and Attorneys

| | | |
|---|---|---|
| Patricia Melly | Pidlak's Supervisor | |
| Rebecca Pidlak | Claims adjuster | |
| Steven Gladstone | Melly's Supervisor | |
| Christopher Maranges | Counsel | Higer Lichter & Givener |
| Michael Higer | Counsel | Higer Lichter & Givener |
| Cathy Simon | | Troutman Sanders (Ross Dixon & Bell) |
| David Gische | | Troutman Sanders (Ross Dixon & Bell) |
| Elizabeth Sara Gee | | Troutman Sanders (Ross Dixon & Bell) |
| Marc Rinder (Rindner) | | Troutman Sanders (Ross Dixon & Bell) |
| Pamela Wahl | | Troutman Sanders (Ross Dixon & Bell) |
| Prashant K. Khetan | | Troutman Sanders (Ross Dixon & Bell) |
| Steven McNutt | | Troutman Sanders (Ross Dixon & Bell) |

*Rules of production as to documents Plain-
tiffs' privilege log (ECF No. 39–11, Case
No. 08CV23343)* [1]—Continued

| Identified Others | |
|---|---|
| Christopher Nolland | |
| Herb Stettin | Mediator |
| Craig Whiteman | Expert |
| Dan Jackson | Expert in RRGC matter (for Plaintiff) |
| Dean Zucarello | Expert in RRGC matter (for Defendant) |

| Uncategorized Entities/Individuals |
|---|
| ATT |
| Adriana Preciado |
| Anthony Frank |
| B. Harmony |
| Betty Hamilton |
| Brian Schulz |
| Buffet Partners |
| Caleb Wood |
| Carol Payne |
| Cathy Simon |
| Chrisella Anderson |
| Diane Lowy |
| Dorothy Hill |
| Eric Wang |
| Eugene Barash |
| Francis Sexton |
| Frank Canale |
| Fred Thompson |
| George Rerat |
| Grisel Morals |
| Guillaume Lemenez |
| Janis Jones |
| Jason Casten |
| Jeff Colditz |
| John Koneck |
| John Mitchell |
| Josann Johnson |

Rules of production as to documents Plain-
tiffs' privilege log (ECF No. 39–11, Case
No. 08CV23343) [1]—Continued

| | | | |
|---|---|---|---|
| Julian Haynes | | | |
| Julie McGoldrick | | | |
| Kathleen Shaw | | | |
| Kelly Perry | | | |
| Lisa Babcock | | | |
| Lisa Nieliwocki | | | |
| Lyrica Rivera | | | |
| Marc Rinder | | | |
| Marci Henderson | | | |
| Michael Namias | | | |
| Michael Schenk | | | |
| Morgan Joseph | | | |
| Normal Kaplan | | | |
| Paetec | | | |
| Patrick Keating | Counsel | | Haynes & Boone, LLP |
| Paul Huffman | | | |
| Richard Critchlow | | | |
| Samantha Kavanaugh | | | |
| Scott Wallace | Counsel | | Haynes & Boone, LLP |
| Shonna Logan | | | |
| Susana Romero | | | |
| Theresa Fails | | | |
| Tiffany Bennet | | | |
| Tom Simotas | | | |
| Vivian Hunter | | | |
| Will Stute | | | |
| Winstar | | | |

**MapleWood—08cv23343**

Privilege Log Index Chart

| | Bates Number | Date(s) | Attorney–Client Privilege claimed | Work Product Immunity claimed | Rule of Production |
|---|---|---|---|---|---|
| 1 | 014021 | 5/11/2007 | | X | F |

MapleWood—08cv23343—Continued

| No. | | Date | | | |
|---|---|---|---|---|---|
| 2 | 014029–014036 | 11/9/2007 | X | X | A–3 |
| 3 | 014039–014040 | 11/9/2007 | | X | A–3 |
| 4 | 014041 –014042 | 11/9/2007 | X | X | A–3 |
| 5 | 014043–014044 | 11/8/2007 | X | X | A–3 |
| 6 | 014045–014046 | 11/8/2007 | X | X | A–3 |
| 7 | 014050 | 11/7/2007 | X | | A–3 |
| 8 | 014051–014052 | 11/6/2007 | X | | A–3 |
| 9 | 014053 | 11/6/2007 | | X | A–3 |
| 10 | 014062 | 10/31/2007 | | X | A–1 |
| 11 | 014067 | 10/25/2007 | | X | A–3 |
| 12 | 014068–014069 | 10/22/2007 | | X | A–3 |
| 13 | 014076–014078 | 10/15/2007 | X | X | A–1 |
| 14 | 014093 | 10/4/2007 | | X | A–1 |
| 15 | 014094–014095 | 10/4/2007; 10/3/2007 | X | X | A–1;F |
| 16 | 014100 | 9/20/2007 | | X | F |
| 17 | 014101–014102 | 9/19/2007 | | X | E |
| 18 | 014103–014105 | 9/13/2007; 9/9/2007 | X | X | A–3 |
| 19 | 014107 | 9/13/2007 | | X | A–3 |
| 20 | 014108 | 9/13/2007 | | X | A–3 |
| 21 | 014109 | 9/13/2007 | | X | A–1 |
| 22 | 014116 | 9/11/2007 | | X | A–3 |
| 23 | 014124–014127 | 9/7/2007; 9/6/2007 | X | X | A–1 |
| 24 | 014128–014130 | 9/7/2007; 9/5/2007; 9/4/2007 | X | X | A–2 |
| 25 | 014131–014133 | 9/7/2007; 9/6/2007 | X | X | A–1 |
| 26 | 014134–014135 | 9/7/2007 | X | X | A–3 |
| 27 | 014136 | 9/6/2007 | X | X | A–1 |
| 28 | 014137 | 9/6/2007 | | X | A–1 |
| 29 | 014138 | 9/4/2007 | | X | A–1 |
| 30 | 014139–014141 | 8/31/2007 | X | X | A–1 |
| 31 | 014142–014144 | 8/31/2007; 8/30/2007 | X | X | A–1 |
| 32 | 014145–014146 | 8/27/2007; 8/23/2007 | X | X | A–3 |
| 33 | 014151 | 8/24/2007 | X | X | A–3 |
| 34 | 014155–014160 | 8/23/2007; 8/22/2007 | X | X | A–3; E |
| 35 | 014161–014162 | 8/23/2007; 8/22/2007 | X | X | A–3; E |
| 36 | 014163–014164 | 8/22/2007 | X | X | A–3 |
| 37 | 014165–014166 | 8/22/2007 | | X | A–1 |
| 38 | 014167 | 8/21/2007 | | X | A–1 |
| 39 | 014168 | 8/20/2007 | | X | A–1 |
| 40 | 014169–014170 | 8/20/2007 | | X | A–3 |
| 41 | 014171–014172 | 8/17/2007 | X | X | A–3 |
| 42 | 014173–014174 | 8/17/2007 | X | X | A–1 |
| 43 | 014175–014176 | 8/17/2007 | X | X | A–1 |
| 44 | 014177–014178 | 8/16/2007 | | X | E |
| 45 | 014181 | 8/8/2007 | | X | A–1 |
| 46 | 014182 | 8/7/2007 | X | X | A–2 |
| 47 | 014183–014185 | 8/7/2007; 8/6/2007 | X | X | A–1 |
| 48 | 014186 | 8/6/2007 | | X | A–1 |
| 49 | 014187–014189 | 8/6/2007 | X | X | A–1 |
| 50 | 014190 | 8/6/2007 | | X | A–2 |
| 51 | 014191–014192 | 8/6/2007 | X | X | A–3 |

**MapleWood—08cv23343—**Continued

| | | | | | |
|---|---|---|---|---|---|
| 52 | 014193–014194 | 7/31/2007 | X | X | A–3 |
| 53 | 014195 | 7/31/2007 | | X | A–1 |
| 54 | 014197–014200 | 7/12/2007 | X | X | A–3 |
| 55 | 014201 | 6/27/2007 | | X | A–3 |
| 56 | 014202 | 6/22/2007 | | X | F |
| 57 | 014203–014208 | 6/20/2007; 5/31/2007; 5/30/2007 | X | X | F |
| 58 | 014209–014210 | 6/20/2007 | | X | E |
| 59 | 014211 –014213 | 6/20/2007; 5/31/2007; 5/30/2007 | X | X | F |
| 60 | 014215–014219 | 6/15/2007 | X | X | A–1 |
| 61 | 014220–014221 | 6/14/2007 | | X | A–1 |
| 62 | 014222–014223 | 6/14/2007 | X | X | A–1 |
| 63 | 014225–014226 | 6/14/2007 | | X | F |
| 64 | 014227 | 6/13/2007 | | X | A–3 |
| 65 | 014229–014232 | 6/12/2007 | X | X | A–1 |
| 66 | 014233–014234 | 6/12/2007; 6/11/2007 | | X | F |
| 67 | 014235 | 6/11/2007 | | X | A–1 |
| 68 | 014236 | 6/11/2007 | | X | F |
| 69 | 014237–014239 | 6/11/2007 | | X | A–1 |
| 70 | 014240–014244 | 6/6/2007; 6/5/2007 | | X | E |
| 71 | 014245–014247 | 6/5/2007 | | X | E |
| 72 | 014254 | 6/4/2007 | X | X | F |
| 73 | 014255 | 6/4/2007 | | X | F |
| 74 | 014256 | 6/4/2007 | | X | E;F |
| 75 | 014262–014263 | 5/24/2007 | X | X | A–1 |
| 76 | 014264 | 5/24/2007 | X | X | A–1 |
| 77 | 014268–014271 | 5/23/2007 | X | X | E;F |
| 78 | 014274–014275 | 5/18/2007 | X | X | A–3 |
| 79 | 014276–014281 | 5/17/2007 | X | X | F |
| 80 | 014282–014286 | 5/17/2007; 5/16/2007 | X | X | F |
| 81 | 014287–014289 | 5/16/2007; 5/15/2007 | X | X | A–3 |
| 82 | 014290–014292 | 5/16/2007 | X | X | A–1 |
| 83 | 014293–014294 | 5/16/2007 | X | X | F |
| 84 | 014295 | 5/16/2007; 5/15/2007 | X | X | A–1 |
| 85 | 014296 | 5/16/2007 | | X | A–3 |
| 86 | 014297–014298 | 5/15/2007 | | X | A–3 |
| 87 | 014299 | 5/14/2007 | X | X | A–2 |
| 88 | 014300–014302 | 5/14/2007; 5/11/2007; 5/10/2007 | X | X | A–1 |
| 89 | 014303–014305 | 5/11/2007; 5/10/2007 | X | X | A–1 |
| 90 | 014306–014309 | 5/9/2007; 5/8/2007 | X | X | A–1 |
| 91 | 014310 | 5/9/2007 | X | X | A–1 |
| 92 | 014311–014312 | 5/8/2007 | X | X | A–1 |
| 93 | 014320 | 4/23/2007 | | X | A–1 |
| 94 | 014321 | 4/16/2007 | | X | A–1 |
| 95 | 014322–014323 | 4/13/2007 | X | X | A–1 |
| 96 | 014323–014325 | 4/12/2007; 4/2/2007 | X | X | A–1 |
| 97 | 014326 | 4/2/2007 | X | X | A–1 |
| 98 | 014327 | 4/2/2007 | X | X | A–1 |
| 99 | 014328–014330 | 3/28/2007 | X | X | F |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 100 | 014331–014334 | 3/28/2007 | X | X | A–1 |
| 101 | 014335–014336 | 3/26/2007 | X | X | A–2 |
| 102 | 014337 | 3/26/2007 | X | X | F |
| 103 | 014338 | 3/22/2007 | | X | A–3 |
| 104 | 014339 | 3/13/2007 | X | X | F |
| 105 | 014340–014342 | 3/12/2007 | X | X | E;F |
| 106 | 014343–014351 | 3/7/2007 | X | X | F |
| 107 | 014354–014355 | 2/26/2007 | X | X | A–1 |
| 108 | 014356 | 2/16/2007 | X | X | F |
| 109 | 014357 | 2/16/2007 | X | X | F |
| 110 | 014358 | 2/15/2007 | X | | A–1 |
| 111 | 014359 | 2/15/2007 | | | NR |
| 112 | 014360 | 2/15/2007 | X | X | A–1 |
| 113 | 014363 | 5/7/2007 | X | X | A–1 |
| 114 | 014364 | 5/7/2008 | X | | A–3 |
| 115 | 014365–014366 | 5/7/2008 | X | | A–1 |
| 116 | 014367 | 5/7/2008 | | X | A–3 |
| 117 | 014368 | 5/6/2008 | | X | A–1 |
| 118 | 014369–014370 | 5/6/2008 | X | X | A–3 |
| 119 | 014371 –014372 | 5/6/2008 | X | X | A–3 |
| 120 | 014373–014375 | 5/6/2008 | | X | E; F |
| 121 | 014376 | 5/6/2008 | | X | A–1 |
| 122 | 014379–014380 | 5/6/2008 | X | X | A–3 |
| 123 | 014381–014384 | 5/6/2008 | X | X | A–3 |
| 124 | 014386–014387 | 5/5/2009 | X | X | A–1 |
| 125 | 014389 | 5/2/2008 | | X | A–1 |
| 126 | 014390 | 5/2/2008 | | X | A–1 |
| 127 | 014391–014392 | 5/2/2008 | X | X | A–3 |
| 128 | 014393–014396 | 5/2/2008 | | X | F |
| 129 | 014397–014398 | 4/30/2008 | | X | A–3 |
| 130 | 014399 | 4/30/2008 | X | X | A–3 |
| 131 | 014400–014401 | 4/30/2008 | | X | A–3 |
| 132 | 014409–014410 | 4/25/2008 | X | X | A–3 |
| 133 | 014413 | 4/25/2008 | X | X | A–3 |
| 134 | 014414–014415 | 4/25/2008 | X | X | A–3 |
| 135 | 014416–014417 | 4/25/2008 | X | X | A–3 |
| 136 | 014418–014422 | 4/25/2008 | X | X | A–3 |
| 137 | 014423–014426 | 4/25/2008 | X | X | A–3 |
| 138 | 014427–014430 | 4/25/2008 | X | X | A–3 |
| 139 | 014431–014432 | 4/25/2008 | X | X | A–3 |
| 140 | 014433 | 4/25/2008 | X | X | A–3 |
| 141 | 014434–014435 | 4/24/2008 | | X | A–3 |
| 142 | 014436–014439 | 4/18/2008 | | X | E |
| 143 | 014440 | 4/18/2008; 4/16/2008 | X | X | E |
| 144 | 014473–014475 | 4/17/2008 | | X | A–1 |
| 145 | 014476 | 4/17/2008 | X | X | A–3 |
| 146 | 014477–014478 | 4/17/2008 | X | X | A–1 |
| 147 | 014480 | 4/16/2008;4/15/2008 | X | X | A–3 |
| 148 | 014489–014494 | 4/15/2008; 4/14/2008; 4/7/2008 | X | X | A–3 |
| 149 | 014495–014496 | 4/14/2008 | X | X | A–1 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 150 | 014497–014500 | 3/29/2008; 3/28/2008 | | X | E |
| 151 | 014501–014505 | 4/14/2008 | X | X | A–3 |
| 152 | 014506–014507 | 4/14/2008 | X | X | A–3 |
| 153 | 014508–014512 | 4/14/2008 | X | X | A–3 |
| 154 | 014513–014516 | 4/14/2008 | X | X | A–3 |
| 155 | 014517–014521 | 4/14/2008; 4/7/2008 | X | X | A–3 |
| 156 | 014522–014524 | 4/10/2008 | | X | D;E |
| 157 | 014525–014526 | 4/10/2008 | | X | D;E;F |
| 158 | 014543 | 4/8/2008 | X | X | A–3 |
| 159 | 014549 | 4/3/2008 | | X | A–3 |
| 160 | 014550 | 4/3/2008 | | X | A–3 |
| 161 | 014551 | 4/3/2008 | | X | F |
| 162 | 014558 | 4/2/2008 | X | X | A–1 |
| 163 | 014559 | 3/31/2008 | | X | E |
| 164 | 014561 | 3/24/2008 | | X | F |
| 165 | 014562–014562 | 3/24/2008 | | X | A–3 |
| 166 | 014565–014567 | 3/21/2008; 3/20/2008; 3/19/2008 | | X | F |
| 167 | 014594–014595 | 3/13/2008 | X | X | A–3 |
| 168 | 014598 | 3/3/2008 | X | X | B–1 |
| 169 | 014599–014601 | 2/27/2006 | X | X | A–3;E |
| 170 | 014602 | 2/21/2008 | X | X | A–3 |
| 171 | 014603–014606 | 2/21/2008 | X | X | A–3 |
| 172 | 014607–014608 | 2/19/2008 | | X | A–3 |
| 173 | 014612 | 2/12/2008 | X | X | B–1 |
| 174 | 014613–014613 | 2/12/2008 | | X | B–1 |
| 175 | 014615 | 2/12/2008 | | X | F |
| 176 | 014617 | 2/5/2008 | X | X | A–3 |
| 177 | 014618–014619 | 2/4/2008 | X | X | A–3 |
| 178 | 014620 | 1/31/2008 | X | X | A–1 |
| 179 | 014623–014624 | 1/25/2008 | | X | E |
| 180 | 014625–014626 | 1/24/2008 | X | X | A–3 |
| 181 | 014630 | 1/22/2008 | | X | E |
| 182 | 014632 | 1/21/2008 | | X | A–3 |
| 183 | 014633–014634 | 1/21/2008 | | X | A–1 |
| 184 | 014635–014636 | 1/16/2008 | | X | F |
| 185 | 014637–014638 | 1/15/2008 | | X | E |
| 186 | 014639–014640 | 1/15/2008 | | X | E |
| 187 | 014641–014642 | 1/10/2008; 1/9/2008 | X | X | A–1 |
| 188 | 014643–014645 | 1/8/2008; 1/7/2008 | | X | A–1 |
| 189 | 014646–014647 | 1/7/2008 | | X | A–1 |
| 190 | 014648 | 1/4/2008 | | X | F |
| 191 | 014649 | 1/4/2008 | | X | F |
| 192 | 014650 | 1/4/2008 | | X | F |
| 193 | 014653 | 1/2/2008 | | X | A–1 |
| 194 | 014654–014656 | 1/2/2008 | X | X | A–1 |
| 195 | 014657–014659 | 1/1/2008 | X | X | A–1 |
| 196 | 014660–014661 | 12/26/2007 | | X | E |
| 197 | 014662–014667 | 12/20/2007; 12/18/2007 | X | X | A–3 |
| 198 | 014668 | 12/17/2007 | X | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 199 | 014669–014677 | 12/19/2007 | X | X | A–3 |
| 200 | 014683–014685 | 12/13/2007; 12/7/2007 | X | X | F |
| 201 | 014686–014687 | 12/12/2007; 12/11/2007; 11/26/2007 | X | X | A–1 |
| 202 | 014688 | 12/12/2007 | X | X | A–3 |
| 203 | 014699 | 12/11/2007 | | X | F |
| 204 | 014700 | 12/9/2007 | X | X | A–3 |
| 205 | 014701–014707 | 11/29/2007 | X | X | F |
| 206 | 014708–014709 | 11/27/2007 | X | X | A–3 |
| 207 | 014710–014711 | 11/26/2007 | | X | A–3 |
| 208 | 014712 | 11/26/2007 | | X | A–1 |
| 209 | 014713–014715 | 11/26/2007 | X | X | A–3 |
| 210 | 014716–014717 | 11/26/2007 | X | X | A–3 |
| 211 | 014718 | 11/26/2007 | X | X | A–3 |
| 212 | 014719–014721 | 11/26/2007 | X | X | A–3 |
| 213 | 014722–014723 | 11/26/2007 | X | X | A–3 |
| 214 | 014724 | 11/20/2007 | X | X | A–1 |
| 215 | 014725–014727 | 11/20/2007 | X | X | A–3 |
| 216 | 014728 | 11/20/2007 | X | X | A–1;B–1 |
| 217 | 014729–014730 | 11/19/2007 | | X | B–1 |
| 218 | 014731–014740 | 11/19/2007; 11/16/2007 | | X | B–1 |
| 219 | 014741–014742 | 11/19/2007; 11/17/2007 | | X | E;F |
| 220 | 014745 | 11/14/2007 | | X | F |
| 221 | 014747 | 7/1/2008 | | X | A–3 |
| 222 | 014755–014758 | 7/1/2008; 6/30/2008; 6/26/2008 | X | X | A–3 |
| 223 | 014761–014762 | 6/30/2008; 6/26/2008 | X | X | A–3 |
| 224 | 014766–014767 | 6/26/2008 | | X | F |
| 225 | 014768 | 6/26/2008 | X | X | A–3 |
| 226 | 014770–014772 | 6/26/2008 | X | X | F |
| 227 | 014777–014778 | 6/18/2008 | | X | F |
| 228 | 014779–014780 | 6/22/2008; 6/20/2008 | X | X | A–3 |
| 229 | 014783 | 6/17/2008 | | X | F |
| 230 | 014784–014785 | 6/17/2008 | X | X | A–3 |
| 231 | 014786–014789 | 6/18/2008 | X | X | A–3 |
| 232 | 014795–014797 | 6/16/2008 | X | X | A–3 |
| 233 | 014798 | 6/13/2008 | | X | A–1 |
| 234 | 014799 | 6/13/2008 | | X | A–3 |
| 235 | 014806–014807 | 6/13/2008 | X | X | A–2 |
| 236 | 014810 | 6/12/2008 | | X | A–3 |
| 237 | 014816–014817 | 10/31/2003 | X | X | A–1 |
| 238 | 014818 | 12/18/2003 | X | X | E;F |
| 239 | 014821–014822 | 6/11/2008 | X | X | A–3 |
| 240 | 014823–014824 | 6/11/2008 | X | X | F |
| 241 | 014827–014829 | 6/9/2008 | X | X | E |
| 242 | 014833 | 6/9/2008 | X | X | A–1 |
| 243 | 014834–014835 | 6/9/2008 | X | X | A–3 |
| 244 | 014836 | 6/6/2008 | | X | A–1 |

| 245 | 014839–014841 | 6/4/2008 | | X | A–3 |
|---|---|---|---|---|---|
| 246 | 014842–014846 | 6/4/2008 | X | X | A–3 |
| 247 | 014862–014863 | 6/3/2008 | | X | A–1 |
| 248 | 014864 | 6/3/2008 | | X | A–1 |
| 249 | 014865 | 6/3/2008 | | X | A–1 |
| 250 | 014877–014881 | 6/2/2008 | X | X | A–1 |
| 251 | 014882 | 6/2/2008 | | X | F |
| 252 | 014883–014884 | 6/2/2008 | | X | E |
| 253 | 014895–014899 | 5/29/2009; 5/28/2009; 5/27/2009 | | X | F |
| 254 | 014900–014901 | 5/29/2008 | X | X | A–3 |
| 255 | 014902–014903 | 5/29/2008 | X | X | A–3 |
| 256 | 014904–014905 | 5/29/2008 | X | X | A–3 |
| 257 | 014911–014914 | 5/28/2008 | | X | E |
| 258 | 014917–014919 | 5/28/2008 | X | X | A–3 |
| 259 | 014920 | 5/28/2008 | | X | A–3 |
| 260 | 014921–014922 | 5/28/2008 | X | X | A–1 |
| 261 | 014924 | 5/27/2008 | | X | A–1 |
| 262 | 014925–014927 | 5/27/2008; 5/23/2008 | | X | F |
| 263 | 014928–014931 | 5/27/2008; 5/23/2008 | X | X | A–3 |
| 264 | 014932–014934 | 5/23/2008 | X | X | A–1 |
| 265 | 014935–014936 | 5/23/2008 | X | X | A–3 |
| 266 | 014941–014942 | 5/23/2008 | X | X | A–3 |
| 267 | 014943–014944 | 5/23/2008 | X | X | A–3 |
| 268 | 014948–014949 | 5/22/2008 | | X | A–3 |
| 269 | 014955–014962 | 5/22/2008 | | X | A–3 |
| 270 | 014969 | 5/22/2008 | X | X | E |
| 271 | 015047–015048 | 5/16/2008 | | X | F |
| 272 | 015049–015050 | 5/16/2008 | | X | F |
| 273 | 015051–015052 | 5/16/2008 | | X | F |
| 274 | 015054 | 5/14/2008 | | X | A–3 |
| 275 | 015055–015057 | 5/14/2008 | | X | F |
| 276 | 015065 | 5/10/2008 | | X | F |
| 277 | 015068 | 5/9/2008 | | X | A–3 |
| 278 | 015069 | 5/9/2008 | | X | A–3 |
| 279 | 015105–015106 | 5/7/2008 | | X | A–3 |
| 280 | 015107–015108 | 5/7/2008 | | X | A–3 |
| 281 | 015110–015111 | 5/6/2008 | X | X | A–3 |
| 282 | 015112–015115 | 5/6/2008 | X | X | E |
| 283 | 015118–015120 | 10/30/2008 | X | X | A–1 |
| 284 | 015121–015123 | 10/28/2008 | X | X | E |
| 285 | 015124–015126 | 10/28/2008 | X | X | B–1;E |
| 286 | 015127–015129 | 10/28/2008 | X | X | A–3 |
| 287 | 015130–015133 | 10/27/2008 | X | X | A–3 |
| 288 | 015134–015140 | 10/23/2008 | | X | A–1 |
| 289 | 015141 | 10/16/2008 | X | X | A–1 |
| 290 | 015142–015146 | 10/15/2008 | | X | A–1 |
| 291 | 015149–015151 | 10/10/2008; 10/9/2008 | X | X | A–3 |
| 292 | 015152 | 9/25/2008 | | X | A–1 |
| 293 | 015153 | 9/24/2008 | | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 294 | 015168–015169 | 9/18/2008 | X | X | A–3 |
| 295 | 015170–015172 | 9/16/2008 | | X | A–1 |
| 296 | 015173–015177 | 9/15/2008 | X | X | A–3 |
| 297 | 015178–015180 | 9/12/2008;9/11/2008 | | X | B–1 |
| 298 | 015181–015182 | 9/12/2008; 9/11/2008; 9/10/2008 | | X | A–1 |
| 299 | 015183 | 9/11/2008; 9/10/2008 | X | X | A–3 |
| 300 | 015185–015187 | 9/10/2008 | X | X | A–3 |
| 301 | 015188 | 9/10/2008 | X | X | A–3 |
| 302 | 015189–015190 | 9/9/2008 | X | X | A–3 |
| 303 | 015197 | 9/8/2008 | X | X | A–3 |
| 304 | 015207–015212 | 9/4/2008; 9/3/2008 | X | X | A–3 |
| 305 | 015213–015217 | 9/4/2008 | X | X | A–3 |
| 306 | 015218 | 9/3/2008 | | X | A–3 |
| 307 | 015219–015220 | 9/2/2008 | X | X | A–3 |
| 308 | 015229–015230 | 8/29/2008 | | X | E;F |
| 309 | 015231–015232 | 8/27/2008 | X | X | A–3 |
| 310 | 015233–015235 | 8/27/2008 | X | X | A–3 |
| 311 | 015236–015237 | 8/26/2008 | | X | A–3 |
| 312 | 015240 | 8/26/2008 | | X | A–3 |
| 313 | 015241 | 8/22/2008 | | X | A–3 |
| 314 | 015242–015244 | 8/21/2008 | | X | A–3 |
| 315 | 015249–015250 | 8/18/2008 | | X | A–1 |
| 316 | 015253 | 8/18/2008 | | X | A–3 |
| 317 | 015254 | 8/18/2008 | | X | E |
| 318 | 015255–015263 | 8/16/2008; 8/15/2008; 8/11/2008; 8/7/2008; 8/6/2008; 8/5/2008; 8/4/2008 | | X | E;F |
| 319 | 015264–015265 | 8/15/2008 | | X | A–3 |
| 320 | 015266 | 8/14/2008 | | X | A–3 |
| 321 | 015270 | 8/12/2008 | | X | A–3 |
| 322 | 015271–015273 | 8/11/2008 | | X | E |
| 323 | 015274 | 8/10/2008 | | X | E |
| 324 | 015276 | 8/10/2008 | | X | A–1 |
| 325 | 015277–015279 | 8/7/2008 | X | X | A–3 |
| 326 | 015286 | 8/6/2008 | | X | A–3 |
| 327 | 015287 | 8/4/2008 | | X | A–3 |
| 328 | 015291 | 8/5/2008 | X | X | A–1 |
| 329 | 015292 | 8/5/2008 | | X | A–1 |
| 330 | 015302 | 8/4/2008 | X | X | A–3 |
| 331 | 015305–015307 | 7/30/2008 | X | X | F |
| 332 | 015308–015313 | 7/30/2008 | X | X | F |
| 333 | 015314 | 7/30/2008 | | X | A–3 |
| 334 | 015315 | 7/29/2008 | | X | E |
| 335 | 015316–015317 | 8/1/2008; 7/31/2008 | X | X | A–3 |
| 336 | 015318–015322 | 7/31/2008 | X | X | A–3 |
| 337 | 015323 | 7/31/2008 | X | X | A–3 |
| 338 | 015324–015326 | 7/31/2008 | X | X | A–3 |
| 339 | 015327–015330 | 7/31/2008; 7/30/2008 | X | X | F |
| 341 | 015397–015398 | 7/25/2009 | | X | E |

**MapleWood—08cv23343—**Continued

| | | | | | |
|---|---|---|---|---|---|
| 342 | 015400–015402 | 7/25/2008; 7/24/2008 | X | X | A–3 |
| 343 | 015403–015405 | 7/25/2008; 7/24/2008 | X | X | A–3 |
| 344 | 015406–015407 | 7/25/2008; 7/24/2008 | X | X | A–3 |
| 345 | 015410–015411 | 7/22/2008 | | X | A–3 |
| 346 | 015412–015413 | 7/22/2008; 7/21/2008 | X | X | F |
| 347 | 015414–015418 | 7/21/2008; 7/20/2008; 7/18/2008 | X | X | A–3 |
| 348 | 015419–015420 | 7/21/2008; 7/20/2008 | X | X | A–3 |
| 349 | 015424 | 7/16/2008 | | X | A–3 |
| 350 | 015425 | 7/16/2008 | | X | A–3 |
| 351 | 015430–015431 | 7/14/2008 | X | X | A–1 |
| 352 | 015438 | 7/8/2008 | | X | A–3 |
| 353 | 015445 | 7/3/2008 | | X | A–3 |
| 354 | 015448–015449 | 7/3/2008 | | X | A–3 |
| 355 | 015450–015471 | 7/3/2008 | | X | A–3 |
| 356 | 015478–015479 | 7/2/2008 | X | X | A–3 |
| 357 | 015500 | 7/1/2008 | | X | A–3 |
| 358 | 015501 | 8/25/2009 | | X | A–3 |
| 359 | 015502–015503 | 8/25/2009 | | X | A–3 |
| 360 | 015504 | 8/25/2009 | | X | A–3 |
| 361 | 015507 | 8/25/2009 | | X | A–3 |
| 362 | 015509 | 8/19/2005 | X | X | A–3 |
| 363 | 015512 | 8/14/2009 | | X | A–3 |
| 364 | 015513 | 8/12/2009 | | X | A–3 |
| 365 | 015516–015517 | 7/21/2009 | X | X | A–3 |
| 366 | 015530–015531 | 7/9/2009 | X | X | E;F |
| 367 | 015532 | 7/8/2009 | | X | E |
| 368 | 015534 | 7/8/2009 | | X | E |
| 369 | 015541–015543 | 6/24/2009 | X | X | A–3 |
| 370 | 015544–015545 | 6/24/2009 | X | X | E |
| 371 | 015546–015547 | 6/24/2009 | X | X | A–3 |
| 372 | 015548–015549 | 6/23/2009 | X | X | A–3 |
| 373 | 015550 | 6/23/2009 | X | X | A–2 |
| 374 | 015551–015552 | 6/22/2009 | X | X | A–2 |
| 375 | 015553 | 6/22/2009 | | X | A–3 |
| 376 | 015555 | 6/22/2009 | | X | A–3 |
| 377 | 015556–015557 | 6/22/2009 | X | X | A–3 |
| 378 | 015558 | 6/22/2009 | X | X | A–3 |
| 379 | 015559–015561 | 6/19/2009 | X | X | B–1 |
| 380 | 015564 | 6/18/2009 | | X | A–3 |
| 381 | 015565 | 6/18/2009 | | X | A–3 |
| 382 | 015567–015568 | 6/13/2009 | X | X | A–3 |
| 383 | 015569 | 6/12/2009 | | X | A–3 |
| 384 | 015572–015576 | 6/4/2009 | X | X | A–2 |
| 385 | 015577–015580 | 6/3/2009; 6/2/2009 | X | X | A–3 |
| 386 | 015581–015582 | 6/2/2009 | X | X | A–3 |
| 387 | 015583–015584 | 5/26/2009 | | X | A–1 |
| 388 | 015585–015586 | 5/26/2009 | | X | A–1 |
| 389 | 015587–015590 | 5/15/2009 | | X | A–3 |
| 390 | 015591–015592 | 5/11/2009 | X | X | A–3 |
| 391 | 015593–015596 | 5/11/2009 | X | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 392 | 015604–015606 | 5/7/2009 | X | X | A–3 |
| 393 | 015612–015614 | 5/1/2009; 4/30/2009 | X | X | A–3 |
| 394 | 015621–015624 | 4/9/2009; 4/8/2009 | X | X | A–3 |
| 395 | 015625–015627 | 4/9/2009; 4/8/2009 | X | X | A–3 |
| 396 | 015628–015630 | 4/8/2009 | X | X | A–3 |
| 397 | 015631–015633 | 4/6/2009; 3/31/2009 | X | X | A–3 |
| 398 | 015634–015635 | 4/6/2009; 3/31/2009 | X | X | A–3 |
| 399 | 015639–015640 | 3/29/2009 | X | X | A–3 |
| 400 | 015641–015642 | 3/29/2009; 3/28/2009 | X | X | A–3 |
| 401 | 015643 | 3/28/2009 | X | X | A–3 |
| 402 | 015644–015645 | 3/27/2009 | X | X | A–3 |
| 403 | 015648–015649 | 3/1/2009 | | X | A–1 |
| 404 | 015651–015653 | 2/27/2007 | | X | A–3 |
| 405 | 015654 | 2/27/2009 | X | X | E |
| 406 | 015655–015658 | 2/23/2009 | X | X | A–3 |
| 407 | 015669–015674 | 2/12/2009 | | X | A–3 |
| 408 | 015675–015681 | 2/12/2009 | | X | A–1 |
| 409 | 015682 | 2/12/2009 | | X | A–1 |
| 410 | 015683–015688 | 2/11/2009 | | | NR |
| 411 | 015689–015694 | 2/11/2009 | | | NR |
| 412 | 015695–015696 | 2/10/2009 | | X | A–3 |
| 413 | 015697–015698 | 2/5/2009 | X | X | A–3 |
| 414 | 015699–015700 | 2/4/2009 | X | X | A–3 |
| 415 | 015701–015702 | 1/29/2009 | | X | A–3 |
| 416 | 015703–015705 | 1/26/2009; 1/22/2009 | X | X | A–3 |
| 417 | 015706 | 1/22/2009 | X | X | A–3 |
| 418 | 015707 | 1/22/2009 | | X | A–3 |
| 419 | 015717 | 1/22/2009 | | X | A–3 |
| 420 | 015718–015720 | 1/16/2009; 1/15/2009 | X | X | A–3 |
| 421 | 015722 | 1/8/2009 | X | X | A–3 |
| 422 | 015723–015727 | 1/6/2009 | X | X | B–2 |
| 423 | 015728–015731 | 1/6/2009 | X | X | B–1 |
| 424 | 015732–015734 | 1/6/2009 | X | X | B–1 |
| 425 | 015735–015738 | 1/6/2009 | X | X | A–3 |
| 426 | 015739–015740 | 1/6/2009 | X | X | B–1 |
| 427 | 015741–015743 | 1/5/2009; 12/30/2008 | | X | E |
| 428 | 015744 | 1/5/2009 | | X | A–1 |
| 429 | 015745–015749 | 1/5/2009 | | X | A–1 |
| 430 | 015750 | 1/5/2009 | X | X | A–3 |
| 431 | 015751–015753 | 1/5/2009 | X | X | B–2;F |
| 432 | 015754–015755 | 1/5/2009 | X | X | B–2 |
| 433 | 015756–015758 | 1/5/2009 | X | X | A–1 |
| 434 | 015759–015765 | 1/2/2009 | X | X | A–3 |
| 435 | 015766–015770 | 1/2/2009 | X | X | A–3 |
| 436 | 015778–015781 | 12/31/2008 | X | X | A–3 |
| 437 | 015782–015784 | 12/31/2008 | X | X | A–3 |
| 438 | 015785–015787 | 12/31/2008 | X | X | F |
| 439 | 015791–015793 | 12/30/2008 | X | X | A–3 |
| 440 | 015803–015805 | 12/28/2009 | X | X | A–3 |
| 441 | 015806 | 12/28/2009 | X | X | A–3 |
| 442 | 015810–015811 | 12/23/2008 | | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 443 | 015812–015813 | 12/17/2008 | X | X | A–3 |
| 444 | 015814–015815 | 12/16/2008 | X | X | A–3 |
| 445 | 015821–015823 | 12/6/2008 | X | X | E |
| 446 | 015826–015827 | 12/4/2008 | X | X | B–2 |
| 447 | 015828–015829 | 12/4/2008 | X | X | B–1 |
| 448 | 015830–015835 | 12/3/2008 | X | X | F |
| 449 | 015840–015842 | 12/2/2008 | X | X | A–3 |
| 450 | 015843–015844 | 12/1/2008 | X | X | A–3 |
| 451 | 015845–015846 | 11/26/2008 | X | X | E |
| 452 | 015849–015850 | 11/26/2008 | | X | E |
| 453 | 015851–015852 | 11/26/2008 | X | X | A–3 |
| 454 | 015855–015877 | 11/25/2008 | X | X | A–3 |
| 455 | 015880–015881 | 11/24/2008 | X | X | E |
| 456 | 015884–015885 | 11/24/2008 | X | X | A–3 |
| 457 | 015886 | 11/24/2008 | X | X | A–3 |
| 458 | 015887 | 11/20/2008 | X | X | A–3 |
| 459 | 015892 | 11/20/2008 | X | X | A–3 |
| 460 | 015893–015894 | 11/18/2008 | X | X | A–3 |
| 461 | 015895–015896 | 11/17/2008 | X | X | A–3 |
| 462 | 015897 | 11/13/2008 | | X | A–3 |
| 463 | 015899 | 11/13/2008 | X | X | A–3 |
| 464 | 015900–015903 | 11/12/2008 | X | X | A–3 |
| 465 | 015907–015908 | 8/13/2010 | X | X | A–3 |
| 466 | 015909 | 8/13/2010 | X | X | A–3 |
| 467 | 015910–015911 | 8/12/2010 | X | X | A–3 |
| 468 | 015912–015914 | 8/12/2010 | X | X | A–3 |
| 469 | 015915–015917 | 8/12/2010 | X | X | A–3 |
| 470 | 015918–015919 | 8/11/2010 | | X | F |
| 471 | 015921 –015924 | 8/10/2010; 8/9/2010 | X | X | A–3 |
| 472 | 015925 | 8/9/2010 | X | X | B–3;F |
| 473 | 015926–015927 | 8/10/2010 | X | X | A–3 |
| 474 | 015928–015931 | 8/10/2010;8/9/2010 | X | X | A–3 |
| 475 | 015932–015938 | 8/10/2010; 8/9/2010 | X | X | A–3 |
| 340 | 015939–015943 | 8/9/2010; 8/4/2010; 8/3/2010 | X | X | A–3 |
| 476 | 015944 | 8/9/2010 | | X | B–3 |
| 477 | 015945–015946 | 8/9/2010 | X | X | A–3 |
| 478 | 015947–015948 | 8/3/2010;8/2/2008 | | X | E;F |
| 479 | 015949 | 8/2/2010 | | X | E |
| 480 | 015951–015953 | 7/23/2010; 7/22/2010 | | X | A–3 |
| 481 | 015954–015957 | 7/1/2010 | | X | B–1 |
| 482 | 015958–015961 | 6/16/2010 | X | X | B–1 |
| 483 | 015962–015963 | 6/15/2010 | X | X | A–3 |
| 484 | 015965 | 6/11/2010 | X | X | A–3 |
| 485 | 015966 | 6/11/2010 | X | X | A–1 |
| 486 | 015970–015971 | 4/29/2010:4/28/2010 | X | X | A–3 |
| 487 | 015972–015974 | 4/28/2010 | X | X | A–3 |
| 488 | 015975–015976 | 4/26/2010; 4/23/2010 | X | X | A–3 |
| 489 | 015977–015983 | 4/26/2010; 4/23/2010; 4/22/2010 | X | X | F |
| 490 | 015984–015985 | 4/19/2010 | X | X | A–2 |

**652**

| | | | | | |
|---|---|---|---|---|---|
| 491 | 015986 | 4/7/2010 | X | X | A–3 |
| 492 | 015987–015988 | 4/2/2010 | X | X | A–1 |
| 493 | 015989 | 4/2/2010 | X | X | A–1 |
| 494 | 015990 | 4/2/2010 | X | X | A–3 |
| 495 | 015991 | 3/29/2010 | | X | A–3 |
| 496 | 015992 | 3/29/2010 | X | X | E |
| 497 | 015993–015994 | 3/16/2010;3/12/2010 | X | X | F |
| 498 | 015995–015996 | 3/12/2010; 3/11/2010 | | X | A–3 |
| 499 | 015999–016001 | 3/8/2010;3/4/2010 | X | X | A–3 |
| 500 | 016004–016007 | 3/4/2010;3/2/2010 | X | X | E |
| 501 | 016008 | 3/3/2010 | | X | A–3 |
| 502 | 016013–016014 | 3/2/2010 | X | X | B–1 |
| 503 | 016028 | 2/26/2010 | X | X | A–1 |
| 504 | 016030–016031 | 2/25/2010 | X | X | A–3 |
| 505 | 016033 | 2/19/2010 | X | X | A–3 |
| 506 | 016034 | 2/17/2010 | X | X | A–1 |
| 507 | 016035–016038 | 2/17/2010:2/16/2010 | X | X | A–3 |
| 508 | 016039–016040 | 2/16/2010 | X | X | A–3 |
| 509 | 016041–016042 | 2/16/2010 | X | X | A–3 |
| 510 | 016048 | 2/15/2010 | X | X | A–3 |
| 511 | 016049 | 2/15/2010 | X | X | A–3 |
| 512 | 016050 | 2/15/2010 | | X | A–3 |
| 513 | 016051 | 2/15/2010 | | X | A–3 |
| 514 | 016052–016057 | 2/11/2010 | X | X | A–2 |
| 515 | 016058–016059 | 2/10/2010 | X | X | A–3 |
| 516 | 016061–016063 | 2/10/2010 | X | X | A–2 |
| 517 | 016064–016066 | 2/10/2010 | X | X | A–2 |
| 518 | 016099–016100 | 2/9/2010:2/8/2010 | X | X | A–3 |
| 519 | 016101 | 2/9/2010 | X | X | B–3 |
| 520 | 016102 | 2/9/2010 | | X | A–3 |
| 521 | 016103–016104 | 2/8/2010 | X | X | A–3 |
| 522 | 016105–016107 | 2/5/2010 | X | X | A–3 |
| 523 | 016108–016109 | 2/4/2010 | X | X | A–3 |
| 524 | 016110–016123 | 2/1/2010 | X | X | A–1 |
| 525 | 016124 | 1/29/2010 | X | X | B–1 |
| 526 | 016128–016131 | 1/25/2010 | X | X | A–3 |
| 527 | 016132–016133 | 1/25/2010 | X | X | A–3 |
| 528 | 016134–016136 | 1/25/2010 | X | X | A–3 |
| 529 | 016137–016138 | 1/21/2010; 1/19/2010 | X | X | A–3 |
| 530 | 016140–016141 | 1/19/2010 | X | X | A–3 |
| 531 | 016142–016144 | 12/17/2009 | | X | A–1 |
| 532 | 016148 | 12/8/2009 | | X | A–3 |
| 533 | 016152–016153 | 11/19/2009 | | X | B–1 |
| 534 | 016154–016155 | 11/18/2009 | | X | A–1; B–1 |
| 535 | 016159–016160 | 10/28/2009; 10/27/2009 | X | X | E;F |
| 536 | 016162–016164 | 10/23/2009 | X | X | A–3 |
| 537 | 016165 | 10/13/2009 | | X | A–3 |
| 538 | 016166–016167 | 10/13/2009 | | X | A–3 |
| 539 | 016168 | 10/13/2009 | X | X | A–3 |
| 540 | 016170 | 10/12/2009 | X | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 541 | 016174–016179 | 10/9/2009; 10/8/2009 | X | X | A–3 |
| 542 | 016180–016181 | 10/8/2009 | X | X | A–3 |
| 543 | 016182–016183 | 10/8/2009 | X | X | A–3 |
| 544 | 016189–016190 | 9/30/2009 | X | X | A–3 |
| 545 | 016192–016193 | 9/24/2009 | | X | A–1 |
| 546 | 016194–016195 | 9/22/2009 | X | X | A–3 |
| 547 | 016196–016197 | 9/18/2009 | X | X | A–3 |
| 548 | 016198 | 9/16/2009 | X | X | A–3 |
| 549 | 016199 | 9/11/2009 | | X | A–3 |
| 550 | 016210 | 9/8/2009 | X | X | A–2 |
| 551 | 016211 | 9/4/2009 | X | X | A–3 |
| 552 | 016226–016228 | 9/2/2009 | X | X | E |
| 553 | 016229–016245 | 8/27/2009 | X | X | A–3 |
| 554 | 016246–016247 | 8/27/2009 | X | X | A–3 |
| 555 | 016248–016251 | 8/27/2009; 4/13/2009; 8/1/2008 | | X | A–3 |
| 556 | 016252–016254 | 8/27/2009 | X | X | F |
| 557 | 016255–016256 | 8/27/2009 | X | X | A–3 |
| 558 | 016257 | 8/27/2009 | X | X | A–1 |
| 559 | 016258 | 8/27/2009;8/25/2009 | | X | A–3 |
| 560 | 016259 | 8/17/2009 | | X | A–1 |
| 561 | 016260 | 8/17/2009 | X | | A–2 |
| 562 | 016261–016264 | 1/28/2009 | X | X | A–3 |
| 563 | 016288 | 10/23/2008 | X | X | A–3 |
| 564 | 016289–016290 | 10/22/2008 | X | X | E;F |
| 565 | 016292–016294 | 10/22/2008 | X | X | F |
| 566 | 016300 | 10/21/2008 | | X | E;F |
| 567 | 016301–016302 | 10/8/2008 | X | X | A–3 |
| 568 | 016303–016304 | 10/8/2008 | | X | A–3 |
| 569 | 016305–016307 | 10/6/2008 | X | X | A–3 |
| 570 | 016308–016309 | 10/6/2008 | X | X | A–3 |
| 571 | 016310–016312 | 10/3/2008 | X | X | A–3 |
| 572 | 016315–016316 | 9/30/2008 | X | X | A–3 |
| 573 | 016326–016327 | 9/4/2008 | X | X | A–3 |
| 574 | 016338–016339 | 8/14/2008 | | X | F |
| 575 | 016344 | 7/23/2008 | X | X | A–2 |
| 576 | 016345–016346 | 7/23/2008 | X | X | A–2 |
| 577 | 016347 | 7/23/2008 | X | X | A–2 |
| 578 | 016348–016351 | 7/23/2008 | X | X | F |
| 579 | 016354–016355 | 7/22/2008 | | X | E |
| 580 | 016356–016358 | 7/17/2008 | X | X | A–3 |
| 581 | 016359–016362 | 7/17/2008 | X | X | A–3 |
| 582 | 016363 | 7/3/2008 | | X | F |
| 583 | 016370–016372 | 7/2/2008 | | X | E |
| 584 | 016378–016380 | 6/30/2008 | X | X | A–3 |
| 585 | 016381–016382 | 6/30/2008 | X | X | A–3 |
| 586 | 016384–016386 | 6/27/2008 | | X | A–3 |
| 587 | 016387 | 6/27/2008 | X | X | A–3 |
| 588 | 016388 | 6/27/2008 | X | X | A–3 |
| 589 | 016389 | 6/27/2008 | | X | F |
| 590 | 016403–016405 | 6/18/2008 | X | X | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 591 | 016411 | 6/16/2008 | | X | A–3 |
| 592 | 016412–016414 | 3/2/2007 | X | | E |
| 593 | 016415–016416 | 3/28/2007 | X | | E;F |
| 594 | 016417 | 9/28/2006 | X | | E;F |
| 595 | 016418–016419 | 10/27/2006 | X | | E;F |
| 596 | 016420–016430 | 10/31/2006 | X | | E;F |
| 597 | 016431–016449 | 10/31/2009 | X | | E;F |
| 598 | 016450–016451 | 11/1/2006 | X | | E; F |
| 599 | 016452 | 6/16/2008 | | X | A–3 |
| 600 | 016558–016559 | 6/11/2008 | X | X | A–3 |
| 601 | 016560–016561 | 6/11/2008 | X | X | A–3 |
| 602 | 016562–016563 | 6/10/2008 | X | X | A–3 |
| 603 | 016564 | 6/10/2008 | X | X | A–3 |
| 604 | 016565 | 6/10/2008 | X | X | A–3 |
| 605 | 016567 | 5/30/2008 | X | X | A–1 |
| 606 | 016568–016569 | 5/30/2008 | X | X | E |
| 607 | 016573–016575 | 5/27/2008 | X | X | A–3 |
| 608 | 016578 | 8/17/2009 | | X | A–2 |
| 609 | 016579–016580 | 3/14/2008 | X | X | A–3 |
| 610 | 016582 | 2/28/2008 | | X | A–3 |
| 611 | 016601–016602 | 2/13/2008 | | X | E;F |
| 612 | 016606 | 2/12/2008 | X | X | F |
| 613 | 016607–016608 | 2/12/2008 | X | X | B–1 |
| 614 | 016609 | 2/12/2008 | X | X | F |
| 615 | 016614 | 1/21/2008 | X | X | A–3 |
| 616 | 016615–016621 | 1/19/2008 | X | X | A–3 |
| 617 | 016623–016626 | 1/16/2008 | X | X | F |
| 618 | 016630–016632 | 1/11/2008 | X | X | F |
| 619 | 016646–016650 | 12/18/2007 | X | | A–3 |
| 620 | 016651–016652 | 12/17/2007 | X | | A–3 |
| 621 | 016653–016660 | 12/17/2007 | X | | A–3 |
| 622 | 016665 | 12/14/2007 | | X | E; F |
| 623 | 016671 | 12/7/2007 | X | | A–2 |
| 624 | 016675 | 11/29/2007 | | X | E; F |
| 625 | 016676–016677 | 11/29/2007 | X | | E;F |
| 626 | 016678–016681 | 11/28/2007 | X | | E |
| 627 | 016684 | 11/26/2007 | | X | A–3 |
| 628 | 016689 | 11/21/2007 | X | X | A–3 |
| 629 | 016693 | 11/16/2007 | X | X | F |
| 630 | 016694–016701 | 11/16/2007; 11/15/2007; 11/14/2007; 11/13/2007; 11/12/2007; 11/6/2007 | X | X | E;F |
| 631 | 016702–016707 | 11/15/2007; 11/14/2007; 11/13/2007; 11/12/2007; 11/6/2007 | X | X | E;F |
| 632 | 016708–016714 | 11/15/2007; 11/14/2007; 11/13/2007; | X | X | E;F |

**MapleWood**—08cv23343—Continued

| | | 11/12/2007; 11/6/2007 | | | |
|---|---|---|---|---|---|
| 633 | 016715–016719 | 11/14/2007; 11/13/2007; 11/12/2007; 11/6/2007 | X | X | E;F |
| 634 | 016720–016721 | 11/13/2007 | | X | A–1 |
| 635 | 016722 | 11/12/2007 | X | X | E |
| 636 | 016723–016724 | 11/12/2007 | X | X | A–3 |
| 637 | 016725–016732 | 11/12/2007; 11/9/2007; 11/6/2007; 11/5/2007 | X | X | F |
| 638 | 016733–016739 | 11/9/2007; 11/6/2007; 11/5/2007 | X | X | F |
| 639 | 016740–016741 | 11/7/2007; 11/6/2007 | X | X | A–2 |
| 640 | 016742–016743 | 11/7/2007; 11/6/2007 | X | X | A–2 |
| 641 | 016744–016748 | 11/5/2007; 10/31/2007 | X | X | F |
| 642 | 016749–016751 | 11/1/2007 | | X | A–3 |
| 643 | 016752–016754 | 10/31/2007; 10/30/2007 | X | X | A–3 |
| 644 | 016755–016757 | 10/31/2007; 10/30/2007 | X | X | A–3 |
| 645 | 016758–016759 | 10/30/2007 | X | X | A–3 |
| 646 | 016760 | 10/30/2007 | X | X | A–2 |
| 647 | 016761–016770 | 10/30/2007 | X | X | A–3 |
| 648 | 016771 | 10/30/2007 | | X | A–2 |
| 649 | 016772–016775 | 10/30/2007 | | X | A–3; E |
| 650 | 016776 | 10/29/2007 | X | X | A–3 |
| 651 | 016777 | 10/25/2007 | X | X | A–3 |
| 652 | 016778–016780 | 10/25/2007 | X | X | A–3 |
| 653 | 016781–016783 | 10/25/2007 | X | X | F |
| 654 | 016784–016787 | No Date | X | X | A–3 |
| 655 | 016788–016790 | 10/25/2007 | X | X | A–3 |
| 656 | 016791 | 10/25/2007 | | X | A–3; E |
| 657 | 016793–016797 | 10/23/2007 | X | X | A–3 |
| 658 | 016801–016803 | 10/17/2007 | X | | A–2 |
| 659 | 016804 | 10/17/2007 | X | | A–3 |
| 660 | 016806–016807 | 10/17/2007 | X | X | A–3 |
| 661 | 016808 | 10/17/2007 | | X | A–3 |
| 662 | 016815–016816 | 10/16/2007 | X | X | F |
| 663 | 016817 | 10/16/2007 | X | X | F |
| 664 | 016820–016821 | 10/16/2007 | | X | A–3 |
| 665 | 016824 | 10/15/2007 | | X | A–3 |
| 666 | 016825 | 10/15/2007 | | X | A–3 |
| 667 | 016826–016827 | 10/12/2007 | X | X | A–3 |
| 668 | 016829–016831 | 10/10/2007 | X | X | F |
| 669 | 016833 | 10/4/2007 | | X | A–1 |
| 670 | 016834–016835 | 9/27/2007 | X | X | A–3 |
| 671 | 016836 | 9/28/2007 | X | X | A–1 |
| 672 | 016837 | 9/28/2007 | X | X | A–3 |
| 673 | 016839–016841 | 9/26/2007 | X | X | A–2 |
| 674 | 016842–016845 | 9/26/2007 | X | X | A–2 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 675 | 016846 | 9/21/2007 | | X | A–3 |
| 676 | 016848 | 9/20/2007 | | X | A–1 |
| 677 | 016849–016855 | 9/19/2007 | X | | A–2 |
| 678 | 016856 | 9/19/2007 | | X | A–1 |
| 679 | 016857 | 9/14/2007 | X | X | A–1 |
| 680 | 016858 | 9/12/2007 | X | X | A–2 |
| 681 | 016860 | 9/12/2007 | X | X | A–1 |
| 682 | 016865 | 9/12/2007 | X | X | A–1 |
| 683 | 016869 | 9/12/2007 | | X | A–1 |
| 684 | 016874–016876 | 9/10/2007 | X | X | A–2 |
| 685 | 016877 | 9/9/2007 | | X | A–3 |
| 686 | 016878–016880 | 9/7/2007 | | X | E |
| 687 | 016881 | 9/7/2007 | | X | F |
| 688 | 016882 | 9/7/2007 | | X | A–3 |
| 689 | 016883–016885 | 9/7/2007 | X | X | A–3 |
| 690 | 016886–016887 | 9/7/2007 | X | X | A–1 |
| 691 | 016888–016889 | 9/6/2007 | | X | E |
| 692 | 016889 | 9/6/2007 | | X | A–1 |
| 693 | 016890 | 9/6/2007 | | X | A–3 |
| 694 | 016891–016892 | 9/5/2007 | | X | A–1 |
| 695 | 016897–016898 | 9/5/2007 | | X | A–1 |
| 696 | 016899–016900 | 9/4/2007 | X | X | A–3 |
| 697 | 016901–016903 | 9/4/2007 | X | X | A–3 |
| 698 | 016908 | 8/31/2007 | | X | A–3 |
| 699 | 016909–016910 | 8/30/2007 | | X | A–1 |
| 700 | 016911 | 8/30/2007 | | X | A–3 |
| 701 | 016912 | 8/30/2007 | X | X | A–2 |
| 702 | 016914 | 8/27/2007 | X | X | A–1 |
| 703 | 016917 | 8/27/2007 | X | X | A–3 |
| 704 | 016918 | 8/22/2007–8/24/2007 | | X | A–1 |
| 705 | 016919–016923 | 8/23/2007 | X | X | A–3 |
| 706 | 016924–016926 | 8/23/2007 | X | X | A–3 |
| 707 | 016928–016929 | 8/20/2007 | X | X | A–3 |
| 708 | 016930–016931 | 8/20/2007 | | X | F |
| 709 | 016933–016934 | 8/18/2007 | | X | A–2 |
| 710 | 016935 | 8/13/2007 | | X | A–3 |
| 711 | 016936 | 8/10/2007 | | X | A–3 |
| 712 | 016938 | 8/9/2007 | | X | A–2 |
| 713 | 016939 | 8/8/2007 | | X | A–1 |
| 714 | 016942–016948 | 8/1/2007 | X | | A–2 |
| 715 | 016949–016952 | 8/1/2007 | X | | A–2 |
| 716 | 016953–016959 | 8/1/2007 | X | | A–2 |
| 717 | 016960 | 6/24/2007 | | X | A–1 |
| 718 | 016963–016964 | 7/11/2007 | | X | E |
| 719 | 016965–016966 | 6/24/2007; 6/25/2007 | | X | A–3 |
| 720 | 016967–016970 | 4/16/2008 | | | C |
| 721 | 016971–016976 | 3/31/2008 | | | C |
| 722 | 016977–016979 | 9/4/2008 | | X | A–3 |
| 723 | 016980–016983 | 9/2/2008 | X | | A–3 |
| 724 | 016984 | 8/11/2008 | X | | A–1 |
| 725 | 016985–016987 | 8/11/2008 | X | | A–3 |

MapleWood—08cv23343—Continued

| | | | | | |
|---|---|---|---|---|---|
| 726 | 016990 | 7/20/2008 | | X | C;E |
| 727 | 016997–016998 | 6/9/2008 | | | C;F |
| 728 | 017052 | 6/5/2008 | | | C;F |
| 729 | 017053–017056 | 6/5/2008 | X | | A–3 |
| 730 | 017057 | 6/5/2008 | | | C;F |
| 731 | 017058–017060 | 6/5/2008 | X | X | A–3 |
| 732 | 017061 | 6/4/2008 | | | C |
| 733 | 017068–017069 | 5/29/2008 | X | | F |
| 734 | 017070 | 5/20/2008 | | X | A–3 |
| 735 | 017071 | 5/20/2008 | X | X | A–3 |
| 736 | 017073 | 5/20/2008 | X | | A–1 |
| 737 | 017074–017079 | 5/21/2008 | X | X | A–3 |
| 738 | 017080–017081 | 5/12/2008 | X | X | A–1 |
| 739 | 017083–017084 | 5/9/2008 | X | X | A–3 |
| 740 | 017085 | 5/9/2008 | X | X | A–1 |
| 741 | 017091–017093 | 5/6/2008 | | X | E |
| 742 | 017094–017156 | 5/5/2008 | ? | ? | A–3 |
| 743 | 017161–017164 | 4/29/2008 | X | X | E |
| 744 | 017165–017167 | 4/28/2008 | X | X | A–3 |
| 745 | 017176–017177 | 4/24/2008 | X | X | A–3 |
| 746 | 017178–017180 | 4/24/2008 | X | X | A–3 |
| 747 | 017181–017184 | 4/24/2008 | X | X | A–3 |
| 748 | 017187–017189 | 4/23/2008 | X | X | A–3 |
| 749 | 017190–017191 | 4/23/2008 | X | X | E |
| 750 | 017192 | 4/23/2008 | X | X | A–3 |
| 751 | 017195 | 4/22/2008 | X | X | A–3 |
| 752 | 017196–017198 | 4/21/2008 | X | X | A–3 |
| 753 | 017199 | 4/18/2008 | X | X | A–3 |
| 754 | 017207–017211 | 4/10/2008 | | X | F |
| 755 | 017212–017217 | 4/10/2008 | X | X | A–3 |
| 756 | 017218–017221 | 4/10/2008 | X | X | A–3 |
| 757 | 017222–017225 | 4/9/2008 | X | X | A–3 |
| 758 | 017226–017229 | 4/9/2008 | X | X | A–3 |
| 759 | 017230 | 4/8/2008 | | X | F |
| 760 | 017231–017232 | 4/8/2008 | X | X | A–3 |
| 761 | 017233–017235 | 4/8/2008 | X | X | B–3; F |
| 762 | 017237 | 4/7/2008 | | X | B–3 |
| 763 | 017238 | 4/3/2008 | X | | A–3 |
| 764 | 017239 | 4/3/2008 | | X | A–1 |
| 765 | 017240–017243 | 4/4/2008 | X | X | A–3 |
| 766 | 017248–017293 | 3/27/2008 | X | X | B–1 |
| 767 | 017294–017296 | 3/21/2008 | X | X | A–1 |
| 768 | 017297–017299 | 3/21/2008 | X | X | F |
| 769 | 017300–017302 | 3/20/2008 | X | X | A–3 |
| 770 | 017303–017307 | 3/20/2008 | X | X | A–3 |
| 771 | 017308–017310 | 3/20/2008 | X | X | A–3 |
| 772 | 017311 | 3/19/2008 | | X | A–1 |
| 773 | 017312–017313 | 3/19/2008 | | X | F |
| 774 | 017317–017318 | 3/17/2008 | X | X | A–3 |
| 775 | 017319–017320 | 3/17/2008 | X | X | A–3 |
| 776 | 017322 | 12/22/2008 | X | X | A–3 |

MapleWood—08cv23343—Continued

| 777 | 017324–017328 | 10/28/2008 | X | X | A–3 |
|-----|---------------|------------|---|---|-----|
| 778 | 017329–017330 | 10/28/2008 | X | X | A–3 |
| 779 | 017331–017333 | 10/23/2008 | X | X | A–3 |
| 780 | 017334 | 10/22/2008 | X | X | A–3 |
| 781 | 017335–017338 | 10/13/2008 | X | X | A–3 |
| 782 | 017339–017341 | 10/13/2008 | X | X | A–3 |
| 783 | 017365–017368 | 9/16/2008 | X | X | A–3 |
| 784 | 017369–017370 | 10/1/2008 | | X | A–3 |
| 785 | 017394–017402 | 9/15/2008 | X | X | A–3 |
| 786 | 017403–017404 | 9/15/2008 | X | | A–3 |
| 787 | 017408 | 9/16/2008 | X | | F |
| 788 | 017409–017546 | 9/15/2008 | | X | A–1 |
| 789 | 017551–017553 | 9/14/2008 | X | X | A–3 |
| 790 | 017554–017556 | 9/14/2008 | X | X | A–1 |